

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

JAMES SEABA and CORY PHILLIPS,

       Plaintiffs,

  v.

MESOSYSTEMS TECHNOLOGY, INC.,

       Defendant.

NO. CIV-02-0103 LH/WWD

## DEFENDANT'S MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

    Defendant MesoSystems Technology, Inc. ("MesoSystems"), pursuant to Fed. R. Civ. P. 56, hereby submits this memorandum in support of its Motion for Summary Judgment and states that there is no material fact in dispute and that MesoSystems is entitled to judgment as a matter of law against Plaintiffs on all counts.

### INTRODUCTION

    Plaintiffs entered into two written employment agreements which governed Plaintiffs' relationship with MesoSystems. Plaintiffs negotiated those agreements in the summer of 2001. During the Plaintiffs' three months of employment with MesoSystems, the parties contemplated creating a spin off company. The parties, mostly due to Plaintiffs' indecision, did not agree on the structure, financing, form or other aspects of an agreement to start the new venture. When the parties could not reach an agreement on the new venture, the employment relationship deteriorated and then ended. Simply put, Plaintiffs are trying to use their lawsuit and this Court's time to impose liability and recover damages from MesoSystems purely on the basis of attempts to put together a business deal was never agreed upon.

    Plaintiffs' claims, however, are barred as a matter of law because the relationship between the parties was governed by two written, fully integrated contracts. MesoSystems did not breach those contracts under the undisputed facts. This Court should reject Plaintiffs' attempts to modify the terms of the contracts with parole evidence. Even setting aside the parole evidence rule, the Complaint's fraud and



misrepresentation claims are defective as a matter of law because (a) the undisputed facts show no intent to deceive on MesoSystems' part, (b) even accepting Plaintiffs' claims as true, promises of future events or opinions are not material misrepresentations of fact, and (c) Plaintiffs did not reasonably rely on the alleged promises and opinions because they signed employment contracts with integration clauses and should reasonably have relied on the terms of those written agreements.

The remaining claims are equally infirm and must be rejected as a matter of law for the reasons discussed below.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.   On August 20, 2001, Seaba executed an Offer of Employment (the "Seaba Contract") with MesoSystems. See Seaba Contract attached as **Exhibit A**; First Amended Complaint for Damages, Injunctive and Declaratory Relief filed with the Court on September 4, 2002 ("Complaint") ¶¶22, 23 and 25.

2.   On August 27, 2001, Phillips executed an Offer of Employment (the "Phillips Contract") with MesoSystems. See Phillips Contract attached as **Exhibit B**; Complaint ¶27.

3.   Plaintiffs' offers of employment and the Confidential Information and Inventions Agreement also signed by the parties, set forth all the terms of Plaintiffs' employment with MesoSystems. Seaba Contract ¶13; Phillips Contract ¶11.

4.   The parties agreed that there was no other agreement between Plaintiffs and MesoSystems except those referenced in ¶¶1-3 herein above. Seaba Contract ¶13; Phillips Contract ¶11.

5.   At all times relevant to the Complaint, Seaba knew that MesoSystems' board of directors would have to ratify any agreement concerning the formation of a spin off company. Deposition of James Seaba, Ph.D. taken April 2-3, 2003 (the "Seaba Dep") 198:8–15 attached as **Exhibit C**.

6.   MesoSystems' Board of Directors never approved or ratified any agreement between the parties concerning the formation of a spin off company. Seaba Dep 197:14–199:9; Deposition of Cory Phillips, Ph.D. taken April 3, 2003 (the "Phillips Dep") 57:17- 59:4 attached as **Exhibit D**.

7.     Plaintiffs received all salary payments set forth in the offers of employment they executed with MesoSystems.  Seaba Dep 112:8-12; Phillips Dep 128:20-25; Affidavit of Samantha League ("League Aff") ¶2 attached as **Exhibit E**.

8.     Phillips received all moving expenses reimbursements set forth in the Phillips Contract. Phillips was reimbursed $9,443.04 for moving expenses.  League Aff ¶ 3.

9.     Seaba received all moving expenses reimbursements set forth in the Seaba Contract. Seaba was reimbursed $43,801.72 for moving expenses.  Seaba Dep 112:19–113:4; League Aff ¶4.

10.    Plaintiffs received all employment benefits afforded to other MesoSystems' employees during their tenure at MesoSystems.  League Aff ¶12.

11.    The parties continued to discuss the structure, financing and Plaintiffs' role in the to-be-formed company up until December 6, 2001.  Seaba Dep 109:21 111:18; Phillips Dep 57:17-22. Affidavit of Charles J. Call (the "Call Aff") ¶2 attached as **Exhibit F**.

12.    MesoSystems personnel did and do work at the Nanopore laboratory facilities and the building is clearly labeled "Nanopore" at the entrance and in other locations throughout the laboratory. Seaba knew that MesoSystems did not own the Nanopore laboratory and understood that MesoSystems could "use this space in Nanopore, like lease it or borrow it or something." Seaba Dep 87:9-23. Call Aff ¶3.

13.    MesoSystems did form a new company, MesoFuel, based on the "know how" of Call. Call Aff ¶4.

14.    MesoFuel is supported by laboratory facilities, marketing facilities, manufacturing facilities and equipment.  Call Aff ¶5.

15.    Call did not intend to deceive Plaintiffs as to the nature of laboratory facilities, marketing facilities, manufacturing facilities, equipment and MesoSystems' ability to support the to-be-formed company.  Call Aff ¶6.

16.    Call did not intend to deceive Plaintiffs as to the structure, timing and relationships of the parties in the to-be-formed company throughout the negotiations in the second half of 2001.  Call Aff ¶7.

17.     Call and other representatives of MesoSystems discussed several possible terms of Seaba's employment with MesoSystems prior to August 20, 2001. Call Aff ¶8.

18.     Call did not anticipate that the Plaintiffs would rely on alleged statements made by Call in meetings with the Plaintiffs prior to their employment with MesoSystems and in an effort to negotiate those terms, rather than on the terms of Plaintiffs' actual written employment agreements with MesoSystems. Call Aff ¶10.

19.     MesoSystems reimbursed Seaba $10,855.22 for expenses he incurred on behalf of MesoSystems during his employment. League Aff ¶5.

20.     Plaintiffs' employment relationship with MesoSystems ended prior to the expiration of one-year of employment. League Aff ¶¶6-7.

21.     Bob Sachs never made a funding commitment, verbal or otherwise, in any amount to Seaba or any other representative of Red Path Energy. Affidavit of Robert Sachs (the "Sachs Aff") ¶3 attached as **Exhibit G**.

22.     TSP never made a funding commitment to Red Path Energy or entered into a contract or an agreement to contract with Red Path Energy. Sachs Aff ¶¶4-5.

23.     On January 30, 2002, MesoSystems sent a revised COBRA notice reciting the 60-day election period to Plaintiffs by overnight mail. League Aff ¶9.

24.     Plaintiffs were still receiving MesoSystems employee benefits on January 30, 2002. League Aff ¶10.

25.     Neither Plaintiff chose to elect COBRA coverage. League Aff ¶11.

26.     While employed by MesoSystems, Seaba and Phillips established a separate New Mexico corporation named "Red Path Energy, Inc.." As stated in the articles of incorporation of Red Path Energy, Inc.. the stated purpose of the corporation was to engage in research and development of micro reaction technology. This was the same field of research and development being performed by Plaintiffs for MesoSystems at the time.

4

## LEGAL STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment should be granted only where no genuine issue of material fact exists, entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56; Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). The burden of establishing the absence of a material question of fact is on the moving party, which may discharge its duty by showing that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The non-moving party has the opportunity to show the existence of an issue of material fact; however, the Court must consider the standard of proof in the case and determine whether, considering all facts in favor of the non-moving party, that party's showing would allow a reasonable trier of fact to find for the non-moving party on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Luckett v. Bethlehem Steel Corp., 618 F. 2d 1373, 1377 (10th Cir. 1980).

## ARGUMENT

**I.     MesoSystems is entitled to summary judgment on Count I   (Fraud) and Count II (Intentional Misrepresentations) because Plaintiffs present no evidence of any   of the required elements, and the alleged misrepresentations are parole evidence of a subsequently signed employment agreement.**

Plaintiffs' claims for fraud and intentional misrepresentations are addressed concurrently as the fraud claim is supported entirely by the alleged intentional misrepresentations. See Complaint ¶¶ 15-56. Actionable fraud consists of misrepresentation of a fact, **known to be untrue by the maker**, and made with an **intent to deceive** and to induce the other party to act in reliance thereon to his detriment. Cargill v. Sherrod, 96 N.M. 431, 432-33, 631 P.2d 726, 727-28 (1981) (citations omitted). In order to prove a fraudulent misrepresentation Plaintiffs must show:

1.      a misrepresentation of fact -- the statement must be literally untrue rather than simply misleading;

2.      that the misrepresentation must be known by the maker to be untrue at the time the misrepresentation is made;

3.      that the maker must have the intent to deceive and to induce the other party to rely or act upon the misrepresentation; and

4.      that the other party must reasonably rely on the misrepresentation to his detriment.

5

Eckhardt v. Charter Hospital of Albuquerque, Inc., 124 N.M. 549, 953 P.2d 722 (1997).

Plaintiffs must plead their claims for fraud and intentional misrepresentation with particularity. N.M. R. Civ. P. Dist. Ct. 1-9(b).) Rule 1-009(B) states that "[i]n all averments of fraud... the circumstances constituting fraud... shall be stated with particularity." Bronstein v. Biava, 114 N.M. 351, 353, 838 P.2d 968, 970 (1992). Plaintiffs contend that the following statements made by Call constitute fraud and intentional misrepresentations:

1.  MesoSystems had laboratory facilities, marketing facilities, manufacturing facilities and equipment to support the to-be-formed company;

2.  Seaba would be CEO of the to-be-formed company;

3.  Phillips and Seaba would be owners of the to-be-formed company;

4.  Seaba would be on the Board of Directors of MesoSystems;

5.  MesoSystems would be a passive investor in the to-be-formed company; and

6.  MesoSystems would create the to-be-formed company as soon as Seaba and Phillips arrived in Albuquerque, so they could immediately begin working for that to-be-formed company. See Complaint ¶46, ¶52.

**A.    Plaintiffs have not alleged a misstatement of material existing fact.**

The alleged fraudulent statements and intentional representations listed above, contain assurances or promises of future actions. These statements contain Call's opinion as to the structure of a potential spin off company to be formed using MesoSystems' technology and which MesoSystems was contemplating to include Seaba and Phillips. The items listed above contemplate the formation of a company that all parties knew had not yet been formed but that all hoped would be formed sometime in the future. In fact, the parties continued to discuss the structure, financing, technological basis and business of the to-be-formed company up until the Plaintiffs' employment with MesoSystems ended on December 6, 2001. See Fact ¶11.

"Fraud cannot be predicated upon the expression of an opinion." See Agnew v. Landers, 59 N.M. 54, 66, 278 P.2d 970, 977 (1954). "A misrepresentation, like a mistake, must be one of fact, in the sense that [predictions] about the future or promises about the future will not be deemed actionable."

6

New Mexico v. Garley, 111 N.M. 383, 389, 806 P.2d 32, 38 (1991). "An assurance (i.e., a promise) cannot be converted into a ground for avoiding or reforming a contract simply by recasting it as a 'misrepresentation' when it turns out that the promisor either does not or cannot keep the promise.'" Id. Logic dictates that alleged misrepresentations, like the ones Plaintiffs plead in their Complaint, cannot have been "untrue at the time they were made" as each representation addressed a future event and/or a yet to be formed company.

The Seaba and Phillips Contracts detail the concrete terms of employment agreed upon by the parties. In ¶11 of the Phillips Contract and ¶13 of the Seaba Contract, the Plaintiffs acknowledged that, "This letter and the enclosed Confidential Information and Inventions Agreement set forth all of the terms of your employment with the Company. There is no other agreement between you and the Company." See Fact ¶4. The Plaintiffs thus entered into fully integrated, written employment contracts with MesoSystems and acknowledged terms of that employment. Contrary to Plaintiffs assertion in ¶ 6 above, their integrated agreements did not contemplate that they would "immediately begin working for that to-be-formed company" upon arrival in Albuquerque. The Seaba Contract also contradicts Plaintiffs' assertion in ¶ 4 listed above that Seaba would be on the Board of Directors of MesoSystems.

Even if Call made the asserted representations, which is specifically denied, these representations are promissory in nature and are superseded by subsequently signed contracts setting forth the relationship between the parties. "The courts cannot change or modify the language of a contract, otherwise legal, for the benefit of one party and to the detriment of another." Yankee Atomic Elec. Co. v. New Mexico and Ariz., 632 F.2d 855 (10th Cir. 1980). In Smith v. Price's Creameries, 98 N.M. 541, 541, 650 P.2d 825, 828 (1982), the New Mexico Supreme Court determined that, "in the face of the clear wording of the rights of the parties under the termination clause, the oral statement of Price's made prior to execution of the agreement cannot be deemed to constitute fraud or misrepresentation." Further, "[E]ach party to a contract has a duty to read and familiarize himself with its contents before he signs and delivers it, and if the contract is plain and unequivocal in its terms, each is ordinarily bound thereby." Id. (citations omitted).

7

**B.     Plaintiffs allege no facts and have no evidence of intent to deceive.**

In order for the Plaintiffs to prove fraud in this case, Call must have had the intent to deceive Plaintiffs and to induce them to rely or act upon the alleged misrepresentations. Eckhardt v. Charter Hospital of Albuquerque, Inc., 124 N.M. 549, 953 P.2d 722. Plaintiffs have alleged no specific facts and have tendered no proof to support the necessary elements that: (1) Call intended to deceive them, or (2) that Call did not believe his alleged assurances and promissory representations would eventually occur at the time the alleged misrepresentations were made.

MesoSystems had several laboratory facilities of its own. Plaintiffs visited the Albuquerque laboratory before entering into an employment contract with MesoSystems. MesoSystems personnel did and do work at the Nanopore laboratory facilities and the building is clearly labeled "Nanopore". Seaba knew that MesoSystems did not own the Nanopore laboratory and understood that MesoSystems could "use this space in Nanopore, like lease it or borrow it or something." Seaba Dep 87:9-23. See Fact ¶12. MesoSystems did form a new company, MesoFuel. See Fact ¶13. MesoFuel has laboratory facilities, marketing facilities, manufacturing facilities and equipment. See Fact ¶14. Therefore, Call's alleged misrepresentations in ¶1 above were true. Even if they were not true, Call believed them to be true. Call did not have the requisite intent to deceive Plaintiffs. See Fact ¶15.

MesoSystems formed a spin off company MesoFuel, based on Call's "know how". See Fact ¶13. One of the potential scenarios being negotiated was that Seaba would be MesoFuel's CEO and that Phillips and Seaba would be part owners of this company. MesoSystems began diligently working toward the formation of MesoFuel as soon as Seaba and Phillips arrived in Albuquerque.

Plaintiffs also allege that Seaba was told he was going to be on the Board of Directors of MesoSystems among the alleged misrepresentations in ¶4 above. However, a position on the Board of Directors of MesoSystems was not a term of Seaba's employment under the Seaba Contract. Call and other representatives of MesoSystems discussed several possible terms of Seaba's employment with the company prior to executing the Seaba Contract. See Fact ¶17. Call did not anticipate that the Plaintiffs would rely on alleged statements made by Call in meetings with the Plaintiffs prior to their employment

with MesoSystems and in a effort to negotiate those terms, rather than on the terms of Plaintiffs' written employment agreements with MesoSystems. See Fact ⁴ 18. Plaintiffs lack any evidence in the record that Call intended to deceive Plaintiffs.

   C.    **Plaintiffs have alleged no facts supporting reasonable reliance.**

   Plaintiffs must reasonably rely on a misrepresentation to their detriment. Eckhardt, 124 N.M. 549, 953 P.2d 722. Plaintiffs claim that they would not have moved to Albuquerque to accept the positions with MesoSystems if the representations listed above had not been made to them. Complaint, ¶48. Plaintiffs fail to mention that they moved to Albuquerque and that MesoSystems reimbursed their moving and related expenses as the parties agreed in the Seaba Contract ¶3 and the Phillips Contract ¶4. See Fact ¶¶8-9. Plaintiffs had signed employment agreements prior to moving to Albuquerque. See Fact ¶¶1-2. Plaintiffs cannot now argue that they should have the benefit of the provisions in the contracts they signed (e.g. reimbursement for moving expenses), but that they were in fact relying on pre-contract negotiation statements made by Call when they made the decision to relocate to Albuquerque. It would be unreasonable for Plaintiffs to rely on pre-contract negotiations and opinions regarding future events rather than on an employment agreement that was the result of discussion and compromise.

**II.    Defendants are entitled to summary judgment on Count III (Negligent Misrepresentation) because Plaintiffs' contracts contain effective integration clauses.**

   Plaintiffs' claim Defendant made negligent misrepresentations and rely on the same six alleged misrepresentations listed above. See Complaint ¶58. In order to prove a negligent misrepresentation claim Plaintiffs must show:

   1.    A misrepresentation of fact;

   2.    Failure to exercise ordinary care in obtaining or communicating the statement;

   3.    Intent that Plaintiffs receive and be influenced by the statement; and

   4.    It is reasonably foreseeable that Plaintiffs will be harmed if the information conveyed was incorrect or misleading.

Eckhardt, 124 N.M. 549, 953 P.2d 722.

As fully discussed above, Plaintiffs have not alleged an actionable misrepresentation. All of the representations that Plaintiffs contend are the basis for the negligence claim are opinions, assurances, promissory in nature, or are true. The alleged misrepresentations were communicated to Plaintiffs throughout negotiations regarding the nature and terms of Plaintiffs' proposed employment with MesoSystems and before Plaintiffs entered into written employment agreements with MesoSystems. It is not reasonably foreseeable that Plaintiffs would be harmed or even that Plaintiffs would rely on promissory statements or assurances, as they each have a clearly defined written contract.

Moreover, because the Plaintiffs executed a subsequent contract with an integration clause, the action for negligent misrepresentation may not be maintained. In New Mexico, in a sale of goods context, a commercial purchaser may not "maintain an action in tort against the seller for pre-contract negligent misrepresentations regarding the system's capacity to perform specific functions, where the subsequently executed written sales contract contains an effective integration clause...." Rio Grande Jewelers Supply, Inc. v. Data General Corp., 101 N.M. 798, 689 P.2d 1269 (1984). The parole evidence rule precludes the admission of any evidence of representations made prior to the formation of the written contract. Id. (citations omitted). Admission of prior representations is "contrary to the favored policy of 'freedom of contract' discussed in Lynch v. Santa Fe National Bank, 97 N.M. 554, 627 P.2d 1247 (Ct. App.), cert. denied (1981). Rio Grande Jewelers, 101 N.M. 798, 689 P.2d 1269.

Under the circumstances of this case, Plaintiffs' claim for negligent misrepresentation "can be nothing more than an attempt to...allow the contract to be rewritten under the guise of an alleged action in tort." Id. "[W]here the parties are otherwise competent and free to make a choice as to the provisions of their contract, it is fundamental that [the] terms of the contract made by the parties must govern their rights and duties." Id. (citations omitted). Even assuming that a representation contrary to the terms of the later executed contract was made to Plaintiffs, "in the face of the clear wording of the rights of the parties under the termination clause, the oral statement of [Defendant]'s made prior to execution of the agreement cannot be deemed to constitute fraud or misrepresentation. Id. (citations omitted). MesoSystems is entitled to judgment as a matter of law on Count III for negligent misrepresentations.

**III.    Defendants are entitled to summary judgment on Count IV (Detrimental Reliance/Promissory Estoppel) because Plaintiffs subsequently executed contract that contain an effective integration clauses.**

Plaintiffs must plead their claim for promissory estoppel with particularity. Continental Potash, Inc. v. Freeport-McMoran, Inc., 115 N.M. 690, 698, 858 P.2d 66, 74 (1993). Plaintiffs assert that they "relied to their detriment on the representations of MesoSystems." See Complaint ¶64. Plaintiffs do not refer to a single representation or statement that supports Plaintiff's claim for promissory estoppel, but leave Defendants to examine the prior 63 paragraphs of the Complaint in order to determine the Plaintiffs' claim. Thus, at the threshold, their promissory estoppel claim must be rejected for Plaintiffs' failure to plead it with particularity. See Id.

In any event, in order to prove promissory estoppel Plaintiffs must show:

1.    An actual promise which in fact induced the promisee's action or forebearance;

2.    The promisee's reliance on the promise must have been reasonable;

3.    The promisee's action or forbearance must have amounted to a substantial change in position;

4.    The promisee's action or forebearance was actually foreseen or reasonably foreseeable to the promisor when making the promise; and

5.    Enforcement of the promise is required to prevent injustice.

Strata Production Company v. Mercury Exploration Company, 121 N.M. 622, 916 P.2d 822 (1996) (citations omitted).

The only actual promises made to Plaintiffs were contained in the employment contracts. Plaintiffs' reliance on pre-contract statements is not reasonable. As mentioned above, Plaintiffs had signed employment agreements prior to moving to Albuquerque. See Fact ¶¶1-2. Plaintiffs cannot now argue that they should have the benefit of the provisions in the contracts they signed, but that they were in fact relying on pre-contract negotiation statements made by Call and not on the written contract when they made the decision to relocate to Albuquerque. It was unreasonable for Plaintiffs to rely on pre-contract negotiations rather than on an employment agreement that was the result of discussion and compromise.

11

The New Mexico Supreme Court has decided that reliance on oral representations contrary to an express term of an employment contract is not reasonable:

> Promissory estoppel requires the party invoking the doctrine to have acted reasonably in justifiable reliance on the promise that was made. See Eavenson v. Lewis Means, Inc., 105 N.M. 161, 730 P.2d 464 (1986). We hold as a matter of law that it was unreasonable for Chavez to change his position in reliance on oral representations contrary to an express term of an employment contract which provided that their agreement could only be modified in writing. Were we to reach a different conclusion, we believe in effect we would be rewriting the terms of the parties' contract, and this we decline to do.

Chavez v. Manville Prods. Corp., 108 N.M. 643, 646,  777 P.2d 371, 374 (1989).

In Planning & Design Solutions v. City of Santa Fe, 118 N.M. 707, 885 P.2d 628 (1994), the New Mexico Supreme Court refused to use a promissory estoppel theory when reliance on an implied contract theory was also available and the contract theory was a more simple and straightforward claim.  Here the Plaintiffs have several other theories of recovery, including a contract claim. MesoSystems is entitled to judgment as a matter of law on Count IV for promissory estoppel.

### IV.    Defendants are entitled to partial summary judgment on Count V  (Breach of Contract with Seaba) because Defendant fully performed its contract obligations

Plaintiffs claim that "Seaba accepted MesoSystems' offer of employment, to include salary, bonus, stock options, severance pay in the event of termination, relocation expenses, reimbursement for expenses incurred on behalf of MesoSystems, payment for corporate country club membership, a position on MesoSystems' Board of Directors, a position as President and CEO of the new to-be-formed company, an ownership interest in the new to-be-formed company, and other benefits."  See Complaint ¶68. Plaintiffs go on to allege that "MesoSystems has refused to provide Seaba with the benefits contemplated by the parties and promised under the Employment Agreement." See Complaint ¶70.  Plaintiffs do not indicate how MesoSystems breached the contract or what benefits Seaba did not receive that were promised under the Employment Contract.

However, Plaintiffs' claim for breach of contract with Seaba must fail as to the following claims, as these terms were not included in the Seaba Contract:

1.    reimbursement for expenses incurred on behalf of MesoSystems;

2.      payment for corporate country club membership;

3.      a position on MesoSystems' Board of Directors;

4.      a position as President and CEO of the new to-be-formed company; and

5.      an ownership interest in the new to-be-formed company.

See Seaba Contract attached as **Exhibit A**. Even though reimbursement for expenses incurred on behalf of MesoSystems was not a term of Seaba's written employment contract, he was reimbursed $10,855.22 by MesoSystems for expenses he incurred on behalf of MesoSystems during his employment. See Fact ¶19; League Aff ¶5.

Seaba was entitled to compensation under the Seaba Contract. See Seaba Contract ¶2. Plaintiffs received all salary payments set forth in the offers of employment they executed with MesoSystems. See Fact ¶7.

Seaba's Contract included two different bonus provisions. The first bonus provision was for incentive stock options. See Seaba Contract *5. The contract states, "The option will not be exercisable as to any shares until the expiration of one-year after the beginning of employment." It is undisputed that Seaba was not employed with MesoSystems for the requisite one-year period. Seaba is not entitled to the bonus stock options. See Seaba Contract ¶5(d) and Fact ¶20. The second bonus provision was a cash signing bonus. According to the contract, "MesoSystems could, at its sole discretion, defer payment of that bonus until is received not less than $100,000 in investments." See Seaba Contract ¶6. The prerequisite for bonus payment has not been met. Even Seaba acknowledged that fact. Seaba Dep 114:6-14.

Seaba was entitled to stock options under the Seaba Contract. See Seaba Contract ¶¶4-5. The contract states, "The option will not be exercisable as to any shares until the expiration of one-year after the beginning of employment." Seaba was not employed with MesoSystems for the requisite one-year period. Seaba was not entitled to any stock options. See Seaba Contract ¶4(d), ¶5(d) and Fact ¶20. James Seaba understood this. Seaba Dep 113:5-14.

Seaba could receive severance payments under certain circumstances. See Seaba Contract ¶11. However, Seaba was not entitled to severance payments if he was terminated for "materially aiding a competitor of MesoSystems." Id. ¶¶ 10-11. It is undisputed that while employed by MesoSystems, Seaba (along with Phillips) established "Red Path Energy, Inc.", with the express purpose was to engage in research and development of microreaction technology. That was the very field that Seaba was working in at the time for MesoSystems. See Fact ¶26. Thus, under the undisputed facts, there is no basis for a severance payment to Seaba.

Seaba's Contract contemplated reimbursement to Seaba for actual relocation expenses up to $50,000. Seaba Contract ¶3. MesoSystems paid Seaba's relocation expenses in the amount of $43,801.72. See Fact ¶9. Seaba admits that his relocations expenses were paid with the exception of an approximately $2,300 payment as he "was not reimbursed for my rent on the house while I still had house payments in Ohio." See Seaba Dep 112:13 113:4. In any event, MesoSystems is entitled to reimbursement for the relocation expenses paid. "[I]f MesoSystems terminates your employment for 'just cause', you agree to reimburse MesoSystems for actual expenses associated with relocation." Seaba Contract ¶3. The definition of "just cause" includes materially aiding a competitor.

Plaintiffs' claim that Seaba was entitled to "other benefits." MesoSystems agrees that there were other terms in the Seaba Contract. MesoSystems complied with the remaining terms of the Seaba Contract. Plaintiffs have presented no evidence, and there is no other factual dispute of any additional MesoSystems alleged breaches. MesoSystems did not breach any terms of the Seaba Contract.

## V. Defendants are entitled to summary judgment on Count VI (Breach of Contract with Cory Phillips) because Defendant fully performed its obligations under the contract.

Plaintiffs claim that "Phillips accepted MesoSystems' offer of employment, to include salary, stock options, severance pay in the event of termination, relocation expenses, reimbursement for expenses incurred on behalf of MesoSystems, an ownership interest in the new to-be-formed company, and other benefits." See Complaint ¶74. Plaintiffs go on to allege that "MesoSystems has refused to provide Phillips with the benefits contemplated by the parties and promised under the Employment Agreement."

14

See Complaint ¶76. Plaintiffs do not indicate how MesoSystems breached the contract or what benefits Phillips did not receive that were promised under the Employment Agreement.

However, Plaintiffs' claim for breach of contract with Phillips must fail as to the following claims, as these terms were not included in the offer of employment as alleged by Plaintiffs:

1. severance pay in the event of termination;

2. reimbursement for expenses incurred on behalf of MesoSystems; and

3. an ownership interest in the new to-be-formed company.

See Phillips Contract attached as **Exhibit B**.

Phillips was entitled to compensation under the Phillips Contract. Phillips Contract ¶3. Plaintiffs received all salary payments set forth in the offers of employment they executed with MesoSystems. See Fact ¶7.

Phillips was entitled to stock options under the Phillips Contract. Phillips Contract ¶5. The contract states, "The option will not be exercisable as to any shares until the expiration of one-year after the beginning of employment." Phillips was not employed with MesoSystems for the requisite one-year period. Phillips was not entitled to any stock options. See Phillips Contract ¶5(d) and Fact ¶20.

MesoSystems' agreement with Phillips contemplated payment of relocation expenses to Phillips of up to $20,000. Phillips Contract ¶4. MesoSystems paid Phillips relocation expenses in full in the amount of $9,443.04. See Fact ¶8 and League Aff ¶3.

As to Plaintiffs claim that Phillips was entitled to "other benefits," there were other terms in the Phillips Contract. MesoSystems complied with the remaining terms of the Phillips Contract. Plaintiffs have presented no evidence of any additional MesoSystems alleged breaches. There are no factual disputes regarding a breach of the Phillips Contract, and MesoSystems is entitled to judgment as a matter of law on Count VI for breach of contract with Phillips.

**VI.     Defendants are entitled to summary judgment on Count VII (Breach of Covenant of Good Faith and Fair Dealing) because New Mexico courts do this cause of action in at-will employment contracts.**

Plaintiffs contend that "MesoSystems breached its duty of good faith and fair dealing." See Complaint ¶81. Plaintiffs do not indicate how MesoSystems breached the covenant or how MesoSystems used the contracts to the detriment of Plaintiffs. "Every contract in New Mexico imposes the duty of good faith and fair dealing upon the parties in the performance and enforcement of the contract." Paiz v. State Farm Fire and Casualty Co., 118 N.M. 203, 212, 880 P.2d 300, 309 (1994). However, New Mexico does "not recognize a cause of action for breach of an implied covenant of good faith and fair dealing in an at-will employment relationship." Silva v. Am. Fed. of State, County and Municipal Employees, 131 N.M. 364, 366, 37 P.3d 81, 83 (2001) (citations omitted).

The Seaba Contract states, "Your employment with the Company is 'at will' and may be terminated at any time upon fourteen (14) days' notice by you or the Company." Seaba Contract, ¶10. The exact same "at will" term appears in the Phillips Contract, ¶9. Plaintiffs' and MesoSystems' "at-will" employment relationship, prevents Plaintiffs from asserting a cause of action based on the implied covenant of good faith and fair dealing. MesoSystems should be granted summary judgment as a matter of law.

**VII.    Defendants are entitled to summary judgment on Count VIII – Wrongful Discharge. Their actions or refusals to act did not further public policy, there is no causal connection between Plaintiffs' actions and their subsequent discharge, and they do only allege a private interest.**

New Mexico first recognized the tort of retaliatory discharge in Vigil v. Arzola, 102 N.M. 682, 686-90, 699 P.2d 613, 617-21 (Ct. App. 1983), rev'd in part on other grounds, 101 N.M. 687, 687 P.2d 1038 (1984), overruled in part on other grounds, Chavez v. Manville Prods. Corp., 108 N.M. 643, 649 777 P.2d 371, 374 (1989). In Vigil, the New Mexico Court of Appeals explained that:

> for employees to recover under a retaliatory-discharge claim, they must demonstrate that they were discharged because they performed acts that public policy has authorized or would encourage, or because they refused to do something required by an employer that public policy would condemn. The employees must show a causal connection between their actions and their subsequent discharge. In addition, in cases involving discharge for

reporting illegal activity, or "whistleblowing," employees must show that their actions furthered a public interest rather than a private one.

Garrity v. Overland Sheepskin Co. of Taos, 121 N.M. 710, 917 P.2d 1382 (1996) (citations omitted).

In the instant case, Plaintiffs' claim that, "MesoSystems terminated the employment of Seaba and Phillips in retaliation for (1) their disagreement with MesoSystems' instructions to record time not worked on contracts; and/or (2) in fear that Seaba and Phillips would report these illegal activities to the United States Department of Defense." Complaint ¶87. This claim is related to Plaintiffs' allegations in ¶¶29 (c) - (d) of their Complaint.

However, Phillips testified that the job with MesoSystems was his "first time charging codes to projects" and that he did not "understand the accounting behind charge codes and things of that nature on government contracting projects at the time." Phillips Dep 72:8-15. Phillips went on to state, "I could not decide if anything is wrong or not with respect to the DOD." Phillips Dep 73:2-16. When Phillips was asked what percentage of the time and equipment he charged to DOD projects was related to the project actually being charged he stated, "The majority of work that was listed there for me was associated with the title of that project...." Phillips Dep 74:22 – 76:6.

Additionally, Seaba stated in his sworn deposition testimony that he never ordered any equipment that was charged to a DOD project. Seaba Dep 172:2-18. Seaba went on to indicate that the statement regarding his work having little relation to the DOD projects to which he charged his time was inaccurate. Seaba Dep 173:8-17. Seaba also admitted that he knew before coming to MesoSystems that he would be working on DOD contracts. Seaba Dep 175:3-6. Therefore, Plaintiffs' allegation of wrongful recording of time to government interests is false.

Also, Plaintiffs are seeking protection as "whistleblowers" when neither Plaintiff ever "blew the whistle" by reporting anything to any outside entity. While both Plaintiffs believe they may have mentioned concerns with the DOD billing process to other employees of MesoSystems, neither reported his concerns to the DOD or to anyone outside MesoSystems. Seaba Dep 176:15 – 177:8. In order for Plaintiffs to recover on the wrongful discharge claim, they must prove that they "were discharged because

they performed acts that public policy has authorized or would encourage, or because they refused to do something required by an employer that public policy would condemn." Garrity v. Overland Sheepskin Co. of Taos, 121 N.M. 710, 917 P.2d 1382 (1996) (citations omitted). Neither Plaintiff contends that he refused to illegally charge time and equipment to inappropriate DOD projects. During deposition testimony, neither Plaintiff will even commit as to whether DOD projects were, in fact, illegally charged. In addition, neither Plaintiff "blew the whistle" as no activities of any alleged DOD billing irregularities were reported to anyone outside MesoSystems.

Several courts recognize the public value of reporting illegal activities. Palmateer v. International Harvester Co., 21 N.E.2d 876 (Ill. 1981) (holding that firing of employee who had **reported** suspected illegal activity of coworker violated a mandate of public policy); Joiner v. Benton Community Bank, 411 N.E.2d 229, 231 (Ill. 1980) (holding that **reporting** violations of state food-labeling laws was important public-policy concern); Harless v. First Nat'l Bank, 246 S.E.2d 270, 275-76 (W. Va. 1978 (holding that firing employee for **reporting** violation for consumer credit protection laws implicated public-policy concerns). No cases recognize Plaintiffs' acknowledging illegal activities, participating in them, and then doing nothing, including not reporting the suspected illegal activities, as having any public value.

Finally, Plaintiffs have presented no evidence of a causal connection between their actions and their subsequent discharge or that their nonexistent "whistleblowing" furthered a public interest rather than a private one. MesoSystems is entitled to judgment as a matter of law on Plaintiffs' wrongful discharge claim.

**VIII.   Defendants are entitled to summary judgment on Count IX (Prima Facie Tort) because its application in this case is an improper means of evading proof of essential and appropriate elements of other claims.**

Plaintiffs claim MesoSystems unjustifiably intended to injure them. Complaint ¶92. No specific lawful conduct is set forth, but the claim for prima facie tort apparently relies on the allegations made in the Complaint ¶1-91 and MesoSystems is once again left to determine which of the 91 allegations Plaintiffs are relying on to establish a prima facie tort claim.

New Mexico first recognized a cause of action for prima facie tort in Schmitz v. Smentowski, 109 N.M. 386, 785 P.2d 726 (1990). The elements of this tort are:

1.      an intentional, lawful act by defendant;

2.      an intent to injure the plaintiff;

3.      injury to the plaintiff; and

4.      insufficient justification for the defendant's acts.

Id. at 394, 785 P.2d at 734. Prima facie tort is intended to provide a remedy for persons harmed by acts that are intentional and malicious, but otherwise lawful, which "fall outside of the rigid traditional intentional tort categories." Id. Prima facie tort should not be used to evade stringent requirements of other established doctrines of law." Id. at 398, 785 P.2d at 738; see Andrews v. Stallings, 119 N.M. 478, 493-94, 892 P.2d 611, 626-27 (Ct. App. 1995).

The only function of the claim of prima facie tort in the Complaint is to escape possible restrictions imposed on the other alleged torts. In New Mexico, "To the extent that [Plaintiff's] claim of prima facie tort does not duplicate the other torts alleged in the complaint, it would simply be a means of evading the requirements of the doctrines underlying those potential torts. This is improper." Stock v. Grantham, 125 N.M. 564, 964 P.2d 125 (Ct. App. 1998).

In the instant case, the Plaintiffs' prima facie tort claim is based on the "conduct described above" including intentional torts, breach of contract claims and other causes of action. Therefore, Plaintiffs' prima facie tort claim is duplicative of their other claims. Further, as the New Mexico Court of Appeals held in Stock, "But to the extent that it is not [duplicative of other claims], we hold that application of that doctrine in this case would be an improper means of evading proof of essential, and appropriate elements of those other claims." Id. at 576, 964 P.2d at 137. Plaintiffs are asking the Court to allow recovery under prima facie tort if their other claims are unsuccessful. That is not an appropriate use of prima facie tort. MesoSystems is entitled to judgment as a matter of law on Plaintiffs' claim of prima facie tort.

**IX.     Defendants are entitled to summary judgment on Count X (Interference with Prospective Contractual Relations) because Plaintiffs cannot prove the necessary elements**

The New Mexico Court of Appeals recognized a cause of action for interference with a prospective contractual relation in M & M Rental Tools, Inc. v. Milchem, Inc., 94 N.M. 449, 612 P.2d 241 (Ct. App. 1980). The Plaintiffs must prove that MesoSystems "intentionally and improperly" interfered with Plaintiffs' prospective contractual relation. Id. Anderson v. Dairyland Ins. Co., 97 N.M. 155, 637 P.2d 837 (1981) (citations omitted). (Improper motive or improper means required).

Plaintiffs must prove that the alleged interference was improper. Id. "[C]ourts are not as willing to protect interests in prospective contractual relations as they are to protect interests in existing contracts. Where the defendant is accused of interfering with the plaintiff's opportunity to enter into contracts with third persons, a strong showing must be made that the defendant acted not from a profit motive but from some other motive, such as personal vengeance or spite." Id. at 158, 637 P.2d at 840.

Here Plaintiffs allege that they "entered into a prospective contractual relationship with an outside investor to provide funding for Red Path Energy, Inc." Complaint ¶96  Plaintiffs also allege that, "Seaba and Phillips continued to pursue funding for Red Path Energy with an outside investor.  Call and Godshall, acting on behalf of MesoSystems, contacted that outside investor and pressured it to withdraw funding for Red Path Energy by making promises and threats.  The outside investor then informed Seaba and Phillips that it would not invest in Red Path Energy." Complaint ¶44.  Plaintiffs do not indicate anywhere in the Complaint who the "outside investor" is, the nature of the prospective contractual relationship between Plaintiffs and the "outside investor," in what way Call and Godshall were acting "on behalf of MesoSystems," the nature of the alleged threats or promises, or the alleged motive or means by which Call and/or Godshall interfered in that relationship.

In his deposition testimony,  Seaba indicated that the "outside investor" referred to in the Complaint is TSP.  Seaba Dep 216:15-19.  Plaintiffs also, "must prove that there was an actual prospective contractual relation which, but for the [defendant's] interference, would have been

consummated." Anderson, at 159, 637 P.2d at 841. Seaba alleges that TSP committed $400,000 to Red Path. Seaba Dep 216-217.

In fact, it is indisputable that Bob Sachs, CEO at TSP, never made a verbal, or any funding commitment in the amount of approximately $400,000 to Seaba or any other representative of Red Path Energy. See Fact ¶21. TSP never entered into a contract or an agreement to contract with Red Path Energy. See Fact ¶22. Therefore, there was no prospective contractual relationship with which MesoSystems could have interfered.

Further, Plaintiffs do not know the "means" by which MesoSystems created the alleged interference and are not aware of any "promises or threats" made by MesoSystems to TSP or any employees or agents of TSP as alleged in the Complaint ¶44. See Seaba Dep 222:1- 224:8.

Even if Call and Godshall encouraged TSP to work with MesoSystems and its proposed spin-off company and not to work with Red Path Energy or the Plaintiffs, Call and Godshall had a clear profit motive to have such conversations. The Plaintiffs' proposed company and MesoSystems' proposed company were in direct competition for funding. Even if Call and Godshall informed TSP about the NDA as Plaintiffs allege, there is nothing wrongful, improper or malicious in providing that information. See Anderson v. Dairyland Ins. Co., 97 N.M. 155, 637 P.2d 837 (1981)(citations omitted). Plaintiffs have not and cannot make a "strong showing" other motives and in fact cannot even demonstrate a prospective contractual relationship required to support the cause of action. MesoSystems is entitled to summary judgment on Count X of Plaintiffs' Complaint.

## X.    Defendants are entitled to summary judgment on Count XI (Refusal to Provide COBRA Notice) and Count XII (Discrimination in Provision of COBRA Benefits).

Seaba and Phillips plead two claims against MesoSystems for violation of COBRA, alleging a refusal to provide COBRA notice upon the termination of employment (Count XI) and discrimination in the provision of COBRA benefits (Count XII). Both counts are based on the same factual allegations. See Complaint ¶¶102-116. Under the undisputed facts, Seaba and Phillips COBRA claims defy common sense and are not supported in law.

Under COBRA, employees must receive notice of their right to continue health insurance on a self-paid basis after their employment terminates. Smith v. Rogers Galvanizing Co., 128 F.3d 1380, 1383 (10th Cir. 1997). COBRA provides that the employer must notify the plan administrator of an employee termination within 30 days. 29 U.S.C. § 1166(a)(2). The plan administrator in turn must notify the employee of his or her COBRA rights within 14 days of receiving notice from the employer. 29 U.S.C. § 1166(a)(2), (c). Plaintiffs allege that MesoSystems failed to provide notice of their COBRA rights and thus, at least impliedly allege that MesoSystems was the plan administrator here. Where, as here, the employer is also the plan administrator, the U.S. Department of Labor has opined, and courts have adopted the position, that COBRA "gives an employer/plan administrator forty-four days to notify a qualified beneficiary." See Roberts v. National Health Corp., 963 F. Supp. 512, 515 (D.S.C. 1997), aff'd w/o op., 133 F.3d 916 (4th Cir. 1998).

Here, plaintiffs allege that they were discharged (and that they did not resign) and that they were given notice of termination of their employment on December 6, 2001. It is undisputed that Plaintiffs were entitled to two weeks' notice of termination, and that they were kept on the MesoSystems payroll and paid their regular salary through December 20, 2001, when employment terminated. Plaintiffs admittedly received notice of their COBRA rights no later than January 25, 2002. See Complaint ¶ 110.

Seaba and Phillips argue that the January 25 notice was defective because it did not state that they had 60 days to decide whether to elect COBRA coverage, as required under the statute (See Complaint ¶111). On January 30, just five days later, MesoSystems sent out--by overnight mail--a revised notice reciting the 60-day election period. See Fact ¶23. Thus, at most, the full and complete notice of COBRA rights came only 40 days after termination of employment. This is within the allowable limits of COBRA.

Finally, even assuming arguendo that the 44-day period for COBRA notice began on December 6, 2001, when notice of termination was allegedly given, the January 30 COBRA notice was only 11 days late and Seaba and Phillips can show no harm whatsoever from the timing of the COBRA notice. See Roberts, 963 F. Supp. at 515 ("delay of a few days" in COBRA notice "would not . . . warrant statutory

damages or equitable relief"). Indeed, Seaba and Phillips were still on company-provided benefits when they received the notice. See Fact ¶24. The January 30 notice gave them the full 60 days required by statute to consider whether to elect self-paid benefits continuation or not. And, in the end, *neither Seaba nor Phillips chose to elect COBRA coverage*. See Fact ¶25. Seaba and Phillips have presented no evidence that there was any gap in health insurance coverage between their MesoSystems-provided coverage and coverage from subsequent employers or any medical expenses that were not covered by insurance, but even if there were a gap in coverage or uncovered medical expenses, it was entirely due to Seaba and Phillips' choice to not elect COBRA coverage. See Chesnut v. Montgomery, 307 F.3d 698, 703 (8th Cir. 2002) (affirming dismissal of COBRA failure-to-notify claim where the plaintiff "incurred no medical expenses during the continuation coverage period, and . . . did not identify any other harm resulting from" the failure to give notice).

In short, Plaintiffs received full and complete notice of their COBRA rights while still on company-provided benefits, within allowable time limits, and never elected COBRA coverage in any event. Counts XI and XII should be dismissed forthwith.

## XI.   Plaintiffs' Count XIII (Rescission) Must Be Dismissed as a Matter of Law

The final count of Plaintiffs' Amended Complaint, Count XIII, makes little sense in the wake of the amendments Plaintiffs made to their original Complaint, and should be dismissed. As pleaded in the original Complaint, Plaintiffs sought rescission of the Confidential Information, Inventions, and Noncompetition Agreement between the parties. In order to avoid the forum selection clause contained in those agreements, however, Plaintiffs deleted all references to those agreements in their Amended Complaint, including in Count XIII.

As pleaded in the Amended Complaint, then, Count XIII now apparently seeks rescission of the Seaba Contract and Phillips Contract. However, under Counts V and VI of the Amended Complaint, Plaintiffs seek damages for breach of contract concerning these *same agreements*. As described above, MesoSystems has not breached either the Seaba Contract or the Phillips Contract under the undisputed

23

facts. Even assuming for the sake of argument, however, that MesoSystems *had* breached either the Seaba Contract or Phillips Contract, Plaintiffs have an adequate remedy at law in damages. There is no basis for the equitable remedy of rescission. Alternatively, if the contracts *were* to be rescinded, there would be no basis for Plaintiffs breach of contract claims in Counts V and VI.

**WHEREFORE,** Defendant MesoSystems moves this Court for its order granting summary judgment against Plaintiffs.

DATED: 05/16/03.

Respectfully Submitted:

**BAUMAN, DOW, McINTOSH & LEÓN, P.C.**

By _____

Alberto A. León
Christopher P. Bauman
PO Box 30684
Albuquerque, New Mexico 87190
(505) 883-3191-telephone
(505) 883-3194-facsimile

AND

**PERKINS COIE, LLP**

Paul E. Smith
One Bellevue Center
Suite 1800, 411
108th Avenue NE
Bellevue, Washington 98004-5584
(425) 453-7317-telephone
(425) 453-7350-facsimile

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing Memorandum in Support of Motion for Summary Judgment was hand delivered to the following, on this 16th day of May, 2003.

Lisa Mann
Angelo J. Artuso
Erin E. Langenwalter
MODRALL LAW FIRM
Attorneys for Plaintiffs
PO Box 2168
Albuquerque, New Mexico 87103-2168
(505) 848-1800

_____
Alberto A. León



**MesoSystems Technology, Inc.**
1021 N. Kellogg St.
Kennewick, WA 99336
Tel: 509. 737.8383
Fax: 509.737.8484
sleague@mesosystems.com

August 2, 2001

James Seaba, Ph.D.
6335 Deeside Dr.
Dublin, OH 43017

**SUBJECT:  Offer of Employment with MesoSystems Technology, Inc.**

Dear Dr. Seaba:

MesoSystems Technology, Inc. (the "Company") is pleased to extend you an offer of employment with the Company in accordance with the following terms:

1.  <u>Start Date</u>.  Your employment with the Company will begin on September 1, 2001.

2.  <u>Compensation.</u> You are being hired as an Executive Vice President, Energy Systems and will work primarily on contract R&D projects.  In addition, you will be tasked with business plan development associated with the creation of a new business unit focused on Micro Reaction Technology applied to fuel and other chemical processing.

    While you are working as an Executive Vice President, your starting annual salary will be $140,000/year, prorated on a daily basis for any period less than a full year, payable in arrears not less frequently than monthly.

3.  <u>Relocation Expenses</u>.  It is anticipated that relocation will be required. The Company will reimburse actual expenses up to $50,000, which shall include expenses related to relocation of you and your family and realtor fees associated with selling your existing home.  All reimbursements should be accounted for on the MesoSystems Expense Reimbursement form with original receipts and/or copies of contracts included with that form.

    If you initiate a termination of your employment with MesoSystems within one year of your start date, or if MesoSystems terminates your employment for "just cause", you agree to reimburse MesoSystems for actual expenses associated with relocation.

4.  <u>Incentive Stock Options</u>.  The Company will grant you an option to purchase shares of the Company's common stock pursuant and subject to the 1999 Stock Incentive Compensation Plan adopted by the Company for its employees and independent contractors (the "SICP").  The detailed provisions of the option are



**EXHIBIT**

"A"

MTI 00213

MesoSystems Technology, Inc.

set forth in the SICP and an option agreement under the SICP. The following paragraphs define the number of Incentive Stock Options (ISO) provided to you as part of this offer letter and highlights from the SICP. The options provided are under the terms and conditions of the SCIP.

    (a)    The ISO will be for 250,000 shares of the Company's common stock.

    (b)    Your right to exercise the option will vest as follows:

        (i)    62,500 options (i.e., 25% of the total number of shares subject to the option) will vest on September 1, 2002, provided that you are then employed with the Company on a full-time basis.

        (ii)    The balance (i.e., 187,500 shares) will be prorated and vest on a monthly basis during your continued full-time employment with the Company over a period of three (3) years (i.e., 36 consecutive months), commencing September 1, 2002.

    (c)    The exercise price will be the fair market value of the stock on the day the Board of Directors approves the grant of the Incentive Stock Options, in accordance with the SICP.

    (d)    The option will not be exercisable as to any shares until the expiration of one-year after the beginning of employment.

    (e)    The Company will have a right-of-first-refusal to repurchase the shares if you desire to sell or otherwise transfer them.

    (f)    The option will not be assignable.

    (g)    The option will be for a term of ten (10) years, subject to earlier termination in the event of any termination of your employment and certain other events as provided for in the SCIP or option agreement.

5.    <u>Signing Bonus - Incentive Stock Options</u>.  Pursuant to signing and returning this agreement within <u>thirty days</u>, the Company will grant you an option to purchase shares of the Company's common stock pursuant and subject to the 1999 Stock Incentive Compensation Plan adopted by the Company for its employees and independent contractors (the "SICP"). The detailed provisions of the option are set forth in the SICP and an option agreement under the SICP. The following paragraphs define the number of Incentive Stock Options (ISO) provided to you as part of this offer letter and highlights from the SICP. The options provided are under the terms and conditions of the SCIP.

MTI 00214

MesoSystems Technology, Inc.

(a)     The ISO will be for 25,000 shares of the Company's common stock.

(b)     Your right to exercise the option will vest as follows:

(i)     6,250 options (i.e., 25% of the total number of shares subject to the option) will vest on September 1, 2002, provided that you are then employed with the Company on a full-time basis.

(ii)    The balance (i.e., 18,750 shares) will be prorated and vest on a monthly basis during your continued full-time employment with the Company over a period of three (3) years (i.e., 36 consecutive months), commencing September 1, 2002.

(c)     The exercise price will be the fair market value of the stock on the day the Board of Directors approves the grant of the Incentive Stock Options, in accordance with the SICP.

(d)     The option will not be exercisable as to any shares until the expiration of one-year after the beginning of employment.

(e)     The Company will have a right-of-first-refusal to purchase the shares if you desire to sell or otherwise transfer them.

(f)     The option will not be assignable.

(g)     The option will be for a term of ten (10) years, subject to earlier termination in the event of any termination of your employment and certain other events as provided for in the SCIP or option agreement.

6.    Signing Bonus- Cash. Pursuant to signing and returning this agreement within thirty days, the Company will grant you a cash-signing bonus of $40,000. The Company may, at its sole discretion, defer payment of the bonus for a period of time until the Company, or its affiliates or subsidiaries, are in receipt of new equity or strategic corporate investment(s) equal to not less than $100,000.

7.    Employee Benefit Plans. During the term of your employment, you will be entitled to participate in any medical insurance and other employee benefit plans maintained by the Company for its employees, subject to and in accordance with the eligibility and other terms and conditions of the applicable plans. You will be entitled to vacation during your first year of employment in accordance with the Company's standard policy. Unless otherwise provided as part of a standard vacation policy that may be adopted by the Company, you will not be entitled to any payment in lieu of accrued and unused vacation.

MTI 00215

8.      Duties.  During the term of your employment, you will devote your full time and
        attention to the business of the Company to the exclusion of all other business
        activities and will not be employed (e.g., as an employee or independent
        contractor) by any other business, without the prior approval of the Company.  As
        an employee of the Company, you will perform such services and other tasks as
        may be assigned from time to time by the Company.

9.      Confidential Information and Inventions and Noncompetition Agreement.  You
        will sign and return the Company's standard Confidential Information and
        Inventions and Noncompetition Agreement, a copy of which is enclosed with this
        letter.

10.     Term.  Your employment with the Company is "at will" and may be terminated at
        any time upon fourteen (14) days' notice by you or the Company.  However, if you
        are terminated without "just cause" or you terminate your employment for "good
        reason," then Severance will be provided to you.  MesoSystems shall have "Just
        Cause" if its Board of Directors in the exercise of its reasonable judgment
        determines you have committed an act or acts constituting any of the following:
        (i) dishonesty or fraud in connection with his duties for MesoSystems; (ii) sexual
        harassment or other violation of laws prohibiting discrimination, in each case,
        committed in connection with his duties for MesoSystems; (iii) materially aiding a
        competitor of MesoSystems; (iv) misappropriation of a business opportunity of
        MesoSystems; (v) repeated and/or gross (A) misconduct or (B) failure to meet
        minimum expectations established by the Board from time to time and
        communicated to you in writing, or (C) negligence, in each case in the
        performance of your duties for MesoSystems; or, (vi) a felony conviction.  You
        shall have "Good Reason" to terminate in the event of (i) a significant demotion;
        (ii) a material breach of a material provision of this Agreement, which breach
        remains uncured thirty days after written notice of such breach is delivered to
        MesoSystems.  Good Reason shall not exist if MesoSystems contemporaneously
        has Just Cause to terminate your employment.

11.     Severance.  If your employment is terminated by MesoSystems without "just
        cause" or by yourself without "good reason," severance payments will apply
        according to the following schedule.  You will receive your base salary for a
        period of 3 months.  Severance payments will be terminated if you are employed
        full-time at any time during the severance period.  All severance payments are due
        at the time the salary would normally have been paid if employment had not been
        terminated.  As a condition to these benefits, you shall provide consulting services
        as needed to MesoSystems on a reasonable basis during the Severance Period.  If
        you are self-employed as a consultant, then these services will be provided at no
        cost during the Severance Period.

MTI 00216

12. _Eligibility._ This offer is contingent upon verification of your identity and eligibility to work in the United States as required by the Immigration Reform and Control Act of 1986.

13. _No Other Agreements._ This letter and the enclosed Confidential Information and Inventions Agreement set forth all of the terms of your employment with the Company. There is no other agreement between you and the Company.

\*    \*    \*

Please acknowledge your agreement to the foregoing by signing and returning to me a copy of this letter, together with the enclosed Confidential Information and Inventions Agreement. If the foregoing does not accurately reflect our agreement, please call me so that we can discuss how to proceed.

Thank you for your cooperation. We look forward to working with you.

Sincerely,                                        Acknowledged and Agreed to:

By: Samantha League                              James Seaba
Title: Director of Human Resources               Date Signed:    Aug 20    , 2001



**MesoSystems Technology, Inc.**
1021 N. Kellogg St.
Kennewick, WA 99336
Tel: 509. 737.8383
Fax: 509.737.8484
sleague@mesosystems.com

August 23, 2001

Cory B. Phillips, Ph.D.
2252 Windsor Chase
Columbus, OH 43235

SUBJECT:   Offer of Employment with MesoSystems Technology, Inc.

Dear Dr. Phillips:

MesoSystems Technology, Inc. (the "Company") is pleased to extend you an offer of employment with the Company in accordance with the following terms:

1.    <u>Start Date</u>.  Your employment with the Company will begin on September 1, 2001.

2.    <u>Position.</u> You are being hired as a Senior Research Engineer, reporting to the Executive Vice President, and will work primarily on R&D projects associated with fuel processor and processor component development. These will include supporting the SBIR Phase II project developing an ammonia fuel processor. You may also from time to time support other activities, including but not limited to product development and corporate management support, as required.

3.    <u>Compensation.</u>  While you are working as a Sr. Research Engineer, your starting annual salary will be $85,000/year, prorated on a daily basis for any period less than a full year, payable in arrears not less frequently than monthly.

4.    <u>Relocation Expenses</u>. It is anticipated that relocation will be required. The Company will pay or reimburse your actual, reasonable out-of-pocket relocation expenses up to $20,000, which shall include expenses related to relocation of you and your family and actual penalties associated with termination of the purchase agreement for the home you intended to purchase. If you initiate a termination of your employment with the Company within one year of your start date, you agree to reimburse the Company for any of your relocation expenses paid or reimbursed by the Company.

5.    <u>Incentive Stock Options</u>. The Company will grant you an option to purchase shares of the Company's common stock pursuant and subject to the 1999 Stock Incentive Compensation Plan adopted by the Company for its employees and independent contractors (the "SICP"). The detailed provisions of the option are set forth in the SICP and an option agreement under the SICP. The following paragraphs define the number of Incentive Stock Options (ISO) provided to you as

**EXHIBIT**

**"B"**

MTI 00320

part of this offer letter and highlights from the SICP. The options provided are under the terms and conditions of the SCIP.

    (a)    The ISO will be for 25,000 shares of the Company's common stock.

    (b)    Your right to exercise the option will vest as follows:

        (i)    6,250 options (i.e., 25% of the total number of shares subject to the option) will vest on September 1, 2002, provided that you are then employed with the Company on a full-time basis.

        (ii)    The balance (i.e., 18,750 shares) will be prorated and vest on a monthly basis during your continued full-time employment with the Company over a period of three (3) years (i.e., 36 consecutive months), commencing October 1, 2002.

    (c)    The exercise price will be the fair market value of the stock on the day the Board of Directors approves the grant of the Incentive Stock Options, in accordance with the SICP.

    (d)    The option will not be exercisable as to any shares until the expiration of one-year after the beginning of employment.

    (e)    The Company will have a right-of-first-refusal to repurchase the shares if you desire to sell or otherwise transfer them.

    (f)    The option will not be assignable.

    (g)    The option will be for a term of ten (10) years, subject to earlier termination in the event of any termination of your employment and certain other events as provided for in the SICP or option agreement.

6.    <u>Employee Benefit Plans</u>.  During the term of your employment, you will be entitled to participate in any medical insurance and other employee benefit plans maintained by the Company for its employees, subject to and in accordance with the eligibility and other terms and conditions of the applicable plans. You will be entitled to vacation during your first year of employment in accordance with the Company's standard policy. Unless otherwise provided as part of a standard vacation policy that may be adopted by the Company, you will not be entitled to any payment in lieu of accrued and unused vacation.

7.    <u>Duties</u>.  During the term of your employment, you will devote your full time and attention to the business of the Company to the exclusion of all other business activities and will not be employed (e.g., as an employee or independent contractor) by any other business, without the prior approval of the Company. As

MesoSystems Technology, Inc.

an employee of the Company, you will perform such services and other tasks as may be assigned from time to time by the Company.

8.    Confidential Information, Inventions and Noncompetition Agreement. You will sign and return the Company's standard Confidential Information, Inventions and Noncompetition Agreement, a copy of which is enclosed with this letter.

9.    Term. Your employment with the Company is "at will" and may be terminated at any time upon fourteen (14) days' notice by you or the Company.

10.   Eligibility. This offer is contingent upon verification of your identity and eligibility to work in the United States as required by the Immigration Reform and Control Act of 1986.

11.   No Other Agreements. This letter and the enclosed Confidential Information, Inventions, and Noncompetition Agreement set forth all of the terms of your employment with the Company. There is no other agreement between you and the Company.

*     *     *

Please acknowledge your agreement to the foregoing by signing and returning to me a copy of this letter, together with the enclosed Confidential Information and Inventions Agreement. If the foregoing does not accurately reflect our agreement, please call me so that we can discuss how to proceed.

Thank you for your cooperation. We look forward to working with you.

Sincerely,                                        Acknowledged and Agreed to:


By: Samantha League                               Cory Phillips
Title: Human Resources Manager                    Date Signed: Au. 27           , 2001



```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF NEW MEXICO
              Civ. No. 02-103 LH/WWD
 3
 4   JAMES SEABA and
     CORY PHILLIPS,
 5
             Plaintiffs,
 6
        vs.
 7
     MESOSYSTEMS TECHNOLOGY, INC.,
 8
             Defendant.
 9
10
11
12          DEPOSITION OF JAMES SEABA, Ph.D.
13                April 2nd, 2003
                     9:12 a.m.
14             7309 Indian School Road, Northeast
               Albuquerque, New Mexico  87110
15
16
17
                PURSUANT TO THE FEDERAL RULES OF CIVIL
18   PROCEDURE, this deposition was:
19
20   TAKEN BY:    MR. ALBERTO A. LEON
                  ATTORNEY FOR DEFENDANT
21
22
23
     REPORTED BY:   MICHELE TRUJILLO, CCR No. 226
24                  Kathy Townsend Court Reporters
                    110 Twelfth Street, Northwest
25                  Albuquerque, New Mexico  87102
```

```
 1          A P P E A R A N C E S
 2   For the Plaintiffs:
 3      MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.
        Attorneys at Law
 4      500 Fourth Street, Northwest, Suite 600
        Albuquerque, New Mexico  87102
 5      By:  MS. LISA MANN
 6   For the Defendant:
 7      BAUMAN DOW, McINTOSH & LEON, P.C.
        Attorneys at Law
 8      7309 Indian School Road, Northeast
        Albuquerque, New Mexico  87110
 9      By:  MR. ALBERTO A. LEON
             MR. CHRIS BAUMAN
10
     Also Present:
11
        Dr. Ned Godshall
12      Dr. Cory Phillips
13
14              I N D E X
15   JAMES SEABA, Ph.D.                      PAGE
16      Direct Examination by Mr. Leon         4
17   CERTIFICATE OF COMPLETION OF DEPOSITION  187
18   SIGNATURE/CORRECTION PAGE                189
19
20
21
22
23          EXHIBIT
24
25             "C"
```

```
 1              E X H I B I T S
 2   SEABA EXHIBIT:                    MARKED
 3   1. Complaint for Damages, Injunctive and
 4      Declaratory Relief               38
 5   2. First Amended Complaint for Damages,
 6      Injunctive and Declaratory Relief   19
 7   3. Resume: James Philip Seaba. Ph.D.   38
 8   4. Plaintiff James Seaba's Answers to
 9      Defendant's First Set of Interrogatories
10      Requests for Production of Documents and
11      Requests for Admission           40
12   5. E-mail dated 11/7/01 to Lubeck, Call and
13      Schallop from Mr. Seaba          65
14   6. Agenda for June 9th and 10th, 2001   85
15   7. Document titled "MicroReactors Applied
16      to Clean Energy," Dr. James Seaba, 5/26/01   96
17   8. Offer of Employment with MesoSystems
18      Technology. Inc., to Dr Seaba dated 8/2/01  106
19   9. Confidential Information, Inventions and
20      Noncompetition Agreement         115
21   10. Articles of Incorporation for Red Path
22       Energy                         119
23   11. Profit Corporate Report for Red Path Energy 136
24
25
```

```
 1          MS. MANN: Before we start, I see that
 2   Mr. Godshall is here today.  Is he here as the corporate
 3   representative for MesoSystems?
 4          MR. LEON: That is correct.
 5          MS. MANN: I would like that on the record,
 6   please.
 7          JAMES SEABA, Ph.D.
 8   after having been first duly sworn under oath,
 9   was questioned and testified as follows:
10          DIRECT EXAMINATION
11   BY MR. LEON:
12   Q.  Can you state your name, please?
13   A.  James Seaba.
14   Q.  Have you ever been deposed before?
15   A.  Yes, once before.
16   Q.  When?
17   A.  About 20 years ago.
18   Q.  Can you tell me in connection with what you
19   were deposed?
20   A.  I witnessed a murder.
21   Q.  Is that the only time?
22   A.  Yes.
23   Q.  Where was that?
24   A.  It was Iowa City, Iowa.
25   Q.  Who deposed you then?
```

85

1  all of these traveling plans taken care of and so forth?
2     A.  Yes.
3     Q.  I'm going to hand you what actually was marked
4  yesterday as an exhibit to Dr. Godshall's deposition, and
5  I'm going to mark it as an exhibit to this deposition,
6  and that's Number 6, which is the agenda of the June 2001
7  visit to Albuquerque.
8        I would like you to take a look at it, and then
9  I'm going to ask you a few questions about it.
10       MS. MANN:  This must have been marked at Tina
11 Call's deposition, because it wasn't marked at --
12       MR. LEON:  I'm sorry.  Tina Call's deposition,
13 that's correct.  I misspoke.
14       (Seaba Exhibit 6 marked.)
15    Q.  Can you take a look at that?  And then I'll ask
16 you a few questions about it.
17    A.  Okay.
18    Q.  What is the document?
19    A.  It's the agenda of our visit.
20    Q.  Did you receive this document at the time of
21 the visit or near the time of the visit?
22    A.  I don't recall.
23    Q.  Do you recall if you ever saw this document
24 before the visit?  During the visit?  After the visit?
25    A.  I don't recall that, either.

86

1     Q.  Do you recall ever seeing this document?
2     A.  No.
3     Q.  Let's go over it, and I want to ask you a few
4  questions about it.
5     A.  Okay.
6     Q.  Under the heading "Saturday, June 9th," there
7  are a number of items there.  Can you tell me if your
8  recollection of your visit is consistent with these
9  items, where these activities took place?  To the extent
10 that any activity didn't take place, I want you to point
11 me to that.
12    A.  Yeah, to my recollection, this seems correct.
13    Q.  So this second item on the agenda -- after
14 11:30 a.m.. it says, "Nanopore Office, Insulation."  Can
15 you tell me about that, what took place during that slot
16 of time?
17    A.  Sure.  I would be happy to.
18       Chuck took me over to -- I can't remember his
19 name, but I assume it's Doug Smith, who is the owner of
20 Nanopore, and the first thing he did was show me in the
21 office there all of the -- Doug Smith's patents and
22 everything in the office, and then he showed me the
23 facilities.
24    Q.  Do you recall or can you help me understand
25 what the word "insulation" would mean in the context of

87

1  your visit to Nanopore?
2     A.  Well, at the time of this visit, I don't
3  recall, but I do understand what that "insulation" means.
4     Q.  Can you tell me?
5     A.  That they make an insulation using this novel
6  carbon material that Doug Smith has proprietary
7  technology on and make it into two-dimensional-type
8  sheets or boards.
9     Q.  Did you inspect any equipment while you were at
10 Nanopore?
11    A.  On this visit?
12    Q.  Yes.
13    A.  No, I did not inspect equipment.  I just looked
14 at the facilities.
15    Q.  Did you see any equipment there?
16    A.  Yeah, I saw a lot of chemical-type equipment,
17 large bottles and drawers and things, and then a very
18 large room with piles of this black-coated material
19 everywhere.  It was quite messy.  So that's the main
20 things I saw there.
21       Then Chuck showed me the facility that he said
22 that we can take and use this space in Nanopore  like
23 lease it or borrow it or something.
24    Q.  Was it only space, or was it space plus
25 equipment?

88

1     A.  At that time, I don't recall.
2     Q.  Did you go to Nanopore again?
3     A.  Yes.
4     Q.  How many times?
5     A.  Coming in, I think I was there at least once or
6  twice.
7     Q.  What were the purposes of the subsequent visits
8  to Nanopore?
9     A.  To look at what MesoSystems employees were
10 working on and really look more in detail at the
11 equipment and things there.
12    Q.  So there were MesoSystems employees working at
13 Nanopore?
14    A.  Yes
15    Q.  What were they working on?
16    A.  From my understanding, they were working on
17 making insulation and also -- we're under a confiden- --
18 okay, and working on a hydrogen membrane device there.
19    Q.  Did you understand that any of the Nanopore
20 equipment was going to be used in connection with NewCo?
21    A.  I was told that the gas chromatograph was owned
22 by MesoSystems.
23    Q.  What gas chromatograph is that?
24    A.  One of the pieces of equipment in Nanopore.
25    Q.  Who told you that?

111

A. Uh-huh.
Q. To close the loop there, at any point during
your employment with MesoSystems, was there a document --
and I'm not talking about your offer letter -- any other
document besides the offer letter that set up in writing,
signed by MesoSystems and by you, percentages in NewCo.
roles in NewCo and all of the details that were being
negotiated?
A. You have all that information.
Q. I'm asking about a single document. Was there
a contract? Was there something that summarized the
agreement, that closed the door, in all of these
negotiations that were going on?
A. I'm not totally sure what you're talking about.
MS. MANN: He's asking if the whole formation
of NewCo ever got finalized in a document signed by both
parties.
THE WITNESS: No.
MS. MANN: Okay.
A. If that's what you mean --
Q. Yeah, that covers what I was trying to get at.
Let's go back to Exhibit 8, the offer letter,
and try to see what other facts you can provide me to
support the breach or violation or lack of compliance
with any of the (a) through (h) provisions.

---

109

A. Okay. Is that fair?
MS. MANN: Does that help?
Q. That is fair. If I need to follow up or
restate the question, then I'll do that, but, you know,
we can start there.
A. I'll do it -- instead of breach, I'll say
breach/deception. Something like that would be better,
so -- especially in retrospect of the events.
So, for example, part (d), they provided me
with all of these shares when I think they knew from the
get-go, from the very beginning, they were never going to
allow that to happen.
Q. Let's talk about that. Let me ask you a couple
of follow-up questions there. How do you know that they
knew from the very beginning that that wasn't going to
happen? What are the factual basis for that knowledge?
A. I just get that impression from the separation
agreement that Chuck Call handed me, where I'm supposed
to just lay over everything or lay over what, at the time
of accepting, had been presented as a clear value to me.
Q. Weren't there ongoing negotiations starting
from the time right before you came until the time right
before you left as to percentages and roles and all of
that? Wasn't that all fluid throughout that period?
A. Yes.

---

112

MS. MANN: Once again, he's going through this
list. Forget that for a minute. Go through this.
Right? Exhibit 2, paragraph 22. (a) through (h), and
he's asking what facts you have to show that they didn't
meet this agreement.
THE WITNESS: Oh, okay.
MS. MANN: Got it?
A. So (b) is -- it's correct. good. What's the
best word?
Q. Your testimony is that they were paying you a
starting salary of $140,000 a year?
A. Correct  That was --
Q. So let's go to (c). Did you receive relocation
expenses of $50,000?
A. No.
Q. What happened there?
A. It says up to $50,000. It was less than
$50,000.
Q. Were you reimbursed for all of your relocation
expenses, though?
A. Yes, I believe I was.
No, I'm sorry, that's incorrect.  I was not
reimbursed for my rent on the house while I still had
house payments in Ohio.
Q. How much money are we talking about here that

---

110

Q. Is it your testimony there was any document or
contract or anything that was signed at any given point
of these negotiations that basically set out these
percentages of ownership or any of that?
MS. MANN: Other than his employment contract?
MR. LEON: Yes.
Q. Other than your employment contract.
A. I'm not sure if I understand the question.
Q. Well, we established that these negotiations
were fluid. They were ongoing over this period of time,
the period of time that you were employed at MesoSystems.
A. Yes.
Q. There were several iterations of capitalization
tables that were presented back and forth.
A. Uh-huh.
Q. There were several business plans that were
also changed, as testified by Dr. Godshall yesterday.
A. Uh-huh.
Q. These documents had different percentages and
different roles for you and for Chuck over this period of
time that you were employed.
A. Correct.
Q. So the global question would be: These
negotiations were going on, they were fluid, during the
time that you were employed with MesoSystems?

113

1 you were not reimbursed?
2     A.  Approximately $2800.
3     Q.  Anything else in that category?
4     A.  No, not that I recall.
5     Q.  Category (d) speaks about an option to purchase
6 275,000 shares of MesoSystems common stock.  Did you ever
7 receive that option?
8     A.  Yeah.
9     Q.  Did you exercise the option?
10     A.  I was not allowed to be there one year.
11     Q.  So, basically, the option died on its own
12 terms.  Would that be your testimony?
13     A.  I would say that by firing me without warning
14 made that option no longer available to me.
15     Q.  Would you have exercised that option if you had
16 stayed at MesoSystems?
17     A.  Conjecture is difficult, but I most likely
18 would have.
19     Q.  So as far as you knew, then, MesoSystems was a
20 company worth holding stock in?
21     A.  Yes.
22     Q.  In spite of all these deficiencies that we've
23 talked about before, lack of equipment, lack of
24 facilities, all of this stuff that we've talked about
25 before, it was still a good company to invest in?

114

1     A.  I felt that I could still make NewCo
2 successful.
3     Q.  We're talking about shares in MesoSystems here.
4     A.  Right, and MesoSystems had a viable -- or had a
5 commercial product in an important market.
6     Q.  As far as subparagraph 22 (e), the $40,000
7 signing bonus, you received that signing bonus?
8     A.  No
9     Q.  How come?
10     A.  Well, the signing bonus required a strategic
11 investment from -- external strategic investment into
12 MesoSystems greater than $100,000, and at the time I was
13 fired, I'm presuming that investment was not in
14 MesoSystems.
15     Q.  Subparagraph (f), that MesoSystems allowed you
16 to participate in medical insurance and other employee
17 benefit plans, were you allowed, sir, to participate in
18 medical insurance and other employment benefit plans?
19     A.  Yes, I was allowed to do that.
20     Q.  Paragraph (g), that -- well, actually, let's
21 talk about (g) later on.  Let me skip to (h), that you
22 would be required to sign a MesoSystems Confidential
23 Information, Inventions and Noncompetition Agreement.
24 You signed that document?
25     A.  Yes.

115

1     Q.  And I'm not -- (g) is going to require a lot
2 more questioning than what I'm prepared to do now, so I'm
3 going to defer on that for a few minutes.
4         Let's talk about that confidential Information,
5 Interventions and Noncompetition Agreement, the
6 confidentiality agreement, which I am going to hand the
7 court reporter to be marked as an exhibit.
8         (Seaba Exhibit 9 marked.)
9     Q.  Is the agreement that I just handed to you the
10 same agreement that is referred to in paragraph 22(h),
11 page seven, of the complaint?
12         MS. MANN:  Before he answers the question, I
13 note that the copy of the exhibit that's marked as
14 Exhibit 9 apparently is a photocopy of something that was
15 highlighted or something, because there is a bunch of
16 marking in section 3.3, and I don't know whether that
17 highlighting was on the original, but, somehow, I doubt
18 it.
19         MR. LEON:  Well, yeah, it probably wasn't, so
20 for the purposes of my questioning, we can ignore that
21 highlighting.
22         MS. MANN:  Okay.
23     A.  Okay.
24     Q.  Is that the document referred to in paragraph
25 22(h) of the -- yeah, 22(h) of the amended complaint?

116

1     A.  It appears so
2     Q.  Is that your signature at the end, the last
3 page of the document?
4     A.  Yes.
5     Q.  Is that your handwriting under the signature,
6 with your name spelled out?
7     A.  Yes.
8     Q.  Is that your handwriting with a Social Security
9 number?
10     A.  Yes
11     Q.  How about above that on that same page?  The
12 date 8/2/2001, is crossed out, and a new date, 9/1/2001,
13 is written.  Is that your handwriting, also?
14     A.  Yes.
15     Q.  Are those your initials next to it --
16     A.  Yes.
17     Q.  -- that you handwrote yourself?
18     A.  Yes.
19     Q.  Let me ask you a question so that I'm clear,
20 especially based on the back-and-forth that we've gone
21 through with the confidentiality issues on these
22 depositions.  Do you consider yourself bound by this
23 agreement right now?
24     A.  No.
25     Q.  You do not?

**121**

1    A.   He, Clinton Marrs, represented Cory and I.
2    Q.   Did MesoSystems -- are you aware whether
3  MesoSystems at the time that this was incorporated --
4  whether MesoSystems had any attorneys working for them?
5  Only if you're aware. I mean, if you're not aware,
6  that's fine.
7    A.   I don't recall, no.
8    Q.   I was just wondering why MesoSystems' attorneys
9  didn't prepare these documents. Do you know why, if this
10  was for NewCo?
11    A.   I wasn't aware of MesoSystems' attorneys, and I
12  was basically in charge of Red Path Energy.
13    Q.   On the third page of this document, there is a
14  stamp on top of it that gives a date of filing. Can you
15  tell me what date that is?
16    A.   December 3rd.
17    Q.   How many days before you allege you were fired
18  did this incorporation take place?
19    A.   Could you restate that question?
20    Q.   Your allegation in this case is that you were
21  fired by MesoSystems, correct?
22    A.   Correct.
23    Q.   What was the date of firing, according to your
24  allegations?
25    A.   December 6th.

**122**

1    Q.   So this would have been filed three days before
2  the alleged firing, correct?
3    A.   Correct.
4    Q.   Does the name of anybody related to MesoSystems
5  at this time, besides you and Dr. Phillips, appear in any
6  of these documents?
7    A.   No.
8    Q.   Is Dr. Call named as a director of Red Path
9  Energy under these articles of incorporation, according
10  to your understanding?
11    A.   Well, Dr. Call was not listed as a director at
12  this time.
13    Q.   Those fluid negotiations that we talked about
14  before that took place over the fall of 2001, at any time
15  was it contemplated that Dr. Call wasn't going to be a
16  director of NewCo?
17    A.   Was not going to be a director?
18    Q.   I can phrase that affirmative. Is it fair to
19  assume or is it fair to say that, at all times during
20  these negotiations, Dr. Call was going to be a director
21  of NewCo?
22    A.   I believe that was to be determined.
23    Q.   So at some point during these negotiations,
24  there was a contemplation that Dr. Call was not going to
25  be a director of NewCo?

**123**

1    A.   Correct.
2    Q.   Is this why he wasn't listed here as a director
3  in the articles of incorporation that we're looking at?
4    A.   No.
5    Q.   What is the reason why Dr. Call wasn't listed?
6    A.   This was just the articles of incorporation.
7  To help clarify --
8    Q.   Go ahead.
9    A.   -- just as Ned discussed yesterday, when
10  MesoFuel was incorporated, you had the CFO for four days
11  and then, when you get all of the articles and other
12  things done, the real structure is formed
13    Q.   Was Dr. Call aware that you were filing these
14  articles of incorporation on December 3rd or around that
15  time?
16    A.   No.
17    Q.   If this was going to be NewCo, why didn't you
18  inform him that you were forming this company?
19    A.   It didn't seem important.
20    Q.   The incorporation of the company that was going
21  to be the spin-off of MesoSystems wouldn't be important
22  to Dr. Call; is that your testimony?
23    A.   No, I didn't state that.
24    Q.   Tell me what wasn't important, then, because I
25  truly don't understand it, so help me, please.

**124**

1    A.   In my own words, Dr. Call provided a separation
2  agreement, in that stating -- forming an independent
3  company. We talked about money coming in. So my
4  concern, and maybe it was an incorrect concern --
5  incorrect, but my thought was we simply needed to
6  incorporate to get all of the paperwork in motion to get
7  it set up so that we would be able to apply for
8  government contracts, which were coming up in January and
9  February.
10         So I was concerned about the time line, and I
11  thought this was the logical first step in working on
12  that separation agreement.
13    Q.   During this time frame of early December 2001,
14  were you at any point contemplating leaving MesoSystems?
15    A.   In December?
16    Q.   Yes.
17    A.   No.
18    Q.   Do you remember having any discussions with
19  Dr. Call or anybody else at MesoSystems about the
20  formation of Red Path Energy on December 3rd?
21    A.   I don't recall talking about the incorporation
22  with anyone.
23    Q.   Let me point you out to Article III of the
24  articles, paragraph three of the articles of
25  incorporation, which I think is the third paragraph of

125

1   the exhibit.
2          Subparagraph A, can you read that out loud for
3   the record?
4      A.   Article III?
5      Q.   Yes.  Article III. subpart (a).  Well, actually
6   just read Article III.
7      A.   "The corporation is formed for the following
8   purposes:  To engage in research and development of micro
9   reaction technology and other technologies, new products
10  pertaining thereto and new product applications; and to
11  engage in any lawful act or activity for which
12  corporations may be organized under this" -- "under the
13  Act."
14     Q.   Is it your testimony today that subparagraph
15  (a) defines the purpose of NewCo?
16     A.   Yeah, that would be correct.
17     Q.   On those activities that are defined there in
18  subparagraph III(a), it was your intention to undertake
19  those activities with MesoSystems Technology at that
20  time?
21     A.   MesoSystems Technology was going to be the
22  major investor in the company.
23     Q.   In Red Path Energy, Inc.?
24     A.   Correct.
25     Q.   So it was never your intention to undertake the

126

1   activities defined in Article III in competition with
2   MesoSystems or with NewCo?
3      A.   It was never the intention of Red Path Energy
4   to compete with MesoSystems.
5      Q.   So what happened to Red Path Energy, Inc.
6   after December 6th, 2001?
7      A.   After December 6th, we tried to continue with
8   Red Path Energy, unfortunately, without the support of
9   MesoSystems.
10     Q.   Where was the intellectual property to be used
11  in connection with Red Path Energy?  Where was that going
12  to come from after December 6th, 2001?
13     A.   Well, we'd have to make our own intellectual
14  property.
15     Q.   How would Red Path Energy be funded after
16  December 6th, 2001?
17     A.   That's a good question.
18          Red Path Energy was then required to look at
19  VCs or angels or -- people, basically, look for money.
20     Q.   Did you approach anybody in particular, trying
21  to obtain funding for Red Path Energy, after December
22  6th. 2001?
23     A.   Yes.
24     Q.   Can you tell me who and when?
25     A.   I can't remember all of the people we

127

1   approached.
2      Q.   Just the ones that you remember is fine.
3      A.   Well, first, we went to TVC. not for funding,
4   but to help us with the company  That's the purpose of
5   TVC in Albuquerque.
6          Then we approached -- oh, man. I'm trying to
7   think here.  Just a moment.
8      Q.   How about Jarrett Carson?  Did you approach
9   Mr. Carson?
10     A.   After December 7th, I called Jarrett Carson.
11     Q.   How did you first get acquainted with
12  Mr. Carson?
13     A.   I met him at a fuel cell conference.
14     Q.   When was that?
15     A.   Summer of 2001
16     Q.   Did MesoSystems, Dr. Call or anybody related to
17  them have anything to do with you meeting Mr  Carson?
18     A.   Dr. Call was also at the conference.
19     Q.   Did Dr. Call introduce you to him or somehow
20  have anything to do with you meeting him?
21     A.   I don't recall exactly how we all got together,
22  but we all did meet at that conference.
23     Q.   Did you participate in putting together a
24  business plan for Red Path Energy after December 7th,
25  2001?

128

1      A.   Yes.
2      Q.   Do you recall who received copies of that
3   business plan?
4      A.   Well, TVC helped. so they had a copy of the
5   business plan, and from what I -- I believe my
6   understanding was, if other potential investors
7   approached them, you know, they could also show that to
8   them.
9          Who else?
10     Q.   Let's go back to the investors.  I don't think
11. that I ever closed the loop on that.  Besides Jarrett
12  Carson, who else did you approach for funding for Red
13  Path Energy after December 7th. 2001?
14     A.   George somebody, George -- I forget his name
15  now.  He's a local VC here in -- or angel. I should say,
16  here in town.
17     Q.   How about PNM?
18     A.   PNM.
19          I don't recall, myself, approaching PNM.
20     Q.   Do you know if anybody on behalf of Red Path
21  Energy approached PNM?
22     A.   It's possible Cory may have.
23     Q.   How about Wally Hunter?
24     A.   I don't recall approaching Wally Hunter.
25     Q.   How about N plus H Power?

129

1    **A.**   Nth power?
2    **Q.**   Yeah, Nth Power. I'm sorry. N plus H, that's
3 nice. I'm sorry. Nth Power.
4    **A.**   Yeah, I don't recall approaching Nth Power.
5    **Q.**   Did you hold any discussions about Red Path
6 Energy with George Richmond after December 7th, 2001?
7    **A.**   That was the George somebody. Thanks.
8    **Q.**   Can you tell me about that? When did you speak
9 with George?
10    **A.**   Well, it either had to be the end of December
11 or early January.
12    **Q.**   Tell me about that discussion. How many
13 discussions did you guys have?
14    **A.**   Well, I think we talked once on the phone to
15 meet at a restaurant, and then we talked at the
16 restaurant, and possibly one more time after that.
17    **Q.**   Can you give me the substance of the
18 discussions? What did you guys talk about?
19    **A.**   Well, we talked a little bit, and he was -- in
20 my memory, basically, he stated that -- the gist of it,
21 he wasn't going to invest in my company, but he was, of
22 course, interested, but you always get that.
23    **Q.**   Do you know if Mr. Richmond received a copy of
24 the Red Path Energy business plan that you guys put
25 together?

130

1    **A.**   He may have, but I can't be certain.
2    **Q.**   Let me ask you, and I would like counsel to
3 maybe look into this.
4    MR. LEON:   In response to a request for
5 production, number 14, which is one of the exhibits
6 marked in this deposition, we requested specifically all
7 business plans pertaining to Red Path, and I'm not aware
8 that we got a copy of this Red Path business plan that
9 was done after December 7th, so can we look into that?
10    MS. MANN:   Sure. Request number 14?
11    MR. LEON:   Number 14, yes, page 18.
12    MS. MANN:   I will look into it.
13    **Q.**   So without having the benefit of -- let me ask
14 you a couple of questions. Was this Red Path business
15 plan in any way similar or based upon the MesoFuel
16 business plan that you had done with MesoSystems?
17    **A.**   The technology would be different.
18    **Q.**   How about the format?
19    **A.**   The format?
20    **Q.**   Yes, the sections, the content. I mean, you
21 know, since I don't have it, I really can't talk about
22 it. I'm trying to see if you recollect something.
23    **A.**   No, it -- I reformatted and redid the business
24 plan from what we had at MesoFuel, or NewCo.
25    **Q.**   Did you do that on your MesoSystems laptop

131

1 computer, or did you do it on a separate computer?
2    **A.**   A separate computer? I have to think.
3       It was a separate computer.
4    **Q.**   Which computer would that be?
5    **A.**   I believe it was on my personal laptop.
6    **Q.**   Not the one that MesoSystems gave you?
7    **A.**   Correct.
8    **Q.**   Did you develop -- and, again, you know, we're
9 under a confidentiality agreement here, so did you
10 develop any intellectual property in connection with Red
11 Path Energy after December 7th, 2001?
12    **A.**   No.
13    **Q.**   Did you attend any conferences or give any
14 papers in connection with work or, you know, anything
15 that had to do with Red Path Energy, Inc., after December
16 7th, 2001?
17    MS. MANN:   Are you asking about on behalf of
18 Red Path Energy or --
19    MR. LEON:   Yeah.
20    MS. MANN:   Because "to do with" is kind of --
21    MR. LEON:   Yeah. I'm going to ask him did you
22 on behalf Red Path Energy first, and then I'm going to
23 ask him on behalf of anyone else.
24    **Q.**   Let's start with on behalf of Red Path Energy.
25    **A.**   I don't believe I ever made any presentations.

132

1    **Q.**   How about attending conferences on behalf of
2 Red Path Energy after December 7th, 2001?
3    **A.**   No, I don't believe so.
4    **Q.**   Can you tell me what conferences at all you
5 have attended since December 7th, 2001, up to, let's say
6 -- when did you start your present employment?
7    MS. MANN:   August of 2002.
8    **A.**   August of 2002.
9    **Q.**   Between December 7th, 2001, and August of 2002,
10 can you tell me all of the conferences that you attended
11 during that time?
12    **A.**   I attended a DOE conference.
13    **Q.**   You attended that as an individual or on behalf
14 of any company?
15    **A.**   I attended that. I was a private consultant
16 and my client was Phillips Petroleum
17    **Q.**   Any other conference?
18    **A.**   Not that I recall.
19    **Q.**   During this time, December 2001 to August of
20 2002, did you have any jobs? Did you do any work?
21    **A.**   Yes, I was a private consultant.
22    **Q.**   Did you do these under any kind of corporation
23 or entity that you formed, or did you do this as an
24 individual?
25    **A.**   I did it as a -- I did it under an LLC.

169

1 June or so.
2 Q. Do you remember how that communication took
3 place? Was it a face-to-face conversation? Was it a
4 phone conversation?
5 A. I believe it was a phone conversation.
6 Q. Do you remember what you told Dr. Call about
7 Dr. Phillips that first time that you talked about him?
8 A. Just that Cory has the -- Cory has unique
9 capabilities, you know, a really excellent researcher in
10 catalysis, which is really essential for novel
11 microreactors to be, you know, developed.
12 Q. As the negotiations or the interactions with
13 Dr. Call took place during the summer of 2001 and after
14 you brought Dr. Phillips to Dr. Call's attention, how did
15 you come to bring Dr. Phillips into, you know, direct
16 contact with Dr. Call? How did that happen? How did
17 they first meet?
18 A. I don't recall how they first met and how that
19 was arranged, exactly.
20 Q. After the first time Dr. Call and Dr. Phillips
21 met, was Dr. Phillips present or part of your
22 communications with Dr. Call?
23 A. Can you repeat that question?
24 Q. I'm trying to establish -- you know, since it
25 appears that most of the communications with Dr. Call

170

1 prior to you joining MesoSystems, the two of you joining
2 MesoSystems, came through you, I'm trying to ascertain
3 what was Dr. Phillips' involvement in these
4 communications, at what point he became part of the
5 communication line.
6 A. I mean, you know, sometime that summer is when
7 he became part of that line, but I don't remember exactly
8 when or how it exactly came about right now.
9 Q. I'm going to digress a little bit. In
10 connection with your present employment with
11 PhillipsConoco -- or ConocoPhillips?
12 A. ConocoPhillips.
13 MS. MANN: ConocoPhillips.
14 Q. -- do you have a country club membership?
15 A. Yes.
16 Q. ConocoPhillips pays for that?
17 A. No.
18 Q. So your country club membership, you pay for
19 personally?
20 A. Yes.
21 Q. In other words, it's not a benefit that you
22 receive from your employer?
23 A. Correct.
24 MR. LEON: Let me take a quick break.
25 MS. MANN: Sure.

171

1 (Recess taken.)
2 Q. I want to direct you to Exhibit 2, the amended
3 complaint, paragraph number 29. Before we go into the
4 subparts, I want to direct you to a statement between the
5 second and the third line -- starting on the second line
6 of paragraph 29 and going onto the third, "MesoSystems
7 immediately began reneging on its promises." That's
8 basically what I'm going to focus on.
9 Specifically, I'm going to start out of order
10 here and I'm going to focus on subparagraph (b), which is
11 one of the promises that is listed, and I want you to
12 read that. Then I'm going to ask you a few questions
13 about that.
14 A. Okay.
15 Q. Can you tell me who at MesoSystems requested
16 that you charge as much time as possible to the existing
17 DOD contract?
18 A. Dr. Call
19 Q. When was that request made of you?
20 A. Within the first week of my arrival in
21 Albuquerque.
22 Q. Was that request made of you in writing?
23 A. No
24 Q. So you're not aware of any document that would
25 contain that request?

172

1 A. I believe that to be correct.
2 Q. How about the request in subparagraph (c) at
3 the top of page 10 or the requirement that you buy
4 equipment for NewCo, but charge the equipment to the DOD
5 contracts? Who requested you to do that?
6 A. I didn't order the equipment. so I didn't
7 request anybody --
8 Q. No, sir. Paragraph 29 says, "MesoSystems
9 immediately began reneging on its promises."
10 A. Uh-huh.
11 Q. Then, in subparagraph (c), it says that
12 MesoSystems required you to buy equipment for NewCo, but
13 to charge that equipment to DOD. I'm wondering who
14 required you to do that at MesoSystems.
15 A. Well, just to clarify. we ordered -- we needed
16 the equipment to do research, and I believe Dr. Phillips
17 and Dr. Chellappa, Anand. made the request and ordered
18 it, and they used a DOD charge number.
19 Q. Can you specify for me what equipment we're
20 talking about, if you recall?
21 A. Well, to my knowledge. one was the gas
22 chromatograph. and another was to Porvair, for metal
23 foams.
24 Q. Anything else?
25 A. Nothing else that I remember right now.

173

1    Q.   As far as the time that we discussed in
2    subparagraph (a) of paragraph 29 -- I'm sorry,
3    subparagraph (b), did you actually charge time to the DOD
4    contract for work that was not related to that contract?
5    A.   I just -- we charged, or I charged, time to
6    that contract for work that was, in my opinion, weakly
7    related to the contract.
8    Q.   So the statement that you -- that the complaint
9    makes here in 29(b) that work being performed had little,
10   if any. relation to the Department of Defense contract.
11   would that be an accurate statement?
12   A.   Well. that sentence says both myself and Cory
13   Phillips, so --
14   Q.   I'm asking you right now. I'll ask Cory
15   Phillips tomorrow.
16   A.   Okay. I believe "little relation." you know,
17   "if any," to me is difficult for me to really determine.
18   Q.   Have you worked on many government contracts
19   before, before this time, before joining MesoSystems?
20   A.   Have I worked for or worked --
21   Q.   Have you worked on any government contracts at
22   all? Have you worked on any, any government contracts at
23   all?
24   A.   Yes.
25   Q.   I'm not asking you for a legal opinion, but are

174

1    you aware whether charging time to a government contract
2    for work that is not related to the government contract
3    -- are you aware whether that's illegal, whether there is
4    any legal issue there?
5    A.   One should not do that. It's -- I don't know
6    about the law, but I do know it's -- personally, I would
7    not do that.
8    Q.   Did you report this issue to anybody, this
9    charging time to DOD contracts for work that was not
10   related? Did you report that to anybody?
11   A.   No, I didn't report it to anybody.
12   Q.   Did you talk to Dr. Call about it?
13   A.   Of course.
14   Q.   Tell me about these conversations.
15   A.   Dr. Call wanted me to charge as much time as
16   possible, reasonable, I guess, to the Department of
17   Defense contracts that he has.
18   Q.   This request from Dr. Call, did that raise any
19   concerns in your mind at the time?
20   A.   Yes, it did.
21   Q.   Did you express those concerns to Dr. Call?
22   A.   Yes, I did.
23   Q.   Did you do that in writing?
24   A.   No, I didn't.
25   Q.   Is there any document that you're aware of that

175

1    may contain any information about your concerns?
2    A.   Not that I'm aware.
3    Q.   Weren't you told before you came to MesoSystems
4    by Dr. Call that you would be working on Department of
5    Defense contracts?
6    A.   Yes.
7    Q.   Tell me about that. When did he tell you? How
8    did he do that? Give me any details that you may
9    remember about that.
10   A.   He said that I would be working primarily on
11   the NewCo. However, they may need some help on some of
12   their government contracts in some areas dealing with
13   some, you know, technologies where I could help.
14   Q.   Do you know if he put that in writing for you?
15   Was there any writing that you're aware of that would
16   have that information?
17   A.   I believe it's in -- I'm sorry. Can you
18   restate that question?
19   Q.   Are you aware of any writings in which Dr. Call
20   informed you that you were going to be working on DOD
21   contracts?
22   A.   I believe the employment letter stated
23   something to that effect.
24   Q.   Going back to the equipment that you -- the two
25   pieces of equipment that you claim were purchased using

176

1    the DOD contract number, did that raise any concerns in
2    your mind at the time?
3    A.   I'm sorry. Could you state the question again?
4    Q.   You testified earlier there were two pieces of
5    equipment purchased under the DOD contract number --
6    A.   Uh-huh.
7    Q.   -- that were not going to be used for DOD work.
8    Is that correct?
9    A.   Again, it's partially correct.
10   The piece of equipment would be used, in part,
11   for a defense contract.
12   Q.   Did the purchase of that equipment raise any
13   concerns in your mind at the time?
14   A.   Yes. it did.
15   Q.   Did you express those concerns to Dr. Call or
16   anybody else at MesoSystems. for that matter?
17   A.   Well. I believe I had some conversations with
18   Dr. Phillips and Anand.
19   Q.   Did you put any of your concerns in writing in
20   any way?
21   A.   No.
22   Q.   Did you speak to or in any way contact anybody
23   outside MesoSystems with these concerns?
24   A.   With these concerns?
25   Q.   Yes, your concerns about the equipment what we

---

**177**

1  just talked about.
2      **A.**  No, I don't believe so.
3      **Q.**  As far as the equipment that we talked about
4  and as far as your concerns about charging time, we're
5  talking about two sets of concerns now.  Did you ever
6  talk to anybody at DOD about these issues?
7      **A.**  I recall talking to someone at DOD, but I don't
8  recall explicitly that it was about these issues.
9      **Q.**  Going back to the corporate country club
10  membership that has been talked about so much today, in
11  paragraph 29(a), you list that as a promise or
12  representation that was reneged by MesoSystems
13  immediately after you joined MesoSystems.  Is that
14  correct?
15      **A.**  Yes.
16      **Q.**  Was that promise in any way incorporated in
17  your offer letter?
18      **A.**  No.
19      **Q.**  How about the representation in subparagraph
20  29(f), that MesoSystems had laboratory facilities in
21  which you and Dr. Phillips could begin work immediately?
22  Was any such representation reflected in your offer
23  letter?
24          **MS. MANN:**  Do you want to look at your offer
25  letter?

---

**178**

1      **A.**  Are you talking about (f)?
2      **Q.**  Yes.
3      **A.**  I don't believe that (f) was incorporated into
4  the employment letter.
5      **Q.**  How about (g), that MesoSystems would provide a
6  capitalization table showing financial contributions to
7  be made by MesoSystems to a new company?  Was that
8  reflected in the offer letter?
9      **A.**  No.
10      **Q.**  How about that you will be named CEO of NewCo?
11  Was that reflected in your offer letter?
12      **A.**  No, it was not.
13      **Q.**  How about that MesoSystems had manufacturable
14  designs and capabilities to support the products, as
15  stated in subparagraph (i) of paragraph 29?  Was that
16  reflected in the offer letter?
17      **A.**  Not explicitly, no.
18      **Q.**  So let me ask you a question.  If all of these
19  promises were made to you by Dr. Call and none of the
20  ones that I've listed in my last few questions were
21  reflected in the offer letter, why didn't you ask him to
22  put them in the offer letter?
23      **A.**  Good faith, I guess.
24      **Q.**  I mean, these things were important to you at
25  the time, weren't they?

---

**179**

1      **A.**  Yes.
2      **Q.**  Important enough that you brought a complaint
3  against my client, partly on the basis of those promises,
4  correct?
5      **A.**  Yes.
6      **Q.**  And you still never asked that they be included
7  in the offer letter or in any other document?
8      **A.**  Well, at the time, I believed him.
9      **Q.**  Now if these promises, as stated in paragraph
10  29, were reneged by MesoSystems, or at least MesoSystems
11  immediately began reneging on these promises as soon as
12  you got to Albuquerque, when was the first time that you
13  brought up these issues to anybody at MesoSystems, to the
14  attention of anybody?  I mean, when did you start
15  complaining about MesoSystems reneging on these promises?
16      **A.**  I had discussions with Chuck, Dr. Call.
17      **Q.**  Did any of your discussions -- did you ever put
18  anything in writing about these offers or these promises
19  that you felt were being reneged on as soon as you got to
20  town?
21      **A.**  No.
22      **Q.**  How about this request that you take a cut in
23  pay?  Tell me about who made that request of you.
24      **A.**  Dr. Call.
25      **Q.**  And the cut in pay would be from what amount to

---

**180**

1  what amount?
2      **A.**  He didn't -- I don't recall the exact amount at
3  this time.
4      **Q.**  Was that request made in writing?
5      **A.**  No, it was not.
6      **Q.**  When was the request made?  Do you remember?
7      **A.**  I think, a week or two after I got there.
8      **Q.**  Were there any witnesses to Dr. Call making
9  that request of you?
10      **A.**  No.
11      **Q.**  Did you, in fact, take a cut in pay from the
12  amount stipulated in the offer letter?
13      **A.**  No.
14      **Q.**  The employment letter, the offer letter, as you
15  understand it, does that require or state that
16  Dr. Phillips would report to you?
17      **A.**  Again, I'm not a lawyer, but my offer letter
18  does not have Dr. Phillips specifically explicitly
19  reporting to me.
20      **Q.**  To finish today -- and then we'll break until
21  tomorrow morning and we'll get going fresh, early, and,
22  hopefully, we'll get through it quickly -- I want to talk
23  a little bit about damages.  You know, I want to talk
24  about what damages or what, you know, harm you have
25  sustained as a result of the conduct that your complaint

---

192

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
Civ. No. 02-103 LH/WWD

JAMES SEABA and
CORY PHILLIPS,

          Plaintiffs,

vs.

MESOSYSTEMS TECHNOLOGY, INC.,

          Defendant.

DEPOSITION OF JAMES SEABA, Ph.D.
VOLUME 2

April 3rd, 2003
9:07 a.m.
7309 Indian School Road, Northeast
Albuquerque, New Mexico  87110

          PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:     MR. ALBERTO A. LEON
              ATTORNEY FOR DEFENDANT

REPORTED BY:  MICHELE TRUJILLO, CCR No. 226
              Kathy Townsend Court Reporters
              110 Twelfth Street, Northwest
              Albuquerque, New Mexico  87102

---

193

A P P E A R A N C E S

For the Plaintiffs:

     MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.
     Attorneys at Law
     500 Fourth Street, Northwest, Suite 600
     Albuquerque, New Mexico  87102
     By:  MS. LISA MANN

For the Defendant:

     BAUMAN, DOW, McINTOSH & LEON, P.C.
     Attorneys at Law
     7309 Indian School Road, Northeast
     Albuquerque, New Mexico  87110
     By:  MR. ALBERTO A. LEON

Also Present:

     Dr. Ned Godshall
     Dr. Cory Phillips

I N D E X

JAMES SEABA, Ph.D.                              PAGE

     Direct Continued Examination by Mr. Leon    195

CERTIFICATE OF COMPLETION OF DEPOSITION          233

SIGNATURE/CORRECTION PAGE                         235

---

194

E X H I B I T S

SEABA EXHIBIT.                                  MARKED

12.  E-mail dated 11/12/01 to Mr. Lubeck,

     Mr. Schallop and Mr. Seaba from Dr. Call    198

13.  Invoice to Rod Path Energy from Vogel,

     Campbell, Blueher & Castle, P.C.            205

14.  E-mail dated 12/4/01 to Dr. Seaba

     from Dr. Call                               231

---

195

1            JAMES SEABA, Ph.D.
2    after having been previously duly sworn under oath,
3    was questioned and testified as follows:
4            DIRECT EXAMINATION (Continued)
5    BY MR. LEON:
6        Q.  Dr. Seaba, I just wanted to remind you that
7    you're still under oath –
8        A.  Right
9        Q.  -- and that all of the rules, explanations that
10   we went through yesterday at the beginning, still apply
11   today.
12       A.  Okay.
13       Q.  I understand that you have a clarification to
14   make concerning your testimony yesterday.
15       A.  Yes, yes.  I think one is actually in error,
16   and another one is incomplete, but both of them relate to
17   employment issues before and after I came to MesoSystems.
18           Those issues with regard to Blue Star
19   Technologies, where, in fact, I was considering
20   employment at Blue Star while I was at Honda, at the same
21   time I was considering, you know, other options, such as
22   MesoSystems and Velosys, et cetera
23       Q.  Before you move far away from Blue Star, can I
24   ask you a follow-up question on that?
25       A.  Yeah, sure.

**196**

1  Q.  Did you ever enter into a nondisclosure
2  agreement with Blue Star?
3  A.  I can't recall.  I'd have to look at records.
4  Q.  Let me maybe narrow it down.  When you were at
5  MesoSystems, did you ever enter into a nondisclosure
6  agreement with Blue Star?
7  A.  I don't recall.
8  Q.  Did you ever submit a disclosure agreement to
9  them for consideration when you were at MesoSystems?
10  A.  I may have, and the second part of my
11  description will help, I think, clarify some of that.
12  Q.  Go ahead.
13  A.  All right.  Both at MesoSystems and as a -- and
14  after MesoSystems, in that December time frame, I
15  contacted Blue Star about any interest they may have in
16  the microreactor technology area, and then I had
17  conversations with Nick Vanderborg.  I think his title is
18  president of Blue Star, and we just discussed some of his
19  needs at Blue Star Technologies, and I know Nick also
20  looked at MesoSystems' technology and basically said he
21  would get back to me.
22  So during that visit, I believe I may have
23  asked him to sign an NDA for that view, but I can't
24  recall at this time.
25  Q.  Do you remember the timing, more or less?

**197**

1  A.  I believe it was either the very end of
2  November -- yeah, the very end of November is the timing
3  on that.
4  Then, after my termination, actually, in --
5  really, the next -- in -- going back to the employment
6  offers that we talked about earlier, after I left
7  MesoSystems, in late January or mid-January, Nick
8  Vanderborg at Blue Star wanted to, again, hire me on
9  there, and he -- we had discussions into February.  He
10  supplied me with an offer letter, and that was it.
11  Q.  Let's talk a little bit about -- clean up a
12  couple of issues that we went through yesterday so we can
13  finish up.
14  We talked at length about various business
15  plans, and we talked about capitalization tables and so
16  forth.  Let me ask you a question.  Are you aware of a
17  MesoFuel or Red Path Energy business plan that was
18  actually formally approved by the board of directors of
19  MesoSystems?
20  A.  When you say "formally approved" --
21  Q.  Where there was a board meeting, there was a
22  resolution, there was an approval, there was a vote.  Are
23  you aware of any of those things?
24  A.  I guess, not in such a formalized setting.
25  Q.  How about as far as a capitalization table?

**198**

1  Are you aware of board of directors of MesoSystems that
2  actually formally approved a cap table for NewCo?
3  A.  Again, formal approval, in a written, signed
4  document form, was not done.
5  Q.  Are you aware of a NewCo board of directors
6  ever being convened at a meeting at all?
7  A.  No.
8  Q.  Are you aware -- oh, let me backtrack here.
9  Did you ever receive any communications from Dr. Call
10  concerning the fact that any cap tables or numbers of
11  shares or anything would have to receive final approval
12  from NewCo's board of directors?
13  A.  I do recall Dr. Call stating that the board of
14  directors would have to approve cap table, things like
15  that.
16  Q.  I'm going to show you what I'm handing to the
17  court reporter to be marked as Exhibit 12, which is a
18  November 12th, 2001, e-mail, and I'm going to refer you
19  to the third sentence of it after the court reporter has
20  marked it for you.
21  (Seaba Exhibit 12 marked.)
22  Q.  After you review that document, I would like to
23  ask you a few questions about it, please.
24  Do you recall receiving that e-mail?
25  A.  Yes.

**199**

1  Q.  Can you read for the record, please, the first
2  paragraph?
3  A.  "Attached is the cap table that Jim and I
4  agreed to last night.  The option pool is 2.5 million
5  shares, which will be used to accomplish the following
6  objectives.  These numbers are obviously 'expectations'
7  because actual awards will be made by the MesoFuel
8  board."
9  Q.  Thank you.
10  Now, let me ask you a couple of questions about
11  intellectual property that may have been created during
12  your time at MesoSystems Technology, and, again, we are
13  under the confidentiality agreement with respect to these
14  aspects.
15  A.  Uh-huh.
16  Q.  Did you create any -- were you involved in the
17  creation of any intellectual property during the
18  three-plus months that you were at MesoSystems
19  Technology?
20  A.  Yes, I believe I was.
21  Q.  Can you tell me, in as much detail as you can,
22  what items of intellectual property you were involved in
23  creating?
24  A.  Well, actually, it was very simple.  It was
25  just one -- one meeting that had Dr. Phillips and Anand

216

1  interfered with prospective contractual relationships
2  that you had, and I'm going to point you to the exact
3  paragraph.
4      That would be Count X, starting with paragraph
5  95, page 21.
6      A.  Okay.
7      Q.  Count X, page 21, starting with the paragraph
8  numbered 95.
9      A.  Okay.
10     Q.  I'll point you specifically to paragraph 96,
11 which says that the plaintiff has entered into a
12 prospective contractual relationship with an outside
13 investor.
14     A.  Uh-huh.
15     Q.  Who is this prospective contractual
16 relationship -- I mean, who is the, number one -- let me
17 backtrack.  Who is the outside investor that you're
18 referring to there?
19     A.  It's TSP.
20     Q.  Can you tell me, summarize for me, your
21 communications with TSP that would have led to a
22 prospective contractual relationship, as stated in your
23 complaint?
24     A.  I'm sorry.  Could you rephrase that?
25     Q.  Did you have telephone conversations with them?

217

1  Did you have meetings with them?  Were there
2  communications exchanged?  I'm trying to ascertain to
3  what extent there was any relationship between you and
4  TSP.
5      MS. MANN:  At what time?
6      MR. LEON:  At the time that is referred to in
7  the complaint, whatever that time might be.  I mean, you
8  guys wrote the complaint, I didn't.  So I'm trying to
9  figure out what allegation is made.
10     Q.  That was my next question.  When was this
11 contractual relationship entered into, or prospective
12 contractual relationship?
13     A.  We had discussed with TSP.  They knew of our
14 activity, about Red Path, and they were willing to
15 provide services to -- services with respect to, you
16 know, manufacturing capability and design, things like
17 that.
18     Over the December and January time frame, we
19 had worked on setting up -- were working on setting up
20 contracts and shares and things in Red Path, and we were
21 discussing those type of activities.
22     Q.  When did you first come into contact with TSP?
23     A.  I don't recall exactly the time when I first
24 contacted TSP.  It was, I believe, in October.
25     Q.  While you were at MesoSystems?

218

1      A.  Correct.
2      Q.  How many communications did you have with TSP
3  between October and December 6th, 2001?
4      A.  Several.
5      Q.  How about after December 6th, 2001?
6      A.  Several.
7      Q.  Are there any letters, memoranda, notes, any
8  written communications that we could obtain from you
9  through your attorneys?
10     A.  You have my e-mail.
11     I know that we had -- like I said, I believe we
12 had written a cap table.
13     Q.  While you were at MesoSystems?
14     A.  Well, it was very end of -- end of November,
15 beginning of December time frame.
16     Q.  Are there any letters from them or documents
17 from them promising you funding?
18     A.  No.
19     Q.  Any funding commitments of any kind?
20     A.  Just verbal discussions
21     Q.  Somebody verbally made a funding commitment to
22 you?
23     A.  Yeah, I believe so.
24     Q.  Who, on behalf of TSP, made a funding
25 commitment to you verbally?

219

1      A.  It was Bob and/or Dan Sachs
2      Q.  When, approximately, was this funding
3  commitment made?
4      A.  Oh, sometime in the -- we are talking about the
5  December -- end of December, January time frame or even
6  -- or it even could have been beginning of -- yeah,
7  sometime in December and January I think.
8      Q.  How much money did they commit to provide for
9  -- this is for Red Path Energy, correct?
10     A.  Yeah, it's --
11     Q.  How much money are we talking about here?
12     A.  About $400,000.
13     Q.  Just to make sure that we're clear, there's no
14 letters or contracts or documents that would specify this
15 commitment that we're talking about here?
16     A.  Commitment.  Yeah, there were no contracts
17 signed.
18     Q.  Are there letters from them saying, "We are
19 committing this money to you"?
20     A.  No, no letters from them.
21     Q.  Did Mr. Call know about these ongoing
22 conversations with TSP after December 6th, 2001?
23     MS. MANN:  Can you repeat -- can you just read
24 the question back?  I missed it.
25     (Question read.)

220

1       MS. MANN: I'm going to object to the form of
2   the question. It asks for speculation.
3       MR. LEON: Ms. Mann, if you read paragraph 97
4   of your complaint, it says, "Charles Call, acting on
5   behalf of MesoSystems, was aware of that prospective
6   contractual relationship." I mean, that was the
7   question.
8       MS. MANN: That's fine.
9       MR. LEON: He's alleging it in his complaint.
10      MS. MANN: You're asking him to speculate about
11  what Charles Call knew during a different time, right?
12      MR. LEON: No, I'm asking after December 6th.
13  This doesn't -- your statement in the complaint doesn't
14  specify time. It's open-ended, so I'm trying to narrow
15  it down.
16      A.   Charles Call was aware of that 400K before he
17  terminated us from MesoSystems.
18      Q.   How about after he terminated you?
19      MS. MANN: Object, calls for speculation.
20      A.   I don't know what he thought, but, obviously,
21  he may have thought that could have continued.
22      Q.   I'm not asking you what he thought. I'm asking
23  you whether he was aware of the prospective contractual
24  relationship between Red Path Energy, Inc., and TSP after
25  12/6/2001.

221

1       MS. MANN: And I'm going to object to the form
2   of the question as asking for speculation. You haven't
3   established any foundation.
4       A.   I don't know.
5       Q.   You don't --
6       MS. MANN: You haven't established any
7   foundation that this witness ever spoke to Charles Call
8   again after December 6th, 2001.
9       MR. LEON: I don't think that, in light of the
10  allegation, as open-ended as it is in your complaint,
11  that I have to establish any foundation.
12      He's stating that he was aware and interfered.
13  I want to know -- I want to get some dates. I want to
14  know the basis of this witness' knowledge that Dr. Call
15  was aware of the prospective contractual relationship
16  after his last day at MesoSystems.
17      A.   I don't know if he was aware --
18      Q.   Do you know --
19      A.   -- after that date.
20      Q.   Do you know whether Dr. Godshall was aware of
21  any ongoing negotiations between Red Path Energy and TSP
22  after December 6th, 2001?
23      MS. MANN: Object to the form of the question
24  for the same reason.
25      A.   I don't know. I don't know if he was aware.

222

1       Q.   So, then, can you clarify for the record, going
2   to paragraph 98, what acts or omissions you allege that
3   Dr. Godshall and Dr. Call did to improperly interfere
4   with that prospective contractual relationship?
5       A.   Okay. Well, they visited TSP, had discussions
6   with Bob and/or Dan Sachs. After that meeting, Bob and
7   Dan Sachs told me that we could not work together, as we
8   had discussed.
9       Q.   When did that meeting take place?
10      A.   In January.
11      Q.   You just testified, though, that you didn't
12  know whether either Dr. Call or Dr. Godshall were aware
13  of any ongoing negotiations between TSP and Red Path
14  Energy after 2001.
15      MS. MANN: Objection to the form of the
16  question. You're badgering the witness.
17      MR. LEON: How am I badgering the witness? I'm
18  asking him to clarify. I mean, they're making an
19  allegation here that my clients did something to harm
20  them after a date where they didn't know whether my
21  clients even knew about this relationship.
22      MS. MANN: Wait a minute. This witness has
23  testified that he is aware that Chuck Call did know about
24  the relationship before December 6th. He has -- that
25  Chuck Call knew about the commitment for $400,000 in

223

1   funding before December 6th.
2       What he's testified to now is that he doesn't
3   know what the awareness was after December 6th, but what
4   he does know is that Chuck Call and Ned Godshall came and
5   had a talk with Bob and Dan Sachs and said, "Don't do
6   business with these guys after December 6th."
7       MR. LEON: Wait a second. Now you're
8   testifying. This witness has at no point said -- put any
9   words in Dr. Godshall's and Dr. Call's mouths as to what
10  they told Mr. Sachs.
11      MS. MANN: Right.
12      MR. LEON: This witness has not said one word
13  about "don't do business." Those are your words. You're
14  not a witness here. Please do not testify.
15      A.   Just to clarify, it was Bob and Dan Sachs that
16  said we could not work together anymore. However I was
17  there when Ned Godshall and Chuck Call were there.
18  Immediately after Chuck Call had left, one of the Sachs
19  brothers instructed me we could no longer work together.
20      Q.   Did this person tell you anything that either
21  Dr. Call or Dr. Godshall had told them concerning you or
22  Red Path or anything like that?
23      A.   He told me he understood that we were under an
24  NDA with MesoSystems and there may be some concerns
25  there.

**224**

1   Q.   Did this gentleman tell you that Dr. Call or
2   Dr. Godshall had told him anything derogatory,
3   detrimental, negative, about you or Dr. Philips?
4   A.   Not that I recall.
5   Q.   Did this gentleman tell you that they were not
6   going to be working with you anymore because of his
7   conversations with Dr. Call or Dr. Godshall?
8   A.   Not explicitly.
9   Q.   Are you aware -- and I think that you already
10  testified to this, and if you did, you can tell me --
11  whether MesoSystems Technology was seeking funding from
12  TSP before December 6th, 2001?
13  A.   I don't recall them seeking funding from TSP.
14  Q.   Did they have any relationship with TSP?
15  A.   Yes.
16  Q.   What was the relationship?
17  A.   Machining, making parts.
18  Q.   Were you at all surprised that that
19  relationship continued after December 6th, 2001?
20  A.   I was not surprised that that relationship
21  continued.
22  Q.   Who is Levi Thompson?
23  A.   He's a professor at the University of Michigan.
24  Q.   When did you first -- I should ask, have you
25  ever held any discussions or conversations with

**225**

1   Dr. Thompson?
2   A.   What time frame are we talking about?
3   Q.   Let's start with before you joined MesoSystems.
4   A.   Yes, I knew Levi. I think I first met him
5   around '98.
6   Q.   Did you have any contacts with him while you
7   were at MesoSystems?
8   A.   Hmm.
9        I don't recall any contact while I was at
10  MesoSystems.
11  Q.   How about after your departure from
12  MesoSystems?
13  A.   Yes, I contacted Levi.
14  Q.   Can you tell me about the contact or contacts
15  that took place at that time?
16  A.   I just talked to Levi to see if he knew of any
17  work in the area that Red Path was pursuing.
18  Q.   How many conversations did you have with him?
19  A.   I talked to him once in December, a few times
20  in January.
21  Q.   Did anything come out of that, of those
22  discussions?
23  A.   Nothing.
24  Q.   How about a Professor Chen from the University
25  of Iowa?

**226**

1   A.   Yes.
2   Q.   Do you know who he is?
3   A.   Of course.
4   Q.   Did you have any contact with Professor Chen
5   while you were at MesoSystems?
6   A.   Yes I did.
7   Q.   Can you tell me about those communications?
8   A.   It was just general discussions. We're really
9   good friends.
10  Q.   Have you had any contact with him since you
11  left MesoSystems?
12  A.   Yes.
13  Q.   Tell me about those.
14  A.   They're all personal in nature.
15  Q.   Have you ever subcontracted to do any business
16  with Professor Chen? Let's say after you left.
17  A.   I had a small personal consulting job I did for
18  him.
19  Q.   When was that?
20  A.   It was over -- after I moved to Iowa, over
21  March-May, through May, time frame.
22  Q.   Was that through Red Path Energy, or was that
23  personally?
24  A.   It was personal.
25  Q.   Is that part of the $50,000 in consulting fees

**227**

1   that we talked about yesterday?
2   A.   No, it was not. It was -- this was a thousand
3   dollars, and it was -- Dr. Chen is the director of the
4   advanced driving simulator. He works a lot of people in
5   Detroit. I worked in Detroit. I have a lot of
6   automotive contracts. That was the nature of the
7   business
8        MS. MANN:   Can we have a two-minute break?
9        MR. LEON:   Sure.
10       (Recess taken.)
11  Q.   We were talking about Dr. Chen from the
12  University of Iowa before the break.
13  A.   Yeah, uh-huh.
14  Q.   Are you aware whether he ever had possession of
15  any of these substrates that we were discussing earlier?
16  A.   Yes.
17  Q.   Can you tell me about that? How did he come
18  into possession of these substrates?
19  A.   Well, no. I'm sorry. You asked me if I was
20  aware if he was in possession. I was aware, and I'm
21  aware that he was never in any possession of those
22  substrates.
23  Q.   Okay. He never was. Are you aware of anybody
24  outside MesoSystems that was ever in possession of those
25  substrates?

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
Civ. No. 02-103 LH/WWD

JAMES SEABA and
CORY PHILLIPS,

    Plaintiffs,

vs.

MESOSYSTEMS TECHNOLOGY, INC.,

    Defendant.

DEPOSITION OF CORY PHILLIPS, Ph.D.

April 3rd, 2003
10:38 a.m.
7309 Indian School Road, Northeast
Albuquerque, New Mexico  87110

PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY    MR. ALBERTO A. LEON
    ATTORNEY FOR DEFENDANT

REPORTED BY:   MICHELE TRUJILLO, CCR No 226
    Kathy Townsend Court Reporters
    110 Twelfth Street, Northwest
    Albuquerque, New Mexico  87102

**Page 2**

A P P E A R A N C E S

For the Plaintiffs:

    MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.
    Attorneys at Law
    500 Fourth Street, Northwest, Suite 800
    Albuquerque, New Mexico  87102
    By:  MR. ANGELO ARTUSO

For the Defendant:

    BAUMAN, DOW, McINTOSH & LEON, P.C.
    Attorneys at Law
    7309 Indian School Road, Northeast
    Albuquerque, New Mexico  87110
    By:  MR. ALBERTO A. LEON

Also Present:

    Dr. Ned Godshall
    Dr. James Seaba

I N D E X

| | PAGE |
|---|---|
| CORY PHILLIPS, Ph.D. | |
| Direct Examination by Mr. Leon | 4 |
| CERTIFICATE OF COMPLETION OF DEPOSITION | 154 |
| SIGNATURE/CORRECTION PAGE | 156 |

EXHIBIT

"D"

**Page 3**

E X H I B I T S

| PHILLIPS EXHIBIT | MARKED |
|---|---|
| 15. E-mail dated 8/22/01 to Dr. Phillips from Dr. Call and e-mail dated 8/22/01 from Dr. Phillips to Dr. Call | 69 |
| 16. Offer of Employment for Dr. Phillips dated 8/23/01 | 105 |
| 17. Acknowledgment of Receipt document from Modrall law firm and Chain of Custody log | 109 |
| 18. Facsimile Cover Sheet dated 3/3/03, letter dated 1/24/02 to Mr. Rohde from Ms. Mann and Exhibit A | 109 |
| 19. Transcript of telephone call from Dr. Call to Dr. Phillips' voice mail | 127 |

**Page 4**

    CORY PHILLIPS, Ph.D.
after having been first duly sworn under oath,
was questioned and testified as follows:
    DIRECT EXAMINATION
BY MR. LEON:

    Q.  Dr. Phillips, good morning.  My name is Alberto Leon.  I am the attorney for MesoSystems in the pending lawsuit here in federal court.  I will be asking you some questions today, as I asked Dr. Seaba in the last couple of days.

    I'm going to now proceed to make sure that we understand how the proceedings are going to work, and at any time, if you have any questions, will you please ask them of me?  And I'll be very happy to answer them.

    A.  Yes, thank you.

    Q.  You understand that you're under oath?

    A.  Yes, I do.

    Q.  Do you understand that you're under oath as you would be in a court of law?

    A.  Yes, I do.

    Q.  To facilitate things and to make your attorney's job and my job a little easier, I'm also going to ask you to please wait for the end of my questions before you provide an answer so that our voices are not on top of each other in the transcript.  Would you agree

57

1  there were a number of draft business plans.
2      We also talked about them yesterday extensively
3  during Dr. Seaba's deposition. Do you remember that?
4      A. Yes, I do.
5      Q. I believe that in fact your attorneys
6  introduced a couple of business plans with proposed
7  capitalization tables during Dr. Godshall's deposition.
8  Do you remember that?
9      A. Yes, I do.
10     Q. I believe that there were also a number of
11 e-mails, and communications went back and forth dealing
12 with the business plans and the cap tables that were
13 introduced. Do you remember that there were a number of
14 e-mails introduced?
15     A. I remember things like Exhibit 5, for instance.
16 I don't know if there's e-mails.
17     Q. So let me ask you a question. During the time
18 that you were working at MesoSystems, between September
19 and December of 2001, were there ongoing negotiations
20 about this NewCo, about the business plan, the cap
21 tables? I mean, was this an ongoing process?
22     A. I hoped and thought it was.
23     Q. Are you aware of the board of directors of
24 MesoSystems Technology ever convening and formally
25 approving any particular business plan that was submitted

58

1  for NewCo?
2      A. I'm not aware, but I hoped for it.
3      Q. Are you aware of the board of directors of
4  MesoSystems ever convening and formally approving any
5  capitalization tables for NewCo that were floating around
6  during these negotiations?
7      A. I'm not aware.
8      Q. Are you aware of a board of directors of NewCo
9  being set up during this time? I'm talking with
10 MesoSystems. I'm talking about Red Path Energy, Inc.,
11 the one that you guys formed.
12     A. That's fine.
13     Q. We'll get to that. We're talking about this
14 NewCo with MesoSystems.
15     A. Was I aware of a board of directors being
16 formed for this?
17     Q. Yes.
18     A. No, I wasn't aware.
19     Q. So would it be fair, then, to conclude that
20 there would be no business plan or capitalization table
21 that would have been formally approved by a board of
22 directors of NewCo, since you're not aware of any board
23 being formed?
24     MR. ARTUSO: Objection to the extent you're
25 asking him to speculate about whether that happened.

59

1      A. Yeah, I don't know if I can speculate on that.
2      Q. Are you aware of any board of directors of a
3  NewCo approving any cap tables or business plans?
4      A. I'm not aware.
5      Q. Let's talk a little bit about your August 2001
6  visit to Albuquerque.
7      A. Okay.
8      Q. Who arranged that visit?
9      A. When you say "arranged" --
10     Q. Who made traveling arrangements?
11     A. I believe it was approved by Dr. Call, but
12 arranged by Lisa Albrecht.
13     Q. Who paid for traveling, accommodations
14 expenses, et cetera?
15     A. On that trip -- that was the first trip, you're
16 referring to, is that correct?
17     Q. Right.
18     A. I believe MesoSystems took care of that bill.
19     Q. How long were you out here for during that
20 visit?
21     A. I believe it was a weekend.
22     Q. Arriving on Friday and leaving on Sunday? I
23 mean, can you tell me, more or less, whether you remember
24 what day of the week you arrived and what day of the week
25 you left?

60

1      A. I'm sorry, but that trip is a blur. I know I
2  came down and had some -- a dinner and breakfast with
3  Dr. Call, my wife and I. I mostly remember eating.
4      It seemed like he didn't want to discuss any
5  details of why I was coming down with him. In fact, he
6  pushed the employment, me signing a few papers, right to
7  the end of the trip. I mean, right near the end of the
8  trip, and once I look back and reflect, it seems really
9  odd that he did that, but with respect to his character,
10 it's not odd at all. It was mostly a trip centered
11 around trying to find housing for my family.
12     Q. Did you visit any offices or any facilities of
13 MesoSystems at that time?
14     A. Yes, I did.
15     Q. Tell me about that visit.
16     A. There was an office over at the UNM incubator
17 technology that -- MesoSystems was occupying a space in
18 that building.
19     Q. Did you have a chance to see any equipment that
20 was being used by MesoSystems?
21     A. There was no equipment that was relevant to my
22 employment at MesoSystems at that time.
23     Q. Did you ask anybody to take you to see any
24 equipment?
25     A. Once again, we conveniently didn't have time

**69**

1    A.   Okay.
2    Q.   -- because they're going to be part of the
3  record in the case.
4    A.   Okay. I'm sorry.
5    Q.   So what we'll do to solve that is we will
6  re-mark your counsel's copy.
7    A.   I'm so used to marking up things.
8        (Phillips Exhibit 15 re-marked.)
9    Q.   Ready?
10   A.   Sure.
11   Q.   I'll refer to paragraph number three on that
12 exhibit, and I will ask you to please read the second
13 sentence of paragraph three into the record, starting
14 with the word "initially," the paragraph numbered three.
15   A.   "Initially, and until additional funds are
16 brought it [sic], you will support the company's
17 military-funded projects on reforming most of the time."
18   Q.   What is the date on that message?
19   A.   Wednesday, August 22nd, 2001.
20   Q.   This was before you joined MesoSystems,
21 correct?
22   A.   That's correct.
23   Q.   So would it be fair to say that, at that point,
24 you were aware or noticed that you would be working on
25 these military-funded projects, on reforming, upon your

**70**

1  arrival at MesoSystems?
2    A.   Yes.
3    Q.   Is that project the same as the so-called DOD
4  projects that are referred to in the complaint in this
5  case? And maybe we can go to the paragraphs of the
6  complaint.
7    A.   Are you referring to the complaint section in
8  Exhibit 2 with respect to that question?
9    Q.   Right, right. Yes. I am, but there are a
10 number of references to a DOD, Department of Defense,
11 project and some irregularities about it, and I want to
12 know if the project that is referred to in that e-mail is
13 the same as the DOD project in your complaint.
14   A.   To the best of my understanding, I believe it
15 is.
16   Q.   Without going into any kind of detail, would it
17 be fair to state that the complaint in this case alleges
18 a number of irregularities that took place with respect
19 to that DOD contract during your tenure at MesoSystems?
20   A.   If I understand the complaint -- if you want to
21 take a moment. I can review the complaint --
22   Q.   Yeah.
23   A.   -- just so I know --
24   Q.   We're talking about -- paragraph 29 has a
25 number of those allegations.

**71**

1    A.   Okay. And I'll answer your question right
2  after that, Dr. Leon. Thank you.
3        Thanks, Dr. Leon. Can you repeat your question
4  for me, please?
5    Q.   I was just asking you whether the complaint --
6  and this is general -- alleged a number of irregularities
7  that took place concerning the so-called DOD project.
8    A.   And can you clarify "irregularities" for me,
9  also?
10   Q.   Time charged to the project that was being
11 worked on other matters and equipment being ordered
12 charged to the project that was being used for other
13 purposes.
14   A.   It can be characterized that way, in that
15 regard. I can see how that -- yes, yes.
16   Q.   Is that, in fact, what you allege took place
17 during your tenure at MesoSystems?
18   A.   There could be -- that situation could be
19 characterized in that manner, depending on who you
20 discuss -- from my perspective, there's a possibility of
21 some of that.
22   Q.   Can you explain that? Elaborate on that for
23 me
24   A.   Sure.
25   Q.   Can you explain how this use of equipment or

**72**

1  charging of time was in any way -- you know, and I've
2  called it irregular, but was in any way problematic to
3  you?
4    A.   That's fine. I just wanted you to define
5  "irregular" for me.
6        Problematic? I noticed you added problematic
7  to it. I just wanted to -- can we start over again?
8    Q.   What was the issue with this charging of time
9  or with the equipment in connection with the DOD project?
10   A.   Okay. From my standpoint, the issue was
11 something that -- it's my first time charging codes to
12 projects, first of all. Okay. So I don't understand the
13 accounting behind -- I did not understand the accounting
14 behind charge codes and things of that nature on
15 government contracting projects at the time.
16        So the issue for me was trying -- I was trying
17 to clear up why Dr. Call instructed me or suggested that
18 I charge my time not too much on one project, but you
19 spread it over related projects, and I didn't understand
20 the accounting, but I assumed, whatever accounting system
21 that they have, but I assumed, that things would be okay and I wouldn't
22 have to explain this to some DOD representative one day
23 or something.
24        So I -- he was part of my, you know, reporting
25 to superiors, and I did my job accordingly, with respect

73

1  to his request.
2      Q.  Since there have been, though, allegations in
3  the complaint, paragraph 29 of the complaint, can you
4  explain to me what is it that you allege that MesoSystems
5  did wrong with respect to the time that you charged to
6  the DOD project?
7      A.  I'm not -- I can't decide if anything is wrong
8  or not with respect to the DOD. However, from my
9  perspective, I was just concerned about the accounting
10  aspect, dealing with time and charges, because I was new
11  to that environment.
12      So "wrong" may be a little strong on the
13  continuum, a little harsh for me to use there, because I
14  can't make that judgment call. However, you know, there
15  were some concerns from my angle, maybe because of the
16  newness of the job.
17      Q.  Did you express these concerns to anyone?
18      A.  Yes. I believe, in the context of a few
19  e-mails to Korina Howard, and sometime in November --
20  once again, my dates are --
21      Q.  Who is Korina Howard?
22      A.  She was one of the staff -- a staff personnel
23  in Kennewick, Washington, that handled contract issues,
24  ordering parts on contracts or -- I don't have the exact
25  title for Korina, but I remember, at some point, when,

74

1  once again, the issue of ordering parts or charging time
2  came up on DOD contracts and I was concerned about it,
3  posing an e-mail to her in some sort of manner.
4      Q.  Did you express your concerns to anybody else?
5      A.  I may have mentioned it to Chuck in passing.
6  He was going in and out, and I probably mentioned it to
7  Jim a few times. Even Dr. Chellappa, I may have
8  mentioned it to.
9      As you probably can tell, I'm pretty vocal, you
10  know, about something that bothers me, and so I'm sure I
11  expressed that to Dr. Chellappa and Dr. Seaba, who worked
12  a little closer, probably, to Dr. Call than me, on maybe
13  several occasions, so --
14      Q.  Did you express these concerns to anybody
15  outside of MesoSystems?
16      A.  Oh, definitely not.
17      Q.  Can you tell me if the work that you were
18  doing, which was being charged to the DOD contract --
19  what relation did that work have with the DOD work?
20      A.  I'm sorry. Could you repeat your question?
21  I'm sorry.
22      Q.  Well, 29(b) of the complaint says that the work
23  being performed had little, if any, relation to the
24  Department of Defense contracts, and I want to establish,
25  you know, to the extent that there is any relation, what

75

1  the relation is and if your view today still is that
2  there was little, if any, relation to DOD contracts.
3      A.  The work.
4      Let me see which -- in what context the work is
5  being -- which work are we talking about with respect to
6  paragraph 29?
7      Dr. Leon, do you also interpret that work to be
8  for the to-be-formed company in that paragraph, or am I
9  misreading that? Can you correct it for me?
10      Q.  No, basically what I'm looking for is the
11  following. Let's say that, as a -- let's use an example.
12  Let's say you charged 10 hours in a particular week to a
13  DOD contract.
14      A.  Uh-huh.
15      Q.  What percentage of those 10 hours would have
16  any relation to the Department of Defense contracts?
17  That's what I'm looking for, during the time that you
18  worked at MesoSystems.
19      A.  A difficult question to answer.
20      I would, for accuracy, safely say today that it
21  was probably a majority of that work being charged to
22  that budget code or -- I forget the actual name of that,
23  what they termed it, but that code.
24      The majority of work that was listed there for
25  me was associated with the title of that project, if you

76

1  will, so it agreed, you know, the majority.
2      Q.  So, then, the statement here saying that the
3  work being performed had little, if any, relation to the
4  DOD contract, would that be accurate, then, in your case?
5      A.  It's probably not totally accurate in my case,
6  yeah.
7      Q.  Let me direct you to paragraph 39 of the first
8  amended complaint.
9      A.  Okay.
10      Q.  I would like you to read it for yourself, and
11  then I would like to ask you a few questions about it.
12      Before we go there, let me just ask you one
13  follow-up question on the last topic.
14      A.  Sure.
15      Q.  Without asking you to render a legal opinion or
16  to, you know, express any views that a lawyer would
17  express, just in common parlance, common terms, is it
18  your belief today that, during your tenure at
19  MesoSystems, MesoSystems was in any way defrauding or
20  lying to DOD?
21      A.  From my perspective, I don't -- well, if you
22  say defrauding, it's consistent -- 100 percent
23  defrauding, you know, there was some misrepresentation
24  going on to DOD, from my perspective, sure.
25      Q.  Going back to paragraph 39, there is an

125

1  used to start up the ammonia cracker. So the ammonia
2  cracker needed a source to start it up, and that was one
3  potential way to start it up.
4      And this is only design, and that design never
5  was reported to the people who funded the project, which,
6  I repeat, was very surprising. After we put all of this
7  work into that design, they never showed it to DOD.
8    Q.  Are you aware of whether this was shown to DOD
9  after your departure from MesoSystems?
10    A.  No, I'm not aware, but the work was for that
11  particular meeting.
12    Q.  But it's possible that it was shown to them
13  after your departure, correct?
14      MR. ARTUSO: Objection.
15    A.  It's possible.
16    Q.  Let's talk a little bit about the December 6th,
17  2001, meeting. Was there a meeting called for that day
18  that you remember?
19    A.  I didn't know about any meeting on that day. I
20  was in the office that day. If I had been, maybe, sent
21  an e-mail about the meeting -- which I receive a lot of
22  e-mails, typically, at any job, and I remember meetings,
23  and it's very atypical of me not to remember meetings,
24  but I was there that day on the 6th, I remember, and no
25  one mentioned any meeting to me.

126

1    Q.  Tell me what happened that day. You went to
2  work normally, as you --
3    A.  Yeah, I can remember, in the morning, say -- in
4  the morning and left for lunch, and a typical day.
5    Q.  Did you work a full day that day?
6    A.  Well, Charles Call fired me that day,
7  unlawfully.
8    Q.  He did this in person?
9    A.  No, he didn't. He left a voice mail.
10    Q.  A voice mail at work?
11    A.  A voice mail on my cell phone.
12    Q.  But you were there in the office until -- what
13  time were you there until that day?
14    A.  Until lunch, I believe, or close to it. Maybe
15  an hour before noon or something.
16    Q.  Then where did you go, after lunch?
17    A.  After lunch, I had some meetings. I may have
18  had a meeting with my separation attorney. I was working
19  on the separation agreement, maybe, and then had some
20  activities I needed to complete over at UNM, and there
21  could have been, even, a TSP meeting in there at that
22  time, so --
23    Q.  So after lunch, you never came back to the
24  office?
25    A.  No.

127

1    Q.  You never spoke with Dr. Seaba about any kind
2  of meeting taking place that day?
3    A.  No, not that day, that day at MesoSystems, no.
4  We could have talked about a meeting, maybe, over at the
5  attorney's office, but --
6    Q.  I'm going to hand you what I'm going to have
7  the court reporter mark as Exhibit 19, and this is a
8  document that was produced to us by your counsel in this
9  case.
10    A.  Thanks.
11      (Phillips Exhibit 19 marked.)
12    Q.  I believe it is a transcript of the telephone
13  call you received on December 6th, 2001, so I'm going to
14  have you read it to yourself, and then I'll ask you a few
15  questions about it.
16    A.  Okay.
17    Q.  There is a time in front of each transcript.
18  Can you tell me what time it says there?
19    A.  1:50 p.m.
20    Q.  Do you remember when you first listened to a
21  message?
22    A.  No, I don't. I don't remember exactly when I
23  -- in the afternoon, when I heard that message.
24    Q.  You don't remember if it was a few minutes
25  after 1:50? Half an hour? An hour? Two hours?

128

1    A.  Nope.
2    Q.  Did you make any attempt to call Dr. Call after
3  you heard these messages?
4    A.  No.
5    Q.  Did you make any attempt to come over to the
6  office pursuant to the request that Dr. Call made to you
7  in this message?
8    A.  No.
9    Q.  I want to take you to line number six, and I'm
10  going to ask you a couple of questions, and this is just
11  for clarification.
12      Is it your understanding from that message --
13  do you have an understanding from the message of what the
14  effective day of your termination was?
15    A.  From this statement, it says, "I will be left
16  with no choice but to terminate you effective -- that
17  would be an effective notice today."
18    Q.  Then what does it say right after that?
19    A.  "Effective 14 days from today."
20    Q.  Did you receive payment for salary through that
21  date from MesoSystems?
22    A.  I don't recall an actual date, but there was a
23  final check sent from -- after December, the first week
24  of December or the second week of December. I'm not
25  sure.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

JAMES SEABA and CORY PHILLIPS,

        Plaintiffs,

    v.

MESOSYSTEMS TECHNOLOGY, INC.,

        Defendant.

NO. CIV-02-0103 LH/WWD

## AFFIDAVIT OF SAMANTHA LEAGUE

STATE OF WASHINGTON     )
                           ) ss.
COUNTY OF BENTON         )

    Samantha League, upon her oath states the following to be true and correct:

    1.    I am employed as the Human Resource Manager of MesoSystems Technology, Inc. ("MesoSystems"). In my capacity as Human Resource Manager, I am attesting to the facts stated herein.

    2.    James Seaba and Cory Phillips received all salary payments set forth in the offers of employment they executed with MesoSystems.

    3.    Cory Phillips received all moving expenses reimbursements set forth in the Phillips Contract. Cory Phillips was reimbursed $9,443.04 for moving expenses.

    4.    James Seaba received all moving expenses reimbursements set forth in the Seaba Contract. James Seaba was reimbursed $43,801.72 for moving expenses.

    5.    James Seaba was also reimbursed $10,855.22 by MesoSystems for expenses he incurred on behalf of MesoSystems during his employment.



**EXHIBIT**

"E"

6.     James Seaba's employment relationship with MesoSystems ended prior to the expiration of one-year of employment.

7.     Cory Phillips' employment relationship with MesoSystems ended prior to the expiration of one-year of employment.

8.     On January 25, 2002, MesoSystems sent James Seaba and Cory Phillips notice of their rights under COBRA.

9.     On January 30, 2002, MesoSystems sent a revised COBRA notice reciting the 60-day election period to Plaintiffs by overnight mail.

10.    James Seaba and Cory Phillips were still receiving MesoSystems benefits on January 30, 2002

11.    Neither James Seaba nor Cory Phillips chose to elect COBRA coverage

12.    James Seaba and Cory Phillips received all employment benefits afforded to other MesoSystems' employees during their tenure at MesoSystems.

FURTHER AFFIANT SAYETH NAUGHT.

_Samantha League_
Samantha League

STATE OF WASHINGTON    )
                       ) ss.
COUNTY OF BENTON       )

This instrument was acknowledged before me by Samantha League this 16th day of May 2003.

_Christine A. Bair_
NOTARY PUBLIC

My Commission Expires:

9.7.04

2

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

JAMES SEABA and CORY PHILLIPS.

Plaintiffs,

v.

MESOSYSTEMS TECHNOLOGY, INC.,

Defendant.

NO. CIV-02-0103 LH/WWD

## AFFIDAVIT OF CHARLES J. CALL

STATE OF NEW MEXICO            )
                               ) ss.
COUNTY OF BERNALILLO           )

Charles J. Call, upon his oath states the following to be true and correct:

1.      I am the President and CEO of MesoSystems Technology, Inc.
("MesoSystems"). located in Albuquerque. New Mexico.  In my capacity as President
and CEO, I am attesting to the facts stated herein.

2.      I continued to discuss the structure, financing and Plaintiffs' role in the to-
be-formed company with Plaintiffs up until the Plaintiffs employment with MesoSystems
ended on December 6, 2001.

3.      MesoSystems personnel did and do work at the Nanopore laboratory
facilities and the building is clearly labeled "Nanopore" at the entrance and in other
locations throughout the laboratory.

4.      Based on my "know-how" MesoSystems did form a new company.
MesoFuel.



EXHIBIT

"F"

5.    MesoFuel is supported by laboratory facilities, marketing facilities, manufacturing facilities and equipment.

6.    I did not intend to deceive Plaintiffs as to the nature of laboratory facilities, marketing facilities, manufacturing facilities, equipment and MesoSystems ability to support the to-be-formed company.

7.    I did not intend to deceive Plaintiffs as to the structure, timing and relationships of the parties in the to-be-formed company throughout the negotiations in the second half of 2001. The negotiations were fluid and on-going.

8.    Representatives of MesoSystems, including myself, had a number of discussions with James Seaba regarding several possible terms of James Seaba's employment with MesoSystems prior to August 20, 2001.

9.    Representatives of MesoSystems, including myself, had a number of discussions with Cory Phillips regarding several possible terms of Cory Phillips' employment with MesoSystems prior to August 27, 2001.

10.    I did not anticipate that James Seaba or Cory Phillips would rely on pre-employment discussions I had with them in an effort to negotiate the eventual terms of their employment agreements, rather than on the terms of their written employment agreements with MesoSystems.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Charles J. Call

2

STATE OF NEW MEXICO          )
                             ) ss.
COUNTY OF BERNALILLO         )


    This instrument was acknowledged before me by Charles J. Call this 16th day of May, 2003.

_Emily L Beneomo_
NOTARY PUBLIC

My Commission Expires:

_6/13/04_

3

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

JAMES SEABA and CORY PHILLIPS,

            Plaintiffs,

    v.

MESOSYSTEMS TECHNOLOGY, INC.,

            Defendant.

NO. CIV-02-0103 LH/WWD

## AFFIDAVIT OF BOB SACHS

STATE OF NEW MEXICO      )
                              ) ss.
COUNTY OF BERNALILLO     )

Bob Sachs, upon his oath states the following to be true and correct:

1.    I am the CEO of TSP located in Albuquerque, New Mexico. In my capacity as CEO, I am attesting to the facts stated herein.

2.    I had several conversations with James Seaba regarding TSP potentially providing funding for Red Path Energy.

3.    I never made a verbal funding commitment in the amount of approximately $400,000 to James Seaba or any other representative of Red Path Energy.

4.    TSP's corporate officers never made a funding commitment to Red Path Energy.

5.    TSP never entered into a contract or an agreement to contract with Red Path Energy.



EXHIBIT

"G"

FURTHER AFFIANT SAYETH NAUGHT.

_____
Bob Sachs

STATE OF NEW MEXICO          )
                             ) ss.
COUNTY OF BERNALILLO         )

        This instrument was acknowledged before me by Bob Sachs this 16th day of May,
2003.

NOTARY PUBLIC

My Commission Expires:

6/13/04

2