IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JAMES SEABA and
CORY PHILLIPS,

        Plaintiffs,

v.                              Civ. No. 02-103 LH/RHS

MESOSYSTEMS TECHNOLOGY, INC.,

        Defendant.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT
AND FOR ATTORNEYS' FEES AND COSTS AS A SANCTION FOR
PLAINTIFFS' ABUSE OF THE DISCOVERY PROCESS**

Plaintiffs deny that they have deleted, copied, or altered, any of the files contained on the laptop computers that they used while working for Defendant. Plaintiffs further deny that their sworn testimony in this case has been anything other than the complete truth. Finally, Plaintiffs deny that they have in any way abused the discovery process in this case. *See* Exhibit A hereto, Affidavit of James Seaba, ¶¶3 and 4 and Exhibit B hereto, Affidavit of Cory Phillips, ¶¶3 and 4.

In addition to their unequivocal denial of Defendant's allegations, Plaintiffs submit that Defendant cannot establish by clear and convincing evidence that Plaintiffs deleted, modified, or altered any of the computer files that they complain about; nor can Defendant establish that any relevant information or evidence has been lost as a result of Plaintiffs' alleged actions. Because Defendant cannot meet its burden of proving such facts by clear and convincing evidence, Defendant's Motion to Dismiss should be denied.



## I. Defendant Cannot Prove "Fraud" by Clear and Convincing Evidence

Defendant has alleged that Plaintiffs have given "perjurous testimony" and have attempted to perpetrate "a fraud upon MesoSystems and the Court." Defendant's Brief, at 19. Plaintiffs unequivocally deny these allegations. *See* Exhibits A and B hereto.

The Tenth Circuit has held that allegations of fraud, misrepresentation, or misconduct in litigation, must be established by "clear and convincing proof." *Anderson v. Dept. of Health and Human Serv.*, 907 F.2d 936, 952 (10th Cir. 1990) (considering Rule 60(b)(3) motion to vacate judgment); *see also Wallace v. Bank of America*, 2003 WL 1736445 (10th Cir. April 2, 2003) (also considering a Rule 60(b)(3) motion. "[F]raud by one's adversary in the course of litigation must be proven by clear and convincing evidence."). Defendant's proof of Plaintiffs' alleged fraud in this case falls far short of clear and convincing and, indeed, is entirely unconvincing.

### A. Defendant's "Chain of Custody" Log is Rife with Inaccuracies.

In her Affidavit in Support of Defendant's Motion to Dismiss, Ms. Lisa Albrecht states that prior to the return of the laptop computers that are at issue in this matter, ". . . MesoSystems set up and implemented a ***strict chain of custody procedure***." Affidavit of Lisa Albrecht, ¶8 (docket no. 72) (emphasis added). Contrary to this assertion, the facts demonstrate that Defendant's chain of custody procedures were far from "strict."

A purported "Chain of Custody Log" is attached as Exhibit A to the Affidavit of Mr. Anton Litchfield (docket no. 73). Mr. Litchfield is a computer forensic expert hired by Defendant to offer opinions with respect to the files on the laptop computers allegedly used by Dr. Seaba and Dr. Phillips while at MesoSystems. At his deposition, Mr. Litchfield testified that the purpose of a chain of custody log is to show what happened to a piece of evidence throughout the course of the investigation. *See* Exhibit C hereto.

2

deposition of Anton Litchfield, p. 36, ln. 21 to p. 37, ln. 1. Ideally, everyone who has possession of the evidence for even a short period of time should sign the log. *Id.* p. 37, ln. 2 – 7.

Despite these requirements, an examination of the chain of custody log maintained by the Defendant shows inconsistencies from the very start. For example, the first initials to appear on the chain of custody log are "MDH," presumably one of Defendant's employees. *See* Exhibit A to Litchfield Affid. In her affidavit, Lisa Albrecht states that she "acknowledged receipt of the two laptops, the CD-writer, and the other items returned" to Defendant on January 30. Albrecht Affid., ¶7, and Exhibit A to Albrecht Affid. No explanation is given as to why Ms. Albrecht acknowledged receipt of the materials, when in fact they were apparently first received by "MDH."

In ¶8 of her affidavit, Ms. Albrecht states that the "laptops were then stored in a locked cabinet on company premises so that no one other than myself had access to them." Yet, page 2 of the chain of custody log shows that someone other than Ms. Albrecht accessed the cabinet on February 7, 2002 to remove some "coated foam block." How did this individual gain access to the cabinet? Did others have such access? Were the keys to this cabinet always in Ms. Albrecht's possession? Do any duplicates exist? What else was stored in the cabinet that might have required regular or even daily access? Ms. Albrecht's affidavit is singularly unrevealing with respect to such questions.

Page 2 of the chain of custody log reports that on February 11, 2002, "LDA," whom Plaintiffs assume is Ms. Albrecht, removed the laptops and shipped them to "New Armor Technologies Armor, Inc. Attn: Scott Stevens." Despite this address, Mr. Stevens was not the person at NTI to receive the laptops. *See* Exhibit C hereto, Litchfield depo., p. 39, ln. 15 to p. 41, ln. 11. Indeed, the individual who apparently next signed the log

3

was Mr. Paul French of NTI whose initials, "PTF," appear on page one of the chain of custody log.

Mr. Litchfield testified that he has no information as to whether the chain of custody log was in the boxes containing the laptops or was delivered separately; nor does he have any information regarding whether Mr. French made the February 12, 2002 entry on the log at the time that he opened the boxes containing the laptops or at some later time. *Id.*, p. 41, ln. 12 to p. 42, ln. 3.

Mr. Litchfield also has no explanation as to why MesoSystems waited eleven days, from January 30, 2002 until February 11, 2002, before sending the computers to NTI. *Id.*, p. 38, ln. 25 to p. 39, ln. 14. Defendant has offered no explanation for this delay. Mr. Litchfield also has no knowledge as to why it took almost 11 months for NTI to begin its work on the computers (the computers were received in February 2002, but work did not commence until January 2003). *Id.*, p. 22, ln. 19 to p. 24, ln. 6 and p. 24, ln. 18 – 22.

Finally, despite the fact that the chain of custody log is designed to document who had access to the computers and when, neither Mr. Litchfield nor any of his other colleagues at NTI ever signed the log. *Id.*, p. 53, ln. 10 – 19. In short, the chain of custody log falls far short of establishing a critical predicate to Defendant's Motion: that no one other than Plaintiffs had access to the computers.

### B. The Dates and Times Shown on the Computers Cannot be Established with Certainty.

Defendant alleges that Plaintiffs accessed and deleted files between December 6, 2001, the date that Plaintiffs were fired, and January 30, 2002, the date that the computers were returned by Plaintiffs' counsel to Defendant. The dates that Defendant relies upon

to establish Plaintiffs' allegedly nefarious activities, are however, fraught with uncertainty.

As just one glaring example, Defendant's expert, Mr. Litchfield, testified that when he turned on Dr. Scaba's computer, the date and time shown on the computer were off by 11 months.

> Q: Okay. What about Mr. Scaba's computer, when you turned it on, did it have the right date and time?
>
> A: I think -- I believe it was 11 months ahead to the day.
>
> Q: Okay. I'm not following your answer, 11 months ahead to the day. What do you mean?
>
> A: For instance, if today is May 27th, the date on Mr. Scaba's computer would be exactly 11 months ahead of today, so it would be April 27th of 2004.
>
> Q: So on Mr. Scaba's computer the system is showing that it is 11 months ahead of today's date? Is that what you're saying?
>
> A: Yes, sir.

Exhibit C hereto, Litchfield depo., p. 49, ln. 22 to p. 50, ln. 10.

Significantly, Mr. Litchfield did *not* reveal this large date discrepancy in the Affidavit he filed with the Court.

Mr. Litchfield testified that there are a number of ways that such an anomaly could occur, including batteries going dead, stray electrical surges, and inadvertent start up. *Id.*, p. 77, ln. 16 to p. 78, ln. 8. Of course, the easiest and most likely explanation is that someone deliberately changed the computer's system settings. *See* Exhibit D hereto, Affidavit of Brooks Hilliard, ¶¶6, 7, 8, and 9. Mr. Litchfield admitted that the dates and times on the files that he reviewed could have been changed. Litchfield depo., p. 69, ln. 1 to p. 70, ln. 8. Even more telling, Mr. Litchfield admitted that if done correctly, such

5

changes could not be detected by him or any other computer forensic examiner. *Id.*, p. 74, ln. 18 to p. 75, ln. 4; and Hilliard Affid., Exhibit 1, Opinion no. 1, at pp. 3 – 5.

Mr. Litchfield further testified that he relied primarily on a Windows system file called "schedlog" to determine whether there had been any date tampering. Litchfield depo., p. 34, ln. 22 to p. 36, ln. 15. He later admitted, however, that even this file could be altered in such a way that alterations would not be detectable. *Id.*, p. 42, ln. 4 to p. 43, ln. 12.

In sum, Mr. Litchfield, for purposes of his analysis and affidavit, assumed that all of the dates for the files that he examined and being reported to him by the computers were correct, even though he knew the date was wrong when he turned Dr. Seaba's computer on in the first place. Yet, he admitted that there are numerous ways in which dates can be falsified with techniques that are virtually impossible to detect. *See* Exhibit 1 to Hilliard affid., Opinion no. 1, at pp. 3 – 5.

### C. The "Results" of Mr. Litchfield's Examination Do Not Support Defendant's Allegations.

In his affidavit, Mr. Litchfield states that "[t]he presence of a .lnk file is important because if a .lnk file has been created during the relevant time period in this case (December 6, 2001 through January 30, 2002), then it indicates that the users were opening or accessing files during that time." Litchfield Affid., ¶14. Mr. Litchfield then states that his investigation showed that 595 .lnk files and at least 440 .lnk files were accessed from Dr. Seaba's and Dr. Phillips' hard drives after December 6, 2001. *Id.*, ¶¶19 and 20. To the uninitiated, the implication of Mr. Litchfield's statement is that something "sinister" was occurring here. At his deposition, however, Mr. Litchfield admitted that merely turning on the computer, without actually opening the files could

6

cause numerous .lnk files to show that they have been "accessed." Exhibit C hereto, Litchfield, p. 93, ln. 23 to p. 95, ln. 5.

Mr. Litchfield's Affidavit states, "numerous files were accessed . . . after December 6, 2001." Litchfield Affid., ¶¶ 18 – 20. Despite Defendant's attempt to portray this as something sinister, access does not mean that these files were "destroyed." In fact, it does not even mean that they were opened and examined or modified. Rather, even if one assumes that the dates reported by Mr. Litchfield are accurate, access dates after December 6, 2001 could simply be the result of sending the file to the printer. *See* Litchfield depo., p. 79, ln. 1 – 8.

Defendant seeks to make much of the fact that a CD-burner, program file was accessed allegedly after December 6, 2001. Aside from the fact that the dates reported by Mr. Litchfield cannot be relied upon with any certainty, as he has admitted, Mr. Litchfield has testified that he does not know and cannot establish whether any files were ever actually copied from either computer. *Id.*, p. 98, ln. 1 to p. 99, ln. 1.

Mr. Litchfield's analysis also showed that each computer hard drive was divided into two partitions. Litchfield affid., ¶11. Interestingly, neither Dr. Seaba nor Dr. Phillips created the partitions on their respective computers, nor do they know how to do so. *See* Exhibit A, Seaba affid., ¶6 and Exhibit B, Phillips affid., ¶6. The questions naturally arise as to where these partitions came from and who created them?

The most interesting curiosities arising from Mr. Litchfield's investigation concern the nature of the files that Plaintiffs' allegedly "deleted" when compared to those that they did not delete. For example, with the usual sinister implications, Mr. Litchfield says that a memo from Dr. Seaba to Dr. L.D. Chen was last accessed on Dr. Seaba's computer on December 7, 2001, and was deleted. Litchfield Affid., ¶26 and Exhibit B to

7

Litchfield Affid. In its Brief, Defendant notes that this document "referenced Seaba as the President/CEO of Red Path Energy." Defendant's Brief, p. 5. Defendant presumably cites this document in support of its argument that this file was deleted because it constitutes "evidence of Plaintiffs' wrongdoing while still employed with MesoSystems." *Id.*, p. 18. Defendant is apparently hoping that the Court doesn't bother to actually read Exhibit B to Mr. Litchfield's affidavit, since the Exhibit explicitly states in the second paragraph on page 1, that Red Path Energy was "[f]ounded in late 2001 by Dr. James Seaba and Dr. Cory Phillips both formerly of Honda R&D America ***along with Dr. Charles Call, CEO of Mesosystems Technology, Inc.***" (Emphasis added). Similar statements, summarized in the table below, appear throughout many of the other "deleted" documents attached as Exhibits to Mr. Litchfield's affidavit.

| Exhibit C | Memo to Dr. Levi Thompson from Dr. Cory Phillips | "Deleted" from computer | Red Path "Founded in late 2001 by Dr. James Seaba and Dr. Cory Phillips … along with Dr. Charles Call, CEO of Mesosystems Technology, Inc." |
|---|---|---|---|
| Exhibit D | Memo to Dr. Levi Thompson from Dr. Cory Phillips | "Deleted" from computer | ". . . Red Path has access to the Mesochannel platform offered by one of our strategic partners Mesosystems Technology, Inc." |
| Exhibit F | Letter from Power Factors, LLC to Dr. James Seaba | "Deleted" from computer | "I want to congratulate you and MesoSystems for making the bold move to form Red Path Energy." |
| Exhibit F | Letter from Power Factors, LLC to Dr. James Seaba | "Deleted" from computer | "We assume MesoSystems, as the owner of Red Path Energy, will have broad control over the development of the company." |
| Exhibit J | Confidentiality Agreement | "Deleted" from computer | Draft agreement between MesoSystems and TSP |

These documents hardly constitute the smoking guns of Plaintiffs' alleged improper competition with Defendant. Indeed, there is no way to reconcile Defendant's

8

allegations of improper competition with the references to Dr. Call and Defendant contained throughout these documents.

Exhibit G to Mr. Litchfield's Affidavit provides another interesting example. This document is purportedly the Business Plan for Red Path Energy. It was also allegedly deleted by Plaintiffs, presumably in an attempt to cover their breach of the non-compete agreement. The "metadata" for this document reveals, however, that the author is Ms. Lisa Oglesby, now know as Lisa Albrecht, secretary to Charles Call, CEO of Defendant. *See* Exhibit 1 to Hilliard Affidavit, at 6. Plaintiffs did not create this document, so it can hardly constitute evidence of their supposed wrongdoing.

Exhibit J to Mr. Litchfield's Affidavit is similarly interesting. This document is a separation agreement sent by Dr. Call to Dr. Seaba and represents a critical piece of Plaintiffs' evidence in this case. The document establishes that the parties had reached an agreement on forming a spin-off company and it is undisputed that Dr. Call breached this agreement when he revoked it by firing the Plaintiffs. Despite its key position in Plaintiffs' case, Defendant would have the Court believe that Plaintiffs "deleted" this document so as to deceive both Defendant and the Court. This contention simply makes no sense.

Finally, there is Exhibit L to Mr. Litchfield's Affidavit. This document is a "summary of events" written by Plaintiffs. It also sets forth Plaintiffs' opinions as to which events constitute a breach of contract. It is, in essence, a layperson's attempt to analyze the legal significance of events, and is just the sort of road map most opposing counsel would love to have. Interestingly, Plaintiffs did *not* delete this document. If Plaintiffs were trying to destroy evidence, why would they have left this document on their computers?

9

In sum, the results achieved by Mr. Litchfield's analysis of the computers do not support the claim that Plaintiffs have lied under oath, nor do they support any claim that Plaintiffs have acted in bad faith in an attempt to destroy evidence.

## II.     Defendant Cannot Establish Any Spoliation of Evidence

With respect to the spoliation of documentary evidence, the Tenth Circuit has held that

> the general rule is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction . . . . The adverse inference must be predicated on the bad faith of the party destroying the records . . . . Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a week case.

*Aramburu v. The Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997).

Defendant's allegations of spoliation in this case fail for the simple reason that it cannot show that any documents have been "destroyed." In his affidavit, Defendant's expert, Anton Litchfield, states 829 files or folders were "flagged as deleted from the first partition of [Dr. Seaba's] hard drive on or after December 6, 2001." Litchfield Affid., ¶19. Another 111 files or folders on the second partition of Dr. Seaba's hard drive were also "flagged as deleted." *Id.* Mr. Litchfield also states that 327 files or folders were "flagged as deleted" on the first partition of Dr. Phillips' hard drive. *Id.*, ¶20. Notwithstanding how "sinister" all these deletions may sound, Mr. Litchfield has testified that for all he knows, all of these allegedly deleted files could be recovered.

> Q:     Now, when you say "deleted" in here, "were flagged as deleted" does that mean that they were unrecoverable, that they could not be recovered?
>
> A:     No. That just means that they were deleted.

10

> Q: Okay.
>
> A: I was – only later on, where I refer to certain files that were recovered, those were the only files that I was ever asked to recover. For all I know, all 829 could be recoverable. I did not look at all 829.

Exhibit C hereto, Litchfield depo., p. 93, ln. 13 – 22. *See also, id.*, p. 95, ln. 13 – 22 (Mr. Litchfield does not know whether the "327 files" flagged as deleted on Dr. Phillips' computer are or are not retrievable); and Exhibit 1 to Affidavit of Brooks Hilliard, at 5 (with limited time, Mr. Hilliard's associate recovered a total of 72 files and "could easily have recovered more with additional time.").

Defendant simply cannot recover for alleged spoliation of evidence in the absence of any evidence that any of the files on either computer were destroyed. Moreover, the analysis by Mr. Litchfield does not support a finding that Plaintiffs acted in bad faith. *See* Section II.C. above.

Plaintiffs admit that they did print files and e-mail from each of the computers. See Exhibit A, Seaba affid., ¶5 and Exhibit B, Phillips affid., ¶5. The printing of these documents is not, in any way, inconsistent with their sworn testimony. Plaintiffs have been asked whether they deleted or copied files after December 6, 2001, not whether they had printed such files. The mere act of printing the documents does not destroy the documents and, therefore, cannot support a claim of spoliation. Rather, because Plaintiffs had the foresight to print relevant documents prior to returning the laptops, relevant evidence has been preserved.

The Plaintiffs' efforts to print and preserve relevant documents must be contrasted with the Defendant's complete lack of any effort to preserve electronic evidence in this case. *See* Exhibit E hereto, deposition of Samantha League, p. 36, ln. 17 to p. 38, ln. 7

11

(after the filing of the Complaint in this case, MesoSystems undertook no steps to make sure that its electronic data was preserved). As a result of MesoSystems' failure to preserve its electronic files, the data, documents, and e-mail contained on Dr. Charles Call's laptop computer may have been irretrievably lost. *Id.*, p. 45, ln. 23 to p. 47, ln. 23. Moreover, because Defendant has failed to undertake even a modest effort to search for and produce responsive electronic documents relevant to this case, Plaintiffs have been put to the task of filing a Motion to Compel electronic discovery. *See* Plaintiffs' Motion to Compel Defendant to Conduct a Complete Search of all Electronic Assets for Documents Responsive to Discovery Requests and to Produce Laptop Computer for Inspection, filed herein on May 27, 2003 (docket no. 84).

Plaintiffs acknowledge that this Court has inherent power to enter sanctions for abuse of discovery and for spoliation of evidence. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 – 45 (1991). Such inherent power must, however, be exercised with restraint and discretion. *Id.* Because Defendant cannot establish any "fraud" by Plaintiffs by clear and convincing evidence, even the exercise of the Court's inherent powers in this matter is not warranted.[1] Moreover, to the extent that Defendant is now asking the Court to exercise its discretion in assessing sanctions for alleged discovery abuses by Plaintiffs, the Defendant appears before this Court with less than clean hands.

---

[1] Defendant requested relief pursuant to Fed.R.Civ.P. 37(b)(2)(C) and 37(c)(1). Defendant's Brief, at 1. Neither of these rules apply. Rule 37(b)(2)(C) does not apply because the Court has not entered a discovery order directed at Plaintiffs in this case. Rule 37(c)(1) does not apply because the information that Defendant complains about is not part of the initial disclosure requirements of Rule 26(a).

## III.   **Plaintiffs are Entitled to Fees and Costs**

28 U.S.C. §1927 provides that

> [a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys fees reasonably incurred because of such conduct.

"Three substantial requirements must be met before liability may be imposed under § 1927: 1) a multiplication of proceedings by an attorney or other person; 2) conduct that can be characterized as unreasonable and vexatious; and (3) a resulting increase in the cost of the proceedings." *Vesco v. Snedeker*, CV 00-1805 WJ/LCS (D.N.M. July 12, 2002) (citations omitted).

Significantly, sanctions under § 1927 do not hinge on a showing of subjective bad faith. They are warranted upon conduct which, when viewed objectively, manifests an intentional or reckless disregard of the attorneys duties to the court. *See Braley v. Campbell*, 832 F. 2d 1504,1512 (10th Cir. 1987).

This Court has previously noted that

> The First Circuit, which also applies an objective standard in its analysis under § 1927, has defined vexatious behavior as that which is harassing or annoying, regardless of whether it is intended to be so. Thus, if an attorney's conduct in multiplying proceedings is unreasonable and harassing or annoying, sanctions may be imposed . . . . The attorney need not intend to harass or annoy by his conduct nor be guilty of conscious impropriety to be sanctioned. It is enough that an attorney acts in disregard of whether his conduct constitutes harassment or vexation, thus displaying a serious and studied disregard for the orderly process of justice. [This,] necessarily demands that the conduct sanctioned be more severe than mere negligence, inadvertence, or incompetence.

> *Cruz v. Savage*, 896 F. 2d 626, 632 (1990) (internal citations omitted).

*Conti v. Wal-Mart Stores, Inc.*, CIV 96-1439 LH/DJA (D.N.M. October 1, 1999).

Plaintiffs submit that as demonstrated above, Defendant's Motion lacks any reasonable factual foundation. As such, the Motion is both unreasonable and harassing or at a minimum, annoying.

Alternatively, Defendant's have styled the Motion as one involving an abuse of discovery and have asked the Court to impose sanctions pursuant to Fed.R.Civ.P. 37. In the event that Defendant's Motion is denied, Plaintiffs' respectfully request that they be awarded their expert costs and attorneys' fees incurred in responding to the Motion pursuant to Fed.R.Civ.P. 37(a)(4)(B)

Finally, Plaintiffs have had to hire an expert witness to prepare their Response to the Motion. The issues raised in the Motion are collateral to the claims in this case and expert testimony on theses issues will not be required at trial. Plaintiffs respectfully request, therefore, that they be awarded the costs of their expert witness pursuant to Fed.R.Civ.P. 54.

## CONCLUSION

For all of the foregoing reasons, Defendant's Motion to Dismiss should be denied and attorneys' fees and costs incurred in responding to the Motion should be awarded to Plaintiffs, together with such other and further relief as the Court deems just and proper.

Respectfully submitted,

MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.

By: *Angelo J. Artuso*
Lisa Mann
Angelo J. Artuso
Attorneys for Plaintiffs
Post Office Box 2168
Albuquerque, New Mexico 87103-2168
Telephone: 505.848.1800

WE HEREBY CERTIFY that a true
and correct copy of the foregoing pleading
was hand-delivered to Defendant's counsel of
record Christopher P. Bauman, and mailed to all other
counsel of record this 6th day of June, 2003.

MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.

By: *Angelo J. Artuso*
Angelo J. Artuso

0303255

15

**THE EXHIBITS ATTACHED TO THIS PLEADING ARE TOO VOLUMINOUS TO SCAN. SAID EXHIBITS ARE ATTACHED TO THE ORIGINAL PLEADING IN THE CASE FILE WHICH IS LOCATED IN THE RECORDS DEPARTMENT, U.S. DISTRICT COURT CLERK'S OFFICE...**