IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JAMES SEABA and
CORY PHILLIPS,

        Plaintiffs,

v.                                   Civ. No. 02-103 LH/RHS

MESOSYSTEMS TECHNOLOGY, INC.,

        Defendant.

**MESOSYSTEMS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DEFENDANT TO CONDUCT A COMPLETE SEARCH OF ALL ELECTRONIC ASSETS FOR DOCUMENTS RESPONSIVE TO DISCOVERY REQUESTS AND TO PRODUCE LAPTOP COMPUTER FOR INSPECTION**

## I. INTRODUCTION

Defendant MesoSystems Technology, Inc., ("MesoSystems") hereby requests that the Court deny plaintiffs James Seaba and Cory Phillips' ("Plaintiffs") motion to compel. MesoSystems has not refused to produce data stored on electronic media. In fact, McsoSytsems is willing, and has been willing, to conduct a search of its electronic data and make efforts to recover electronic data that has either been deleted or is contained on backup tapes, provided that Plaintiffs pay the costs associated therewith, and provided that appropriate measures are taken to preserve MesoSystems' sensitive, confidential, proprietary and privileged information. However, Plaintiffs did not give MesoSystems an adequate opportunity to comply with their requests, and failed for more than eight months to even respond to MesoSystems' request for a protective order.



## II. STATEMENT OF FACTS

### A. Factual Background

This case is about two former employees of MesoSystems who were hired, in part, to assist MesoSystems with the creation of a spin-off company whose business would focus on the development and manufacture of micro-reaction products for hydrogen generation, hydrogen purification and advanced thermal management technology. See Affidavit of Ned Godshall ("Godshall Aff."), ¶ 4. During Plaintiffs' brief three-month employment with MesoSystems, the parties were unable to come to terms on the creation of the spin-off company. See Defendant's Answer to First Amended Complaint and Counterclaim (hereinafter, "Counterclaim"), ¶ 3. However, Plaintiffs had access to and did learn sensitive, confidential and trade secret information during their tenure, including patent applications, drafts of business plans for the spin-off company, agreements between MesoSystems and other entities, and contact information related to investors. See Godshall Aff., ¶ 5.

After the cessation of Plaintiffs' employment on December 6, 2001, MesoSystems learned that Plaintiffs had formed a competing New Mexico corporation named Red Path Energy, Inc. ("Red Path Energy"), while they were still employees of MesoSystems. See Counterclaim, ¶ 6; Deposition of James Seaba ("Seaba Dep.") at 118:23-119:3, relevant excerpts of which are attached to the Affidavit of Alberto León ("León Aff.") as Exhibit A. The articles of incorporation for Red Path Energy reflect that Plaintiffs are the only directors of Red Path Energy and that Red Path Energy was formed for the purpose of engaging in research and development of micro-reaction technology and other technologies, new products pertaining thereto, and new product applications. See Counterclaim, ¶ 6; Seaba Dep. at 122:4-12, 125:7-13. Plaintiffs incorporated Red Path Energy without MesoSystems' knowledge or participation. See Seaba Dep. at 122:4-12, 123:13-19, 124:18-22. MesoSystems has also learned that Plaintiffs have used the information related to potential and actual investors and MesoSystems' business plan for

2

the spin-off company to solicit funding for their competing company, Red Path Energy. See Godshall Aff., ¶ 6; Seaba Dep. at 127:8-10, 130:14-24, 154:16-156:4, 157:2-21; Deposition of Cory Phillips ("Phillips Dep."), at 85:20-25, 120:18-121:8, 131:20-132:1, relevant excerpts of which are attached to León Aff. as Ex. B. Plaintiffs now work for entities that compete with MesoSystems and/or its majority-owned spin-off company, MesoFuel, Inc.

**B.      Discovery of Electronic Evidence**

**1.      Discovery of Emails**

Seaba has issued two sets of requests for production and Phillips has issued one set of requests for production. In the three sets of requests for production, Plaintiffs sought a variety of documents, including, *inter alia*, documents relating to correspondence between Plaintiffs and MesoSystems. See Seaba's First Requests for Production at Request No. 4; Phillips' First Requests for Production at Request No. 2, 21.

In response to Plaintiffs' requests, MesoSystems directed its employees to search their computers for all emails related to Plaintiffs. See Godshall Aff., ¶ 13; Deposition of Samantha League ("League Dep.") at 32:14-24, 33:14-17, 33:20-24, 42:24-43:4, relevant excerpts of which are attached to the León Aff. as Exhibit E. Each employee sent responsive documents to Samantha League, MesoSystems' office administrator in its Kennewick, Washington office. See Godshall Aff., ¶ 13; League Dep. at 33:18-19. The responsive, nonprivileged emails were produced to Plaintiffs.

MesoSystems searched the server for documents related to Plaintiffs' hiring paperwork. See League Dep. at 42:1-18. MesoSystems also searched its server for letters that were kept in the "letter book file," which contains letters that were drafted on MesoSystems' letterhead, on the server. See id. at 41:18-23.

During the Fed. R. Civ. P. 30(b)(6) deposition of Ms. League, the person designated by MesoSystems as knowledgeable about MesoSystems' computers, Plaintiffs' counsel asked Ms. League a number of questions regarding the thoroughness of

3

MesoSystems' search for responsive documents from MesoSystems' server. For example, Ms. League was asked if she looked on the server for deleted files or files that might have been saved to a temporary file. See League Dep. at 43:5-22, 44:24-45:10. Ms. League responded that she did not search the server for deleted files or files that might be located in a temporary file on the server. See id. at 43:23, 44:11.

MesoSystems did not conduct a search on the backup server for responsive documents or emails because MesoSystems used a different backup system in 2001 (the relevant time period for discovery in this lawsuit) than it currently uses and it is unlikely that any responsive documents are located on the backup tapes. See League Dep. at 9:1-7 ("We had a single server in Kennewick, Washington. We backed up data only on a daily basis. And this is data that people put out on the server to save. And it was, I would say 99 percent of it was finance documents and research and development documents."). Also, in 2001, MesoSystems backup tapes were maintained on a daily basis, with one tape for each day of the week. See id. at 22:7-12. For example, every Monday, the server would automatically backup data to the "Monday tape," and the following Monday, the server would overwrite the previous Monday's data with the current Monday's data on the same "Monday tape." See id. at 22:7-23:25. Because of the way in which the backup data was overwritten on a weekly basis (due to cost-saving measures), it is unlikely that there is any responsive data on the Kennewick backup tapes for 2001 because data was only preserved on a weekly basis. See id. at 23:5-19.

In 2001, MesoSystems used an outside email firm to provide email services. See League Dep. at 26:20-27:7. To the best of MesoSystems' knowledge, that outside email firm does not keep any records or backups of emails sent through it. See id. at 29:13-30:8. The record of emails in 2001 only would exist on the individual user's computer. See id. at 30:9-14. In late Spring 2002, when MesoSystems began using its own exchange server, MesoSystems stopped using the outside email firm. See id. at 27:13-18.

4

Additionally, in 2002, MesoSystems upgraded its server, so that the only files that were moved over to the new server were full intact files, like Human Resources files, finance files, and contract files. See id. at 10:23-11:7, 43:15-20. Therefore, any files that would have been saved in the temporary file directory in 2001 would not have been transferred over to the new server in 2002. See id. at 13:4-9, 43:21-23. However, it is possible that the old hard drives for the old server that was in use in 2001 may contain evidence from the temporary file directories. See id. at 44:3-7.

Further, in 2001, MesoSystems' employees in Albuquerque were not directly connected to MesoSystems' server in Kennewick and therefore their computers were not automatically backed up on MesoSystems' server. See League Dep. at 11:13-15. Instead, the Albuquerque employees were responsible for backing up their own data by using a CD Read-Write drive. See id. at 11:15-19. It is not known how many Albuquerque employees backed up their computers, how often they did so, and what data they backed up. Even computers connected to the Kennewick server did not automatically save data on the server; instead, each user had to specify which files would be saved to the server. See id. at 20:7-21:17.

In order to comply with Plaintiffs' requests to conduct a search of all electronic files for responsive documents (with a very remote chance of finding such documents, as described above), MesoSystems estimates that it will cost approximately $40,000. See Godshall Aff., ¶ 14. This amount is broken down as follows:

- **Data Recovery from Server in Albuquerque:** In order to recover data from the server in MesoSystems' Albuquerque office, MesoSystems estimates that it will take over seven hours per backup tape to recover responsive documents, at a rate of $105 per hour. There are eighteen backup tapes that need to be recovered from this location, for an estimated cost of $13,500. See Godshall Aff., ¶ 15.

5

- **Data Recovery from Server in Kennewick:** In order to recover data from the server in MesoSystems' Kennewick office, MesoSystems needs to obtain off-site assistance. This is because MesoSystems only has one server available in Kennewick and cannot take the server down to perform the recovery efforts. See Godshall Aff., ¶ 16. MesoSystems estimates that it will take approximately three hours per backup tape to recover responsive documents, at a rate of $105 per hour. There are five backup tapes that need to be recovered from this location, for an estimated cost of $1,575. See id.

- **Recovery of Email Mailboxes from Server:** In order to recover email mailboxes from the servers, MesoSystems estimates that it will take approximately three hours per mailbox, at a rate of $105 per hour, for a total of approximately $315 per mailbox. Although is unclear how many mailboxes of which Plaintiffs are seeking recovery, if MesoSystems were to recover all mailboxes for all employees during 2001 (52 employees), the cost would be approximately $16,400. See Godshall Aff., ¶ 17.

- **Man-hours to Recover Electronic Data:** In addition to the other costs to recover the requested electronic data in Albuquerque, MesoSystems estimates that it will take 150 hours for a computer person to perform the above-listed recovery work, at an hourly rate of $57.68, for an estimated total of $8,652. See Godshall Aff., ¶ 18.

2.   **Production of Dr. Call's Computer**

By letter dated May 27, 2003, Plaintiffs asked MesoSystems to produce the laptop that Charles Call, MesoSystems' Chief Executive Officer, used in 2001.[1] See Motion to

---

[1] It should be noted that May 27, 2003, was the deadline for filing discovery motions. Plaintiffs never made any timely discovery request seeking the production of Dr. Call's laptop; instead, Plaintiffs waited until the last day to file discovery motions (which was over seven weeks after Dr. Call's deposition and eleven days after Ms. League's deposition) to informally ask MesoSystems for the production of the actual laptop. Plaintiffs also failed to give MesoSystems the opportunity to comply with its request or work toward a mutually agreeable alternative prior to filing its present motion to compel.

Compel at Ex. D. Dr. Call testified in his April 4, 2003, deposition that the laptop he used in 2001 crashed, that attempts were made to recover the files from the laptop, but that those attempts were not successful. Ms. League also testified in her May 16, 2003 deposition, that Mr. Call's laptop crashed in early 2002, that she tried to recover the data from the hard drive, but that she was only able to recover partial documents from the "My Documents" folder and nothing from the Outlook file. See League Dep. at 46:2-20, 4-7. Plaintiffs' May 27 request for the production of Dr. Call's laptop also indicated that Plaintiffs wanted to have their expert, Mr. Hilliard, examine the laptop and attempt to recover additional files.

### III.   ARGUMENT

### A.   MesoSystems Is Willing to Conduct a Search of Its Electronic Assets

In their motion, Plaintiffs are seeking to compel MesoSystems to conduct a complete search of all electronic assets for responsive documents. Under reasonable circumstances, MesoSystems is willing to conduct a further search of its electronic assets, including searching its backup tapes for its servers, and restoring employee email mailboxes. MesoSystems recognizes that electronic data is discoverable under the Federal Rules of Civil Procedure provided that such discovery is not unduly burdensome.[2] See Playboy Enters. v. Welles, 60 F. Supp. 2d 1050, 1053 (S.D. Cal. 1999) ("[I]nformation stored in computer format is discoverable. . . . The only restriction in this

---

[2] One federal court recently has explained the lengthy process involved in producing electronic data:

> Producing electronic data requires, at minimum, several steps: (1) designing and applying a search program to identify potentially relevant electronic files, (2) reviewing the resulting documents for relevance, (3) reviewing the resulting documents for privilege, (4) deciding whether the documents should be produced in electronic or printed form, and (5) actual production. If, however, the allegedly discoverable information is contained on backup tapes, a preliminary step must be performed. All data on each backup tape must be restored from the backup tape format to a format that the standard computer can read. In the case of a large data volume on multiple tapes like this case presents, the restored files from each tape must be compared to the restored files from every other tape and duplicate files eliminated. The restored data files that are not duplicates must be converted to a common format so that a search program may seek information within them.

Medtronic Sofamor Danek, Inc. v. Michelson, 2003 U.S. Dist. LEXIS 8587, at *5-6 (W.D. Tenn. May 13, 2003).

7

discovery is that the producing party be protected against undue burden and expense and/or invasion of privileged matter.").

However, MesoSystems should not be required to bear the costs of this expensive undertaking, particularly in light of the remote chance of finding discoverable materials.[3] Although the general rule is that the party responding to discovery requests bears the cost of compliance, "a court may protect the responding party from 'undue burden or expense' by shifting some or all of the cost of production to the requesting party." Rowe Entm't Inc. v. William Morris Agency, Inc., 205 F.R.D. 421, 428-29 (S.D.N.Y. 2002). In determining whether the cost of recovering electronic discovery will be unduly burdensome to the responding party, courts weigh the benefit and burden of discovery, which includes a consideration of the following factors:

> (1) the specificity of the discovery requests; (2) the likelihood of discovering critical information; (3) the availability of such information from other sources; (4) the purposes for which the responding party maintains the requested data; (5) the relative benefit to the parties of obtaining the information; (6) the total cost associated with production; (7) the relative ability of each party to control costs and its incentive to do so; and (8) the resources available to each party.

Rowe Entm't Inc., 205 F.R.D. at 428-29. A balancing of these factors weighs decidedly in favor of Plaintiffs bearing the costs for such electronic discovery here.

### 1. Specificity of Discovery Requests

"The less specific the requesting party's discovery demands, the more appropriate it is to shift the costs of production to that party." Rowe Entm't Inc., 205 F.R.D. at 429. Here, Plaintiffs have not given specific requests for what documents they wish to have recovered. Instead, Plaintiffs are seeking production of documents including *all* emails between Plaintiffs and anyone at MesoSystems. See Seaba's First Requests for

---

[3] It should also be noted that Plaintiffs have failed to reimburse MesoSystems with the expenses (over $700) incurred in providing mirror image copies of the hard drives from the laptops used by Plaintiffs during their employment. See León Aff., ¶ 11; Godshall Aff., ¶ 22. MesoSystems, in good faith, provided these mirror images to Plaintiffs in order to allow Plaintiffs the opportunity to conduct their own examination of the data contained on the laptops so that Plaintiffs could adequately respond to MesoSystems' pending Motion for Sanctions. See León Aff., ¶ 11. However, Plaintiffs have yet to pay for these mirror images. See id.

8

Production at Request No. 4; Phillips First Requests for Production at Request No. 2. This will require MesoSystems to search the computers of all 52 employees employed by MesoSystems in 2001, the backup tapes, and the servers for responsive documents. The breadth of this request weighs in favor of Plaintiffs bearing the costs for recovery. See id. at 430 ("Where a party multiplies litigation costs by seeking expansive rather than targeted discovery, that party should bear the expense."); In re Gen. Instrument Corp. Secs. Litig., 1999 U.S. Dist. LEXIS 18182, at *17 (N.D. Ill. Nov. 18, 1999) (denying motion to compel production of emails where requesting parties "have not identified any specific factual issue for which additional discovery would help them prove their case").

### 2. Likelihood of Discovering Critical Information

"The more likely it is that the backup tape contains information that is relevant to a claim or defense, the fairer it is that the [responding party] search at its own expense. The less likely it is, the more unjust it would be to make [that party] search at is own expense." McPeek v. Ashcroft, 202 F.R.D. 31, 34 (D.D.C. 2001). Given the manner in which MesoSystems' network and electronic data retention system was set up, it is unlikely that any critical information will be recovered. Ms. League testified in her deposition that there is not much data retained on the backup tapes for 2001, and that it is unlikely that any emails or deleted files were stored. Because the likelihood that any responsive documents will be found, this factor weighs in favor of Plaintiffs' bearing the costs of recovery.

### 3. Availability of Information from Other Sources

Where equivalent information is accessible in a different format at less expense, courts have shifted the costs of the discovery of electronic evidence to the requesting party. See Rowe Entm't Inc., 205 F.R.D. at 430. Because the electronic data is not generally available other than by a search of the backup tapes, this factor does not weigh in favor of cost-shifting.

9

### 4. Purposes of Retention

Generally, "a party that happens to retain vestigial data for no current business purposes, but only in case of an emergency or simply because it has neglected to discard it, should not be put to the expense of producing it." Rowe Entm't Inc., 205 F.R.D. at 431. "Back-up tapes clearly fall into this category." Id. In this case, MesoSystems only stores data in the event of a catastrophic event that leads to destruction of electronic data on the server, not for general recovery purposes. See League Dep. at 24:8-19 ("It costs a lot for tapes. What . . . we wanted was if something happened to the server to be able to access the data basically that we had the day before. . . . [T]his is data that is, it's contract materials, it's finance materials. It basically changes in terms of finance daily. The rest of it is basically . . . archived data from R&D projects."). This is shown by the fact that in 2001 MesoSystems only saved one week's worth of data on its backup tapes and then overwrote each tape during the next week. The backup tapes were not intended for use as a means of record retention. Therefore, this factor weighs in favor of cost-shifting to Plaintiffs. See Rowe Entm't Inc., 205 F.R.D. at 431 (where "[t]here is no evidence that the defendants themselves ever search these tapes for information or even have a means for doing so . . . [c]ost-shifting is . . . warranted with respect to the back-up tapes."); see also Murphy Oil USA, Inc. v. Fluor Daniel, Inc., 2002 U.S. Dist. LEXIS 3196, at *15-16 (E.D. La. Feb. 19, 2002) (where backup tapes were maintained solely for emergency data recovery, not for current business activities, cost-shifting is appropriate).

MesoSystems also does not have a policy regarding retention of emails. See Godshall Aff., ¶ 19. Where a party does not access either its backup tapes or its deleted emails in the normal course of business, the cost of recovering emails deleted from an employee's active files should be borne by Plaintiffs. See Rowe Entm't Inc., 205 F.R.D. at 431 ("The same is true of e-mails which, although deleted from the user's active files, remain on the hard drive. Aside from the occasional practice of 'dumpster diving,' the discovery of deleted computer documents does not have a close analogue in

conventional, paper-based discovery. Just as a party would not be required to sort through its trash to resurrect discarded paper documents, so it should not be obligated to pay the cost of retrieving deleted e-mails.").

### 5. Benefit to the Parties

Where the responding party benefits from the production of electronic evidence, "there is less rationale for shifting costs to the requesting party." Rowe Entm't Inc., 205 F.R.D. at 431. Here, it is unlikely that MesoSystems will benefit from the recovery of deleted emails or information from the backup tapes because the data stored on the backup tapes was for the purpose of recovering data in the event of a catastrophic event that leads to the destruction of the data on the server. See Godshall Aff., ¶ 20. Furthermore, the only likely pertinent data from this will simply be a duplication of what MesoSystems already produced in its original discovery responses. See id. Therefore, this factor weighs in favor of cost-shifting to the Plaintiffs.

### 6. Total Costs

Generally, "[i]f the total cost of the requested discovery is not substantial, then there is no cause to deviate from the presumption that the responding party will bear the expense." Rowe Entm't Inc., 205 F.R.D. at 431. Here, the estimated cost of recovery of the electronic data is $40,000. See Godshall Aff., ¶ 14. This is a sufficiently high to constitute a significant expense. See, e.g. Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 361-62, 98 S. Ct. 2380 (1978) ("a threshold expense of $16,000 . . . hardly can be viewed as an insubstantial burden," even where the defendant has assets exceeding one-half billion dollars); Anti-Monopoly, Inc. v. Hasbro, Inc., 1996 U.S. Dist. LEXIS 563, at *6 (S.D.N.Y. Jan. 23, 1996) (finding costs of $1,680 to one defendant and $5,000-6,000 to another to be sufficiently significant to warrant cost-shifting). Therefore, this factor weighs in favor of cost-shifting to Plaintiffs.

### 7. Ability to Control Costs

This factor does not apply in this case.

11

### 8. Parties' Resources

The ability of each party to bear the costs of discovery in some instances may be an appropriate consideration. See Rowe Entm't Inc., 205 F.R.D. at 432. MesoSystems is not a company with unlimited resources. See Godshall Aff., ¶ 21. In fact, MesoSystems, a small, entrepreneurial company, is still struggling to become profitable. See id. Plaintiffs may have limited resources as well, but they are the ones seeking this form of discovery. If Plaintiffs want MesoSystems to engage in the type of in-depth search for responsive electronic data and recovery of lost data, Plaintiffs should bear the costs of doing so. In all, the balancing of the factors strongly favors cost-shifting in this case.

### B.  MesoSystems' Should Not Be Compelled to Produce the Laptop of Its CEO

MesoSystems does not object to an attempt to recover the electronic data from Dr. Call's old laptop in order to search for responsive documents. However, MesoSystems objects to providing the actual computer to Plaintiffs or their expert, particularly since there is no protective order in this case. Dr. Call, as MesoSystems' CEO, is privy to the most sensitive information about MesoSystems. He also has extensive dealings with the Company's counsel. To the extent that any data can be recovered from the crashed laptop, it is likely that such information will include highly sensitive financial information, trade secrets related to plans, processes and/or products created by MesoSystems, and matters that would be subject to the attorney-client privilege. Therefore, it would be highly damaging to MesoSystems to provide Plaintiffs or their expert with the actual laptop.

Nevertheless, MesoSystems recognizes that if the information can be recovered, some of it might be relevant to this action.[4] To minimize the risks to MesoSystems of privileged and sensitive information being improperly disclosed to Plaintiffs,

---

[4] While it is possible that an expert may be able to recover some information from Dr. Call's laptop, MesoSystems has already taken its own internal steps to recover such data, to no avail. See League Dep. at 45:23-47:10.

12

MesoSystems proposes that it submit Dr. Call's laptop to New Technologies Armour, Inc. ("NTI"), a respected computer forensics firm, for examination and recovery. If any information is recoverable, NTI would produce such information in documentary form to MesoSystems' counsel for review for both privilege and responsiveness. MesoSystems would then produce responsive, nonprivileged documents to Plaintiffs' counsel (and if an appropriate protective order is in place by then, MesoSystems will also produce documents that are designated as confidential). This approach has been consistently favored by courts as appropriately balancing the requesting party's need for electronic information against the responding party's need to protect its sensitive, confidential, proprietary and privileged information. See, e.g., Medtronic Sofamor Danek, Inc., 2003 U.S. Dist. LEXIS 8587, at *36, *43, *52 (requesting party instructed to review responsive non-privileged files and may request paper production of such documents subject to an Attorneys' Eyes Only designation); Antioch Co. v. Scrapbook Borders, Inc., 210 F.R.D. 645, 653-54 (D. Minn. 2002) (directing requesting party to hire an expert to created a mirror image of hard drives, prohibiting requesting party's access of computer data, requiring expert to produce one copy of data to court and other to responding party, then responding party will filter through data and produce responsive nonprivileged documents to requesting party); Playboy Enters., 60 F. Supp. 2d at 1054 ("Defendant's privacy and attorney-client privilege will be protected pursuant to the protocol outlined below, and Defendant's counsel will have an opportunity to control and review all of the recovered e-mails, and produce to Plaintiff only those documents that are relevant, responsive, and non-privileged."); Rowe Entm't, Inc., 205 F.R.D. at 432, 433 (allowing for attorneys' eyes only review of documents recovered from electronic data); Simon Prop. Group, L.P. v. mySimon, Inc., 194 F.R.D. 639, 641-42 (S.D. Ind. 2000) (requiring requesting party to select and pay for expert to create mirror images of hard drives, to produce all available documents, emails, PowerPoint presentations, spreadsheets and similar files to responding party's counsel for review of such documents for

13

responsiveness and privilege, the responding party directed to provide responsive, nonprivileged documents to requesting party, and the expert directed not to disclose the contents of any files or documents to requesting party or its counsel); Anti-Monopoly, 1996 U.S. Dist. LEXIS 563, at *5 (notwithstanding confidentiality order, business data should not be viewed by competitors).

Moreover, for the reasons set forth in Section A above, Plaintiffs, as the party seeking this extraordinary discovery, should be required to pay the costs associated with the information recovery. See, e.g., Playboy Enters., 60 F. Supp. 2d at 1054 (requesting party "will pay the costs associated with the information recovery").

Even if the Court requires MesoSystems to produce the actual computer to Plaintiffs, MesoSystems requests that the Court make such production subject to an Attorneys' Eyes Only protective order to protect MesoSystems from disclosure of sensitive, confidential and proprietary information that is located on the computers. See, e.g., Playboy Enters., 60 F. Supp. 2d at 1053 ("if the discovering party needs to check the electronic source itself, the court may protect respondent with respect to preservation of his records, confidentiality of nondiscoverable matters, and costs") (quoting Fed. R. Civ. P. 34 Advisory Committee Notes).

14

## IV. CONCLUSION

For the foregoing reasons, MesoSystems respectfully requests that the Court deny Plaintiffs' motion, and award MesoSystems its attorneys' fees and costs in responding to this motion.

DATED: June 10, 2003.

BAUMAN, DOW, McINTOSH & LEÓN, P.C.

By: _____
Alberto A. León
Christopher P. Bauman
Attorneys for Defendant
P. O. Box 30684
Albuquerque, New Mexico 87190-0684
(505) 883-3191

I HEREBY CERTIFY that a true
and correct copy of the foregoing
was mailed to counsel of record
this 10 day of June, 2003.

_____
Alberto A. León