# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**JAMES SEABA and**
**CORY PHILLIPS,**

        **Plaintiffs,**

v.

        **Civ. No. 02-103  LH/RHS**

**MESOSYSTEMS TECHNOLOGY, INC.,**

        **Defendant.**

## AFFIDAVIT OF ALBERTO A. LEÓN IN SUPPORT OF MESOSYSTEMS' OPPOSITIONS TO PLAINTIFFS' MOTIONS TO COMPEL

STATE OF NEW MEXICO    )
                    ) ss.
COUNTY OF BERNALILLO    )

    Alberto A. León, being first duly sworn upon oath, states as follows:

    1.    I am a partner at the law firm of Bauman, Dow, McIntosh and León, P.C.. I am one of the attorneys for MesoSystems Technology, Inc., defendant in this action. I make this declaration upon personal knowledge of which I am competent to testify.

    2.    I submit this affidavit in support of Defendant's Opposition to Plaintiffs' Motion to Compel Defendant's Discovery Responses and Motion for Protective Order and Defendant's Opposition to Plaintiffs' Motion to Compel Defendant to Conduct a Complete Search of All Electronic Assets for Documents Responsive to Discovery Requests and to Produce Laptop Computer for Inspection.

    3.    I deposed James Seaba on April 2, 2003. A true and correct copy of relevant excerpts from the transcript for the Seaba Deposition is attached hereto as Exhibit A.



4.      I deposed Cory Phillips on April 3, 2003. A true and correct copy of relevant excerpts from the transcript for the Scaba Deposition is attached hereto as Exhibit B

5.      On August 13, 2002, in conjunction with producing its responses to Scaba's First Request for Production, I provided to Plaintiffs' counsel a proposed stipulated protective order.

6.      After providing Plaintiffs with its proposed protective order on August 13, 2002, MesoSystems did not receive any feedback on the protective order until April 2003. Instead, on September 6, 2002, Phillips issued a set of requests for production prior to responding to MesoSystems' offer to enter into a stipulated protective order.

7.      MesoSystems responded to Phillips' First Requests for Production on October 22, 2002. The parties specifically agreed to a fifteen-day extension (from October 7, 2002 to October 22, 2002).

8.      It was not until the first week of April 2003, during the deposition of Ned Godshall where MesoSystems' counsel objected to questioning that would reveal confidential, financial or trade secret information for either MesoSystems or MesoFuel, that Plaintiffs acknowledged the proposed protective order. A true and correct copy of relevant excerpts from the Godshall Deposition is attached hereto as Exhibit C.

9.      MesoSystems is submitting herewith as Exhibit D an amended privilege log that reflects the privileged document received from a private investigator that is being withheld on the basis of the work-product doctrine.

10.     Attached as Exhibit E is a true and correct copy of relevant excerpts from Deposition of Samantha League.

11.     To date, Plaintiffs have failed to reimburse MesoSystems with the expenses (over $700) incurred in providing mirror image copies of the hard drives from the laptops used by Plaintiffs during their employment. MesoSystems, in good faith, provided these mirror images to Plaintiffs in order to allow Plaintiffs the opportunity to

2

conduct their own examination of the data contained on the laptops so that Plaintiffs could adequately respond to MesoSystems' pending Motion for Sanctions. However, Plaintiffs have yet to pay for these mirror images.

Alberto A. León

SUBSCRIBED and SWORN to before me this 10th day of June, 2003.

Print Name: HILDA KENNEDY
Notary Public in and for the State of New Mexico, residing at Albuquerque
My commission expires: 09-11-04

OFFICIAL SEAL
HILDA KENNEDY
Notary Public
State of New Mexico
My Commission Expires 09-11-04

I HEREBY CERTIFY that a true And correct copy of the foregoing was mailed to counsel of record this 10th day of June, 2003.

Alberto A. León

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
Civ. No. 02-103 LH/WWD

JAMES SEABA and
CORY PHILLIPS,

Plaintiffs,

vs.

MESOSYSTEMS TECHNOLOGY, INC.,

Defendant.

DEPOSITION OF JAMES SEABA, Ph.D.

April 2nd, 2003
9:12 a.m.
7309 Indian School Road, Northeast
Albuquerque, New Mexico 87110

PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:       MR. ALBERTO A. LEON
                ATTORNEY FOR DEFENDANT

REPORTED BY:    MICHELE TRUJILLO, CCR No. 226
                Kathy Townsend Court Reporters
                110 Twelfth Street, Northwest
                Albuquerque, New Mexico 87102

**Page 2**

APPEARANCES

For the Plaintiffs:

MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.
Attorneys at Law
500 Fourth Street, Northwest, Suite 600
Albuquerque, New Mexico 87102
By:  MS. LISA MANN

For the Defendant:

BAUMAN, DOW, McINTOSH & LEON, P.C.
Attorneys at Law
7309 Indian School Road, Northeast
Albuquerque, New Mexico 87110
By:  MR. ALBERTO A. LEON
     MR. CHRIS BAUMAN

Also Present:

Dr. Nod Godshall
Dr. Cory Phillips

I N D E X

JAMES SEABA, Ph.D.                              PAGE

Direct Examination by Mr. Leon                    4

CERTIFICATE OF COMPLETION OF DEPOSITION         187

SIGNATURE/CORRECTION PAGE                       189

EXHIBIT
A

**Page 3**

E X H I B I T S

SEABA EXHIBIT:                          MARKED

1. Complaint for Damages, Injunctive and
   Declaratory Relief                   38
2. First Amended Complaint for Damages,
   Injunctive and Declaratory Relief    19
3. Resume: James Philip Seaba, Ph.D.    36
4. Plaintiff James Seaba's Answers to
   Defendant's First Set of Interrogatories,
   Requests for Production of Documents and
   Requests for Admission               40
5. E-mail dated 11/7/01 to Lubeck, Cali and
   Schailoo from Mr. Seaba              65
6. Agenda for June 9th and 10th, 2001   85
7. Document titled "MicroReactors Applied
   to Clean Energy," Dr. James Seaba, 5/26/01   96
8. Offer of Employment with MesoSystems
   Technology, Inc., to Dr. Seaba dated 8/2/01   106
9. Confidential Information, Inventions and
   Noncompetition Agreement            115
10. Articles of Incorporation for Red Path
    Energy                             119
11. Profit Corporate Report for Red Path Energy   136

**Page 4**

MS. MANN:  Before we start, I see that
Mr. Godshall is here today.  Is he here as the corporate
representative for MesoSystems?

MR. LEON:  That is correct.

MS. MANN:  I would like that on the record,
please.

JAMES SEABA, Ph.D.
after having been first duly sworn under oath,
was questioned and testified as follows:

DIRECT EXAMINATION

BY MR. LEON:

Q.  Can you state your name, please?

A.  James Seaba.

Q.  Have you ever been deposed before?

A.  Yes, once before.

Q.  When?

A.  About 20 years ago.

Q.  Can you tell me in connection with what you
were deposed?

A.  I witnessed a murder.

Q.  Is that the only time?

A.  Yes.

Q.  Where was that?

A.  It was Iowa City, Iowa.

Q.  Who deposed you then?

117

1    MS. MANN: Exhibit 9?
2        (Ms. Mann confers with the witness.)
3    A.  I thought this was the -- I'm sorry.  I read --
4    so, I'm sorry, you meant the entire agreement?
5    Q.  Yes, sir.
6    A.  That I'm bound about the entire agreement?
7    Q.  Uh-huh.
8    A.  Today?
9    Q.  Yes.  I understood that was your counsel's
10   concern and your concern about maintaining this as
11   confidential, that you were bound by a confidentiality
12   agreement with MesoSystems, and I didn't want to be
13   accused of breaching it by disclosing information in this
14   deposition.
15   A.  Right.
16   Q.  So my question is:  Do you consider yourself
17   bound by this agreement today?
18   A.  Again, I'm not a lawyer, so it's difficult for
19   me to ascertain.
20       It's my current understanding that I'm not
21   bound by the entire agreement.
22   Q.  Why is that?
23   A.  Because the noncompete is no longer valid.
24   Q.  When did, as far as you understand, the
25   noncompete part of the agreement expire?

118

1    A.  I believe my understanding is December 7th,
2    2002.
3    Q.  Is it your testimony, though, that you are
4    bound by part of this agreement?
5    A.  That's unclear.
6    Q.  Well, you said that you were partly bound by it
7    or that you were bound in part.  I'm trying to ascertain
8    what part of this agreement, what aspect of this
9    agreement, what conduct are you still bound to, you know,
10   to do or not to do, based on your understanding of this
11   agreement, without going into any legal conclusions or
12   anything like that?
13   A.  My understanding is that I'm still bound by
14   confidentiality.
15   Q.  So based on that, let me ask you a couple of
16   questions, then.  Since your employment with MesoSystems
17   ceased, have you disclosed any confidential information
18   of MesoSystems to anybody else?
19   A.  I believe that to be true.
20   Q.  You have?  You have disclosed or you have not
21   disclosed information?
22   A.  I believe I have not disclosed any information.
23   Q.  Were you involved in the incorporation of a New
24   Mexico company called Red Path Energy, Inc.?
25   A.  Yes, I was.

119

1    Q.  When did that happen?
2    A.  I believe the incorporation took place in the
3    first week in December.
4    Q.  What was the purpose of incorporating this
5    company?
6    A.  To get a company name to set up accounts, bank
7    accounts, and obtain federal ID numbers and start that
8    process.
9    Q.  Are you talking about doing all of those things
10   for NewCo, the same new company that was going to be done
11   with MesoSystems, or are we talking about a separate
12   company?
13   A.  No, with NewCo.
14   Q.  I'm going to hand you what the court reporter
15   is going to mark as Exhibit Number 10, and I'm going to
16   ask you to identify that.
17       (Seaba Exhibit 10 marked.)
18   Q.  I'm sorry.  I handed you the wrong one.  I gave
19   you MesoFuel, didn't I?  Yeah, I meant to give you Red
20   Path Energy, which I'll get during the break.  We'll
21   leave it marked, but we'll refer to it later on, because
22   I'm going to use this one.
23       MR. BAUMAN:  I'll get it.
24       MR. LEON:  Yeah, could you get those for me,
25   please?

120

1        MS. MANN:  I could use a restroom break.
2        MR. LEON:  All right.  Let's take a restroom
3    break.
4        (Recess taken.)
5    Q.  I would like you to examine what has been
6    marked as Exhibit 10 to this deposition, and I'm going to
7    ask you a few questions about it.
8        Do you recognize that document?  I think
9    there's several documents in one.
10   A.  Yes.
11   Q.  Can you tell me what these documents are?
12   A.  Just as they state, Public Regulation
13   Commission, but it's -- the purpose is to incorporate Red
14   Path Energy.
15   Q.  Before we broke, you testified that this
16   incorporation was done in connection with NewCo, what
17   we've been calling NewCo yesterday and today?
18   A.  Correct.
19   Q.  Who did this incorporation work for you?
20   A.  Clinton Marrs.
21   Q.  Who is Clinton Marrs?
22   A.  An attorney in Albuquerque.
23   Q.  Is he a MesoSystems attorney?
24   A.  No.
25   Q.  Was he your individual attorney?

121

1    **A.**  He, Clinton Marrs, represented Cory and I.
2    **Q.**  Did MesoSystems – are you aware whether
3  MesoSystems at the time that this was incorporated --
4  whether MesoSystems had any attorneys working for them?
5  Only if you're aware. I mean, if you're not aware,
6  that's fine.
7    **A.**  I don't recall, no.
8    **Q.**  I was just wondering why MesoSystems' attorneys
9  didn't prepare these documents. Do you know why, if this
10  was for NewCo?
11    **A.**  I wasn't aware of MesoSystems' attorneys, and I
12  was basically in charge of Red Path Energy.
13    **Q.**  On the third page of this document, there is a
14  stamp on top of it that gives a date of filing. Can you
15  tell me what date that is?
16    **A.**  December 3rd.
17    **Q.**  How many days before you allege you were fired
18  did this incorporation take place?
19    **A.**  Could you restate that question?
20    **Q.**  Your allegation in this case is that you were
21  fired by MesoSystems, correct?
22    **A.**  Correct.
23    **Q.**  What was the date of firing, according to your
24  allegations?
25    **A.**  December 6th.

122

1    **Q.**  So this would have been filed three days before
2  the alleged firing, correct?
3    **A.**  Correct.
4    **Q.**  Does the name of anybody related to MesoSystems
5  at this time, besides you and Dr. Phillips, appear in any
6  of these documents?
7    **A.**  No.
8    **Q.**  Is Dr. Call named as a director of Red Path
9  Energy under these articles of incorporation, according
10  to your understanding?
11    **A.**  Well, Dr. Call was not listed as a director at
12  this time.
13    **Q.**  Those fluid negotiations that we talked about
14  before that took place over the fall of 2001, at any time
15  was it contemplated that Dr. Call wasn't going to be a
16  director of NewCo?
17    **A.**  Was not going to be a director?
18    **Q.**  I can phrase that affirmatively. Is it fair to
19  assume or is it fair to say that, at all times during
20  these negotiations, Dr. Call was going to be a director
21  of NewCo?
22    **A.**  I believe that was to be determined.
23    **Q.**  So at some point during these negotiations,
24  there was a contemplation that Dr. Call was not going to
25  be a director of NewCo?

123

1    **A.**  Correct.
2    **Q.**  Is this why he wasn't listed here as a director
3  in the articles of incorporation that we're looking at?
4    **A.**  No.
5    **Q.**  What is the reason why Dr. Call wasn't listed?
6    **A.**  This was just the articles of incorporation.
7  To help clarify --
8    **Q.**  Go ahead.
9    **A.**  -- just as Ned discussed yesterday, when
10  MesoFuel was incorporated, you had the CFO for four days,
11  and then, when you get all of the articles and other
12  things done, the real structure is formed.
13    **Q.**  Was Dr. Call aware that you were filing these
14  articles of incorporation on December 3rd or around that
15  time?
16    **A.**  No.
17    **Q.**  If this was going to be NewCo, why didn't you
18  inform him that you were forming this company?
19    **A.**  It didn't seem important.
20    **Q.**  The incorporation of the company that was going
21  to be the spin-off of MesoSystems wouldn't be important
22  to Dr. Call; is that your testimony?
23    **A.**  No. I didn't state that.
24    **Q.**  Tell me what wasn't important, then, because I
25  truly don't understand it, so help me, please.

124

1    **A.**  In my own words, Dr. Call provided a separation
2  agreement, in that stating -- forming an independent
3  company. We talked about money coming in. So my
4  concern, and maybe it was an incorrect concern --
5  incorrect, but my thought was we simply needed to
6  incorporate to get all of the paperwork in motion to get
7  it set up so that we would be able to apply for
8  government contracts, which were coming up in January and
9  February.
10        So I was concerned about the time line, and I
11  thought this was the logical first step in working on
12  that separation agreement.
13    **Q.**  During this time frame of early December 2001,
14  were you at any point contemplating leaving MesoSystems?
15    **A.**  In December?
16    **Q.**  Yes.
17    **A.**  No.
18    **Q.**  Do you remember having any discussions with
19  Dr. Call or anybody else at MesoSystems about the
20  formation of Red Path Energy on December 3rd?
21    **A.**  I don't recall talking about the incorporation
22  with anyone.
23    **Q.**  Let me point you out to Article III of the
24  articles, paragraph three of the articles of
25  incorporation, which I think is the third paragraph of

125

1 the exhibit.
2 Subparagraph A, can you read that out loud for
3 the record?
4 A. Article III?
5 Q. Yes. Article III, subpart (a). Weil, actually
6 just read Article III.
7 A. "The corporation is formed for the following
8 purposes: To engage in research and development of micro
9 reaction technology and other technologies, new products
10 pertaining thereto and new product applications: and to
11 engage in any lawful act or activity for which
12 corporations may be organized under this" -- "under the
13 Act."
14 Q. Is it your testimony today that subparagraph
15 (a) defines the purpose of NewCo?
16 A. Yeah, that would be correct.
17 Q. On those activities that are defined there in
18 subparagraph III(a), it was your intention to undertake
19 those activities with MesoSystems Technology at that
20 time?
21 A. MesoSystems Technology was going to be the
22 major investor in the company.
23 Q. In Red Path Energy, Inc.?
24 A. Correct.
25 Q. So it was never your intention to undertake the

126

1 activities defined in Article III in competition with
2 MesoSystems or with NewCo?
3 A. It was never the intention of Red Path Energy
4 to compete with MesoSystems
5 Q. So what happened to Red Path Energy, Inc.,
6 after December 6th, 2001?
7 A. After December 6th, we tried to continue with
8 Red Path Energy, unfortunately, without the support of
9 MesoSystems.
10 Q. Where was the intellectual property to be used
11 in connection with Red Path Energy? Where was that going
12 to come from after December 6th, 2001?
13 A. Well, we'd have to make our own intellectual
14 property.
15 Q. How would Red Path Energy be funded after
16 December 6th, 2001?
17 A. That's a good question.
18 Red Path Energy was then required to look at
19 VCs or angels or – people, basically, look for money.
20 Q. Did you approach anybody in particular, trying
21 to obtain funding for Red Path Energy, after December
22 6th, 2001?
23 A. Yes.
24 Q. Can you tell me who and when?
25 A. I can't remember all of the people we

127

1 approached.
2 Q. Just the ones that you remember is fine.
3 A. Well, first, we went to TVC not for funding,
4 but to help us with the company. That's the purpose of
5 TVC in Albuquerque.
6 Then we approached -- oh, man, I'm trying to
7 think here. Just a moment.
8 Q. How about Jarrett Carson? Did you approach
9 Mr. Carson?
10 A. After December 7th. I called Jarrett Carson.
11 Q. How did you first get acquainted with
12 Mr. Carson?
13 A. I met him at a fuel cell conference.
14 Q. When was that?
15 A. Summer of 2001.
16 Q. Did MesoSystems, Dr. Call or anybody related to
17 them have anything to do with you meeting Mr. Carson?
18 A. Dr. Call was also at the conference.
19 Q. Did Dr. Call introduce you to him or somehow
20 have anything to do with you meeting him?
21 A. I don't recall exactly how we all got together,
22 but we all did meet at that conference.
23 Q. Did you participate in putting together a
24 business plan for Red Path Energy after December 7th,
25 2001?

128

1 A. Yes.
2 Q. Do you recall who received copies of that
3 business plan?
4 A. Well, TVC helped, so they had a copy of the
5 business plan, and from what I -- I believe my
6 understanding was, if other potential investors
7 approached them, you know, they could also show that to
8 them.
9 Who else?
10 Q. Let's go back to the investors. I don't think
11 that I ever closed the loop on that. Besides Jarrett
12 Carson, who else did you approach for funding for Red
13 Path Energy after December 7th, 2001?
14 A. George somebody. George -- I forget his name
15 now. He's a local VC here in -- or angel, I should say,
16 here in town.
17 Q. How about PNM?
18 A. PNM.
19 I don't recall, myself, approaching PNM.
20 Q. Do you know if anybody on behalf of Red Path
21 Energy approached PNM?
22 A. It's possible Cory may have.
23 Q. How about Wally Hunter?
24 A. I don't recall approaching Wally Hunter.
25 Q. How about N plus H Power?

**129**

1    A. Nth power?

2    Q. Yeah, Nth Power. I'm sorry. N plus H, that's

3 nice. I'm sorry. Nth Power.

4    A. Yeah, I don't recall approaching Nth Power.

5    Q. Did you hold any discussions about Red Path

6 Energy with George Richmond after December 7th, 2001?

7    A. That was the George somebody. Thanks.

8    Q. Can you tell me about that? When did you speak

9 with George?

10    A. Well, it either had to be the end of December

11 or early January.

12    Q. Tell me about that discussion. How many

13 discussions did you guys have?

14    A. Well, I think we talked once on the phone to

15 meet at a restaurant, and then we talked at the

16 restaurant, and possibly one more time after that.

17    Q. Can you give me the substance of the

18 discussions? What did you guys talk about?

19    A. Well, we talked a little bit, and he was -- in

20 my memory, basically, he stated that -- the gist of it,

21 he wasn't going to invest in my company, but he was, of

22 course, interested, but you always get that.

23    Q. Do you know if Mr. Richmond received a copy of

24 the Red Path Energy business plan that you guys put

25 together?

**130**

1    A. He may have, but I can't be certain.

2    Q. Let me ask you, and I would like counsel to

3 maybe look into this.

4    MR. LEON: In response to a request for

5 production, number 14, which is one of the exhibits

6 marked in this deposition, we requested specifically all

7 business plans pertaining to Red Path, and I'm not aware

8 that we got a copy of this Red Path business plan that

9 was done after December 7th, so can we look into that?

10    MS. MANN: Sure. Request number 14?

11    MR. LEON: Number 14, yes, page 18.

12    MS. MANN: I will look into it.

13    Q. So without having the benefit of -- let me ask

14 you a couple of questions. Was this Red Path business

15 plan in any way similar or based upon the MesoFuel

16 business plan that you had done with MesoSystems?

17    A. The technology would be different.

18    Q. How about the format?

19    A. The format?

20    Q. Yes, the sections, the content. I mean, you

21 know, since I don't have it, I really can't talk about

22 it. I'm trying to see if you recollect something.

23    A. No, it -- I reformatted and redid the business

24 plan from what we had at MesoFuel, or NewCo.

25    Q. Did you do that on your MesoSystems laptop

**131**

1 computer, or did you do it on a separate computer?

2    A. A separate computer? I have to think.

3 It was a separate computer.

4    Q. Which computer would that be?

5    A. I believe it was on my personal laptop.

6    Q. Not the one that MesoSystems gave you?

7    A. Correct.

8    Q. Did you develop -- and, again, you know, we're

9 under a confidentiality agreement here, so did you

10 develop any intellectual property in connection with Red

11 Path Energy after December 7th, 2001?

12    A. No.

13    Q. Did you attend any conferences or give any

14 papers in connection with any work or, you know, anything

15 that had to do with Red Path Energy, Inc., after December

16 7th, 2001?

17    MS. MANN: Are you asking about on behalf of

18 Red Path Energy or --

19    MR. LEON: Yeah.

20    MS. MANN: Because "to do with" is kind of --

21    MR. LEON: Yeah, I'm going to ask him did you

22 on behalf Red Path Energy first, and then I'm going to

23 ask him on behalf of anyone else.

24    Q. Let's start with on behalf of Red Path Energy.

25    A. I don't believe I ever made any presentations.

**132**

1    Q. How about attending conferences on behalf of

2 Red Path Energy after December 7th, 2001?

3    A. No, I don't believe so.

4    Q. Can you tell me what conferences at all you

5 have attended since December 7th, 2001, up to, let's say

6 -- when did you start your present employment?

7    MS. MANN: August of 2002.

8    A. August of 2002.

9    Q. Between December 7th, 2001, and August of 2002,

10 can you tell me all of the conferences that you attended

11 during that time?

12    A. I attended a DOE conference.

13    Q. You attended that as an individual or on behalf

14 of any company?

15    A. I attended that. I was a private consultant,

16 and my client was Phillips Petroleum.

17    Q. Any other conference?

18    A. Not that I recall.

19    Q. During this time, December 2001 to August of

20 2002, did you have any jobs? Did you do any work?

21    A. Yes, I was a private consultant.

22    Q. Did you do these under any kind of corporation

23 or entity that you formed, or did you do this as an

24 individual?

25    A. I did it as a -- I did it under an LLC.

153

1   Q.  When did you first become acquainted with that
2   company?
3   A.  While I was working at Honda.
4   Q.  Have you or any company that you've been
5   affiliated with ever done any strategic alliances or had
6   any business relationships with Symyx, that you're aware
7   of?
8   A.  I'm sorry.  Could you state that again?
9   Q.  Are you aware of any company that you've worked
10  for or you, as a consultant, having any kind of business
11  relationship with Symyx?
12      MS. MANN:  And you've got to watch out, with
13  your noncompete -- your proprietary information from
14  Honda.
15      THE WITNESS:  Yeah.
16  Q.  I'm not asking for the nature of the business
17  relationship.  I'm just asking you if you're aware of any
18  business relationship.
19      MS. MANN:  Start it out just with yes or no.
20  A.  Yes.
21  Q.  Can you tell me which one of your employers has
22  ever had a business relationship with Symyx?  I don't
23  want to know the nature.  I just want to know --
24  A.  No, I cannot.
25  Q.  Because of this non- -- this --

154

1   A.  No, it's confidential.
2   Q.  Okay.
3       THE WITNESS:  But can we talk?
4       MS. MANN:  No.
5   Q.  Did this take place after you left MesoSystems,
6   whatever you're referring to that you can't talk about?
7   A.  No, it did not take place after I left
8   MesoSystems.
9   Q.  Has there been any activity involving Symyx
10  since after you left MesoSystems?
11  A.  Nothing substantial.
12  Q.  So there was no relationship that you're aware
13  of between Symyx and MesoSystems Technology during the
14  time that you were there?
15  A.  No, that's -- could you restate that question?
16  Q.  Are you aware of any relationship, business or
17  otherwise, between Symyx and MesoSystems Technology that
18  took place during the time that you were at MesoSystems
19  Technology?
20  A.  Yes, Symyx came to visit MesoSystems, upon my
21  request.
22  Q.  Tell me about that.  Tell me about that visit.
23  Who came?  When did that take place?
24  A.  The exact time was, I think, the end of October
25  or -- end of October, early November.

155

1       Oh, I should back up, because I do recall where
2   we flew out to Symyx to present our business idea,
3   NewCo's business plan and idea.
4   Q.  Who is "we"?
5   A.  Dr. Call -- Al Schallop met us there -- and
6   myself.
7   Q.  What happened at that -- where is Symyx
8   located, anyway?
9   A.  Santa Clara, California.  Silicon Valley.
10  Q.  Can you give me a summary, to the best of your
11  recollection, of what took place during this visit?
12  A.  We gave a presentation to one of the persons
13  there.  It was Troy Campione and some other
14  managers/executives of Symyx.  We basically showed them
15  what we wanted to do, see if they're interested in
16  investing or partnering or if they wanted to work with us
17  in some way.
18  Q.  Did you or Dr. Phillips, that you're aware of,
19  have any contacts with Symyx after December 5th, 2001?
20  A.  Yes, we've had some contact.
21  Q.  Can you tell me about that?
22  A.  I have to make it general because of the
23  confidentiality of Symyx.
24  Q.  Go ahead.
25  A.  But it was just to explore a business

156

1   opportunity at Symyx.
2   Q.  Was this business opportunity for Red Path
3   Energy, Inc.?
4   A.  Correct.
5   Q.  Do you remember when this contact or contacts
6   took place?
7   A.  I believe, around the beginning of January
8   Sometime in January, I believe.
9   Q.  Who would be the person at Symyx that you would
10  have direct contact with?
11  A.  Usually, the person that I talk directly with
12  is Troy Campione.
13  Q.  How about a company called Sub Chemi?
14  A.  Sud Chemie?
15  Q.  Your pronunciation is probably correct.  I
16  murdered that one, but how about them?
17      MS. MANN:  They got it.
18      THE WITNESS:  Yeah, of course.
19      MS. MANN:  How do you spell that one?
20      THE WITNESS:  I don't know.
21      MS. MANN:  Cory, how do you spell that one?
22      DR. PHILLIPS:  S-u-d C-h-e-m-i-e.
23      (Off-the-record discussion.)
24  Q.  (By Mr. Leon)  Have you had any contact with
25  them after December 5th, 2001?

157

1    A.  Sud Chemie.
2        I don't recall a specific discussion or
3    anything, but I think I may have and probably did send an
4    e-mail to the people that we know at Sud Chemie after we
5    had left MesoSystems.
6        Q.  How about Porvair?
7        A.  I'm not certain if we made any contact with --
8    again, is this in the time after December 5th?
9        Q.  After you left, yeah.
10       A.  And then do you have another time before, then?
11   August, is that --
12       Q.  At this point I'm only interested in after
13   December 2001.
14           MS. MANN:  Right, but he's asking for a
15   termination point.  Are we talking about a time span
16   or --
17           MR. LEON:  Anytime, anytime after December
18   2001.
19       A.  Okay.  Well, I have to back up, then, on Sud
20   Chemie, because I ran into and talked with John Wagner
21   out at the fuel cell meeting in November of 2002.
22       Q.  How about Porvair?
23       A.  I haven't had any contact with Porvair.
24       Q.  Are you aware whether Dr. Phillips had any
25   contact with them?

158

1        A.  I can't speak for Dr. Phillips.
2        Q.  Well, but are you aware whether he has or not?
3    I'm not asking you to speak for him, but he may have told
4    you or you may have heard or --
5        A.  Oh, not that I know of.
6        Q.  Just to close a loop on the computer issue,
7    when was the first time that you remember MesoSystems
8    Technology asking you to return the MesoSystems
9    Technology laptop to MesoSystems after December 5th,
10   2001?
11       A.  Oh, December 6th, on my voice mail, when he
12   terminated me.
13       Q.  Can you tell me why it took almost two months
14   for that to take place?  Because the return date, as I
15   understand it, was January 30th, 2002.
16       A.  Sure.  MesoSystems owed me some money for
17   business travel that they had not paid me; for example,
18   going out to Symyx with Chuck and Al.  I still haven't
19   been reimbursed for that; and we had, I think, some other
20   issues with MesoSystems we wanted to resolve, so I think
21   that's why it took so long for the computers to get back.
22       Q.  Let's talk a little bit about events that may
23   have taken place after December 5th, 2001, and before --
24   did I understand that you started your new job on July
25   1st, 2002?  Is that correct?

159

1        A.  Yeah, that is correct.
2        Q.  Let's talk about that window of time.
3        A.  All right.
4        Q.  Can you tell me whether you made any attempts
5    to obtain new employment during this time?
6        A.  Attempts to --
7        Q.  Send out resumes, call people, headhunters.  I
8    mean, I want you to take me through the process that you
9    undertook to obtain new employment during this time that
10   I just referred to.
11       A.  Called up some friends.
12       Q.  How many friends, and who are these friends?
13       A.  I called people at Phillips Petroleum, and I
14   talked to some people at John Deere.  I talked to some
15   people at Neuvara.
16       Q.  When did these conversations take place,
17   starting with Phillips?
18       A.  I believe, in the latter part of January.
19       Q.  2002?
20       A.  Yes.
21       Q.  Who did you talk to at Phillips in the latter
22   part of January of 2002?
23       A.  His name is Joe Kaufman.
24       Q.  Did you send out any letters or resumes to
25   Phillips?

160

1        A.  No.
2        Q.  How about John Deere?  When did you talk to
3    people at John Deere?
4        A.  Sometime in February.
5        Q.  Who did you talk to at John Deere?
6        A.  I can't recall the name right now.
7        Q.  Did you send any letters or resumes to John
8    Deere?
9        A.  I don't recall.
10       Q.  How about Neuvara?  When did you talk to people
11   at Neuvara?
12       A.  January.
13       Q.  Early?  Mid?  Late?
14       A.  Oh, it was, you know, mid- to late January.
15       Q.  Did you send letters or resumes to anybody at
16   Neuvara?
17       A.  No.
18       Q.  Who did you talk to at Neuvara?
19       A.  I talked with Jeff Bentley, Bill Mitchell.
20       Q.  Any other companies that you talked to during
21   this time?
22       A.  Not that I recall.
23       Q.  How did you come to get the position that you
24   presently hold?  When did you first apply?  Who did you
25   talk to?  I mean, I just want you to take me through

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
Civ. No. 02-103 LH/WWD

JAMES SEABA and
CORY PHILLIPS,

        Plaintiffs,

vs.

MESOSYSTEMS TECHNOLOGY, INC.,

        Defendant.

DEPOSITION OF CORY PHILLIPS, Ph.D.

April 3rd, 2003
10:36 a.m.
7309 Indian School Road, Northeast
Albuquerque, New Mexico  87110

PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:    MR. ALBERTO A. LEON
             ATTORNEY FOR DEFENDANT

REPORTED BY:  MICHELE TRUJILLO, CCR No. 226
              Kathy Townsend Court Reporters
              110 Twelfth Street, Northwest
              Albuquerque, New Mexico  87102

**Page 2**

A P P E A R A N C E S

For the Plaintiffs:

    MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.
    Attorneys at Law
    500 Fourth Street, Northwest, Suite 800
    Albuquerque, New Mexico  87102
    By:  MR. ANGELO ARTUSO

For the Defendant:

    BAUMAN, DOW, McINTOSH & LEON, P.C.
    Attorneys at Law
    7309 Indian School Road, Northeast
    Albuquerque, New Mexico  87110
    By:  MR. ALBERTO A. LEON

Also Present:

    Dr. Nod Godshall
    Dr. James Seaba

I N D E X

CORY PHILLIPS, Ph.D.                          PAGE

    Direct Examination by Mr. Leon              4

CERTIFICATE OF COMPLETION OF DEPOSITION      154

SIGNATURE/CORRECTION PAGE                    156

EXHIBIT
B

**Page 3**

E X H I B I T S

PHILLIPS EXHIBIT:                          MARKED

15.  E-mail dated 8/22/01 to Dr. Phillips
     from Dr. Call and e-mail dated 8/22/01
     from Dr. Phillips to Dr. Call          69

16   Offer of Employment for Dr. Phillips
     dated 5/23/01                         105

17   Acknowledgment of Receipt document from
     Modrall law firm and Chain of Custody log  109

18.  Facsimile Cover Sheet dated 3/3/03,
     letter dated 1/24/02 to Mr. Rohde from
     Ms. Mann and Exhibit A                108

19.  Transcript of telephone call from Dr. Call
     to Dr. Phillips' voice mail           127

**Page 4**

CORY PHILLIPS, Ph.D.
after having been first duly sworn under oath,
was questioned and testified as follows:
DIRECT EXAMINATION
BY MR. LEON:
    Q.  Dr. Phillips, good morning.  My name is Alberto
Leon.  I am the attorney for MesoSystems in the pending
lawsuit here in federal court.  I will be asking you some
questions today, as I asked Dr. Seaba in the last couple
of days.
        I'm going to now proceed to make sure that we
understand how the proceedings are going to work, and at
any time, if you have any questions, will you please ask
them of me?  And I'll be very happy to answer them.
    A.  Yes, thank you.
    Q.  You understand that you're under oath?
    A.  Yes, I do.
    Q.  Do you understand that you're under oath as you
would be in a court of law?
    A.  Yes, I do.
    Q.  To facilitate things and to make your
attorney's job and my job a little easier, I'm also going
to ask you to please wait for the end of my questions
before you provide an answer so that our voices are not
on top of each other in the transcript.  Would you agree

85

1  the changes for NewCo at that particular time, agree to
2  them, yes, they should be reflected in that plan, but the
3  key to that statement was if he agreed to it and if he
4  was willing to go forward with that type of negotiation
5  and include it in that business plan at that particular
6  time.
7      Q.  Well, let's go back, then, to your recollection
8  of the last iteration of the business plan of NewCo that
9  you saw before you left MesoSystems or before your last
10 day at MesoSystems.
11     Would that business plan, then, be different
12 from the business activities that you had envisioned for
13 Red Path Energy, Inc.?
14     A.  It's a good chance that you can go further
15 enough back in time where the business plans possibly
16 would have some similarities. because the negotiations
17 were not complete.
18     Q.  I wasn't talking about going back in time.  I
19 was talking about the last iteration that you saw.
20     A.  You referred to the last iteration that I saw,
21 and my belief is that that last iteration is, quote,
22 unquote, "back in time," and it's a good chance that, you
23 know, there were some similarities between the business
24 plans of Red Path Energy, which I don't even know existed
25 at this date, and NewCo's business plan.

86

1      Q.  When was the last time that you saw a business
2  plan for NewCo?
3      A.  Maybe back in October I saw a draft.
4      Q.  Early October?  Mid-October?  Late October?
5      A.  My guess is maybe early October or mid-October,
6  sometime -- maybe mid-October, because my function with
7  respect to that business plan was just to gather data and
8  information, not to review the entire document as an
9  entity.
10     Q.  Who is listed as directors of Red Path Energy,
11 Inc., in the document that you have in your hands?
12     A.  Is it the same page that that information would
13 be on?
14     Q.  The next page.
15     A.  Thank you.
16     Q.  Or maybe even the page after that.
17     A.  Thank you.
18     James Seaba and Cory Phillips.
19     Q.  Was your understanding --
20     A.  Article VII, right?
21     Q.  Yes.
22     A.  That's correct.  Thank you.
23     Q.  Was your understanding at the time that Red
24 Path Energy, Inc., was incorporated that it would compete
25 in any way with MesoSystems Technology?

87

1      A.  That was never my understanding.
2      Q.  How about with NewCo?
3      A.  Never my understanding, nor with Honda, nor
4  with any other entity that I had involvement with.
5      Q.  Was there any intellectual property that had
6  been put in place which would be placed into Red Path
7  Energy, Inc., at the time that it was incorporated?
8      MR. ARTUSO:  I'm going to object on the basis
9  that "intellectual property" is pretty broad and vague.
10 Are you talking about issued patents, or are you talking
11 about trade secrets?  Are you talking about just ideas?
12     MR. LEON:  I'll define it as disclosures, trade
13 secrets, patent applications or patents issued, and
14 trademarks.
15     A.  And trademarks.
16     Help me out, Dr. Leon.  I'm going to try and
17 repeat it so I can process it again, your question.
18     Q.  Disclosures --
19     A.  Just the full question.  I'm sorry.
20     Q.  Whether, at the time that you were involved in
21 incorporating Red Path Energy, Inc., there were any items
22 of intellectual property, as you've just defined, that
23 were going to be placed with Red Path Energy, Inc. or
24 made part of Red Path Energy, Inc.
25     A.  The last time I recalled, there was a clear

88

1  effort on the part of all entities involved in setting up
2  Red Path that intellectual property would be separate to
3  each corporate entity and not talk to each other.
4      Q.  But do you remember any specific item of
5  intellectual property that was being allocated into Red
6  Path Energy, Inc., at that time?
7      A.  Dr. Leon, allocated from whom and -- just from
8  whom?
9      Q.  Well. we'll get to that.  I mean, if there is
10 anything that is going to be placed in it, then the
11 follow-up question would be to try to find out what it is
12 and where it came from.
13     A.  Yeah, nobody was placing intellectual property
14 from anywhere into Red Path.
15     Q.  Do you remember where you were on Tuesday,
16 December 4th, 2001?  This was two days before your last
17 day at MesoSystems.
18     A.  I remember, about that week, that I was -- what
19 I do remember about that week is that I was trying to
20 spend a lot of time researching information for
21 establishing, possibly, some proposals to certain
22 different -- different government agencies, like types of
23 proposals for, maybe, SBIRs or other types of proposals
24 that we could use to generate money for Red Path, so --
25     I do recall, from a meeting that I had with

117

1    expect and would appreciate the same from you. So
2    refrain from boisterous behavior, please.
3         A.   You are being respectful, Dr. Leon, and I
4    apologize for raising my voice to you. I apologize to
5    the Court as well. I'm a little sorry, just hurt, that
6    he terminated me unlawfully over the phone and could not
7    do it face-to-face.
8              MR. ARTUSO: Why don't we take a quick break.
9              (Recess taken.)
10        Q.   If we look at Exhibit 17, can you tell me why
11   the needle valve SS-SS2 was in your possession –
12        A.   Yes.
13        Q.   – upon your departure from MesoSystems?
14        A.   Yes. That needle valve, most likely, was in
15   some personal materials that I had taken from
16   MesoSystems.
17        Q.   Can you tell me what that needle valve is used
18   for in your research work or what it would be used for in
19   MesoSystems' work?
20        A.   Many different capacities. It's a valve, so if
21   you have gas flowing and you need to stop the flow of
22   that gas, this would be possibly one use for that valve.
23             It's a needle valve, so it can also control the
24   flow of that gas. Meter the flow is the proper term,
25   maybe.

118

1         Q.   So I'm still a little bit confused. Under what
2    set of circumstances would a piece of equipment like that
3    be taken out of the premises and taken to somebody's
4    house?
5         A.   My theory is I probably ordered this needle
6    valve and it got mixed in with some personal items that I
7    had and that's why it was in my possession, because
8    you're –
9         Q.   Go ahead.
10        A.   – because you're not asking why the cell phone
11   is in my possession, either. That was a personal item.
12        Q.   No, I'm talking about the needle valve.
13        A.   So it's the same as the cell phone. It was a
14   personal item that was probably removed from MesoSystems.
15        Q.   How would an F series filter -- why would that
16   be in your possession?
17        A.   The same reason as the needle valve, as I
18   mentioned earlier.
19        Q.   How big of an item is this filter?
20        A.   Small. They're maybe half the size of my hand.
21   You could drop those in a box or something and not even
22   know you have them in the box.
23        Q.   The same for a needle valve?
24        A.   Oh, yeah.
25        Q.   Small item?

119

1         A.   Definitely.
2         Q.   How about the TF series filters?
3         A.   The same reason as the needle valve.
4         Q.   How big of an item is that?
5         A.   To the best of my memory, I think it's on the
6    order, in terms of size, of the needle valve or other
7    filter that you requested information about.
8         Q.   There is an item here, a UT by one-half
9    Swagelok? I don't -- I can't read the handwriting there
10   on Exhibit 17.
11        A.   Yeah, that's the -- yeah, the half-inch
12   Swagelok?
13        Q.   Yes.
14        A.   What's interesting is I don't know what they
15   mean by UT, but I must have interpreted it correctly when
16   I returned the items. Whatever that small fitting is –
17        Q.   Is that what it is, a fitting?
18        A.   Yes. It's a tube fitting, yes.
19        Q.   How about the storage cylinder, ABQ 01-094?
20   How would that end up in your possession?
21        A.   The same way.
22        Q.   You testified earlier that, as far as the
23   substrates, none of them had been sent out after you left
24   -- well, actually, either before or after you left or the
25   last day of your employment at MesoSystems. Is that

120

1    correct?
2         A.   Yes.
3         Q.   Now, would it surprise you to know that there
4    were two substrates in the possession of TSP that TSP
5    delivered to -- or that, actually, MesoSystems picked up
6    at TSP in addition to the ones listed on Exhibit 17?
7         A.   No, there was one substrate that possibly went
8    to TSP, if I recall.
9         Q.   One substrate? One or two?
10        A.   Well, it wasn't that many. It was one, maybe,
11   that went over to TSP. Thank you for reminding me.
12        Q.   Let's talk about TSP, then.
13        A.   Okay.
14        Q.   Who are they?
15        A.   I believe TSP stands for Team Specialty
16   Products, and they're a local prototyping business in
17   town.
18        Q.   Did you have any contacts or -- yeah, any
19   contacts with anyone at TSP after your last day at
20   MesoSystems?
21        A.   After my last day at MesoSystems?
22        Q.   Yes.
23        A.   Sure.
24        Q.   Can you tell me about those contacts and the
25   context of them and so forth?

121

1       A.  I talked to several people at TSP after my
2   employment with MesoSystems, for instance, Bob Sachs, Dan
3   Sachs, Dan O'Geary, Paul Reynolds.  That's -- I can't
4   think of any more outside of them.
5       Q.  Were there any discussions about TSP maybe
6   becoming an investor in Red Path Energy after your
7   departure from MesoSystems?
8       A.  Yes.  Possibly, yes.
9       Q.  And at the same time they were holding
10  MesoSystems' samples while you were talking about them
11  being an investor for Red Path Energy?
12      A.  I'm not getting the connection in your
13  question, actually.
14      Q.  Well, there's no connection.  There is just a
15  time.
16          At the same time that they were holding these
17  samples or these substrates that had been sent to them,
18  you were engaged in discussions with them about funding
19  for Red Path Energy?
20      A.  It's possible that there's some overlap there.
21  Yes, it's possible.
22      Q.  Do you know if the samples that went to TSP
23  were sent to them before your last day at MesoSystems or
24  after?
25      A.  I believe, before I was terminated at

122

1   MesoSystems.
2       Q.  And you sent those?  You would be the one that
3   would have sent those to them?
4       A.  Most likely, it was me that sent them over,
5   yes.
6       Q.  Did any of the work that you did during your
7   tenure at MesoSystems -- and that includes government
8   contract work, the DOD project, Palm Power or whatever.
9       A.  Okay.
10      Q.  Did any of that work involve hydrocarbons?
11      A.  Yes, and when you say "involve," you don't mean
12  from an experimental standpoint, but from a planning
13  perspective or design perspective, I gather?
14      Q.  Well, tell me.  Why don't you tell me which
15  hydrocarbons were involved and in what context they were
16  involved.
17      A.  It's important to understand that there was no
18  experimental infrastructure in place at the time that I
19  was at MesoSystems, so the hydrocarbon discussions
20  occurred with respect to designs, and one design that
21  stands out in particular is the start-up reactor that
22  Dr. Seaba mentioned yesterday, and that start-up reactor
23  would involve propane, possibly, as a fuel, and propane
24  is a hydrocarbon.
25      Q.  Any other hydrocarbons involved?

123

1       A.  That one stands out in my mind, but I'm sure
2   maybe other hydrocarbons could be used, but that one --
3   the discussions regarding that particular hydrocarbon
4   stand out in my mind.
5       Q.  I'm trying to ascertain whether there was any
6   other hydrocarbon-related work that you did during your
7   time at MesoSystems or that you were involved in in any
8   way.
9       A.  No, not at -- other than that, I can't think of
10  anything else.
11      Q.  As far as this particular propane project that
12  you mentioned, was there any, again, intellectual
13  property created or derived from it?  And we'll use the
14  same definition that we used before.
15      A.  The same definition, yes, that we used before.
16  I'm sorry for talking over you.
17          There was work product developed as a result of
18  that activity.  The work product was in the form of a 3-D
19  rendering, drawings that had been provided by TSP under a
20  work-for-hire situation.
21          Under that work-for-hire activity, they
22  generated a presentation for that device that involved
23  the hydrocarbons, and that presentation was done out of
24  an obligation for a meeting where a representative from
25  DOD would be there at that meeting and they wanted to

124

1   have some type of deliverable.
2           It turns out, they never showed that
3   deliverable to the DOD representative, which I found very
4   interesting, but --
5       Q.  What is your understanding, then, as to who
6   that intellectual property belonged to?
7           MR. ARTUSO:  Objection to the extent you're
8   asking for a legal conclusion.
9           MR. LEON:  I'm just asking to the extent that
10  he understands intellectual property to be defined under
11  the parameters that we did before.
12      Q.  Who owned that?
13      A.  Oh, MesoSystems owned that.
14      Q.  And none of that intellectual property or data
15  or whatever ended up in Red Path Energy's business plan
16  after December 6, 2001?
17      A.  I'm not totally sure if it did or not.  My
18  belief is that it didn't, but I'm not totally sure.
19      Q.  So let me just ask, for my own edification and
20  clarification, both Dr. Seaba and yourself have referred,
21  up to this point, to the NewCo business plan as being
22  based on ammonia or sole sodium ammonia, and now we're
23  talking about some hydrocarbon-related work, so clarify
24  that for me, please.
25      A.  The hydrocarbon part of that work was simply

129

1    Q.   Do you know if that payment covered the 14 days
2  after December 6th?
3    A.   I'm not sure. I'm not sure. I'm sorry.
4    Q.   Do you have a pay stub or records that we could
5  take a look at?
6    A.   I'm sure. I'm sure we could produce that. I'm
7  sure.
8    Q.   In the second part of the message, can you read
9  -- on this part. I'm going to ask you to read out loud
10  for me.
11    A.   Okay.
12    Q.   Starting with "Hello Cory" and so forth.
13    A.   Okay. "Hello Cory. One, one more message. If
14  de -- Please do not delete files from your hard drive or
15  from your mail system. Everything on the computer is
16  company property. Its company files and deleting them is
17  effectively just destroying company property and I don't
18  think you want to go down that path. Please bring
19  everything in 'as is' and, hopefully, we'll see you by 3.
20  Take Care."
21    Q.   Did you follow these instructions that were
22  given to you by Dr. Call?
23         MR. ARTUSO:  Objection, compound. Which
24  instructions?
25         MR. LEON:  "Do not delete files from your hard

130

1  drive or from your mail system."
2    A.   Yes.
3    Q.   So what did you do with the computer after
4  receiving this message?
5    A.   Stopped using it. It's a termination, so I
6  stopped using the computer. It's time to stop using it.
7    Q.   Let's move on. I'm going to ask you a few
8  questions about activities undertaken by Red Path Energy,
9  Inc., after December 6th, 2001.
10    A.   Sure.
11    Q.   Can you tell me, you know, in as concise a
12  manner as you can possibly do so, what plans were
13  formulated for Red Path Energy, Inc., after December 6th,
14  2001?
15    A.   Plans in the form of -- could you help me out,
16  please?
17    Q.   What were your ideas as to what you were going
18  to do through Red Path Energy, Inc., after that date?
19    A.   The first plan I remember was just to try to
20  get funding somehow. It's the only plan that comes to
21  mind.
22    Q.   Did you undertake any activities to further
23  this funding, you know, to obtain funding?
24    A.   Yes. The only activity that comes to mind is
25  the involvement of TVC, Technology Ventures Corporation,

131

1  helping prepare a business plan.
2    Q.   Did that take place? Did you have TVC help you
3  prepare a business plan?
4    A.   TVC helped educate us on certain aspects of a
5  business plan. Whether that plan was finished. I -- I
6  don't think so. I don't think it was a completed
7  document, if you will.
8    Q.   Were you involved in the preparation of this
9  partial business plan or this incomplete business plan?
10    A.   Yes, yes, more of a supportive role, and Dr.
11  Seaba typically led the authorship of a business plan, so
12  I was mostly supporting him in that activity.
13    Q.   Are you aware as to whether this business plan
14  was sent to anybody?
15    A.   No, I'm not aware. We never re- -- we never
16  completed our relationship with TVC.
17    Q.   Any other activities toward obtaining funding
18  that you participated in, too?
19    A.   Not that stand out in my mind.
20    Q.   How about conversations with TSP about
21  potentially funding Red Path Energy, Inc.?
22    A.   Yeah, that is a form of investment.
23         Yes, conversations with TSP, that's correct. I
24  was mostly talking about venture capitalist kind of
25  investment. Yes, in-kind investment, like TSP

132

1  discussions were, I was involved in those discussions.
2    Q.   Did anything come out of that?
3    A.   No.
4    Q.   Do you remember when these discussions took
5  place?
6    A.   Maybe sometime in January.
7    Q.   Who did you talk to at TSP?
8    A.   There were conversations with -- that involved
9  Dr. Seaba, myself and, typically, maybe Bob Sachs or Dan
10  Sachs.
11    Q.   How did you first get acquainted with TSP?
12    A.   Sometime in the fall -- and I was still with
13  MesoSystems -- we asked them to do some fabrication work,
14  work-for-hire type of activities.
15    Q.   So you were aware that MesoSystems was working
16  in some capacity with TSP before December 6th, 2001?
17    A.   No, I was not aware of that. In fact, I
18  received lots of resistance -- I was responsible for
19  bringing TSP to MesoSystems, and I received lots of
20  resistance from several people in MesoSystems at the --
21  in terms of my memory now, Dr. Call and, actually, Dr.
22  Chellappa posed some resistance to that relationship,
23  because they felt like they had their own machine shop in
24  Kennewick, Washington, that could accomplish the job that
25  they needed, and, in reality, TSP had probably the

Ned Godshall
4/1/2003

Seaba vs.
Mesosystems

Page 1

EXHIBIT
C

```
 1              IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF NEW MEXICO
 3      No. Civ. No. 02-103 LH/WWD
 4      JAMES SEABA and CORY PHILLIPS,
 5                          Plaintiffs,
 6      vs.
 7      MESOSYSTEMS TECHNOLOGY, INC.,
 8                          Defendant.
 9
                     DEPOSITION OF NED GODSHALL
10                      April 1, 2003
                         11:15 a.m.
11                      500 4th Street N.W.
                      Albuquerque, New Mexico
12
13          PURSUANT TO THE APPLICABLE RULES OF CIVIL
        PROCEDURE this deposition was:
14
        TAKEN BY:  LISA MANN
15                 Attorney for Plaintiffs
16      For the Plaintiff:
17                 MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.
                   500 Fourth Street, N.W.
18                 Suite 1000
                   Albuquerque, New Mexico   87102
19                 BY:  MS. LISA MANN
                        MR. ANGELO ARTUSO
20
        For the Defendant:
21
                   BAUMAN, DOW, MCINTOSH & LEON
22                 Attorneys at Law
                   7309 Indian School Road N.E.
23                 Albuquerque, New Mexico
                   BY:  ALBERTO LEON
24                      CHRISTOPHER BAUMAN
25      ALSO PRESENT:  JAMES SEABA and CORY PHILLIPS
```

Ned Godshall
4/1/2003

Seuba vs.
Mesosystems

---

Page 6

1   Q.   What case was that?
2   A.   It was a case having to do with me here locally
3   in a lawsuit in Albuquerque.
4   Q.   What was the nature of the lawsuit?
5   A.   Can you --
6   Q.   What kind of lawsuit was it?  What was the claim
7   against you?
8   A.   There wasn't one.
9   Q.   Were you bringing a claim?
10  A.   Yes.
11  Q.   What claim were you bringing?
12  A.   Several.
13  Q.   Okay.  Why don't you tell me what kinds of
14  claims they were.
15  A.   To the best of my recollection, because it is
16  quite involved with lots of claims, basically it had to do
17  with the way I had been treated fraudulently in a business
18  transaction.
19  Q.   Who did you sue?
20  A.   High Desert Investment Corporation.
21  Q.   Was that a business transaction that you had
22  entered into?
23  A.   Yes.
24  Q.   How was the case resolved?
25  A.   Can't answer the question.

---

Page 7

1   Q.   You don't know how it was resolved?  Did the
2   case ever end?
3   A.   The case hasn't ended so there is no answer to
4   your question.
5   Q.   The case is still pending?
6   A.   That is correct.
7   Q.   Who is representing you in that case?
8   A.   In that case, Bauman, Dow & McIntosh.
9   Q.   Why don't you tell me generally your educational
10  background.
11  A.   Most recently I have a Ph.D. in material science
12  from Stanford University and an MBA from the Anderson
13  School of Management at University of New Mexico.
14  Q.   When did you obtain your MBA?
15  A.   1994.
16  Q.   When did you obtain your Ph.D.?
17  A.   1980.
18  Q.   Who is your present employer?
19  A.   MesoFuel Inc.
20  Q.   Since when have you been employed by MesoFuel?
21  A.   January 1, 2002.
22  Q.   What is your present title?
23  A.   President and CEO.
24  Q.   CEO?
25  A.   Yes.

---

Page 8

1   Q.   Have you ever had any other titles with
2   MesoFuel?
3   A.   No.
4   Q.   What is your annual compensation from MesoFuel?
5        MR. LEON:  Well, I am going to place an
6   objection to the extent that the question asks for any
7   kind of confidential, financial information of MesoFuels,
8   MesoSystems or of this witness as far as -- and I want to
9   take this opportunity, Ms. Mann, to bring something up to
10  you which would have an effect on today's proceedings.
11       I believe that in August of 2002, we
12  submitted a protective order for your consideration and we
13  have never received any input or response or anything on
14  it.  So, we are going to be objecting to any financial,
15  strategic marketing, any trade secret confidential
16  information of either MesoSystems or MesoFuels across the
17  board.  We would be happy to work with you guys on a
18  protective order so that information can be disclosed at a
19  later time.  As of today, we are going to object to that.
20       MS. MANN:  I don't think that is going to work
21  so, we can, however, agree that we will pursue diligently
22  an effort to get a protective order entered that we
23  mutually agree on and that when we enter a protective
24  order this deposition would be subject to it, but I would
25  resist any effort to force us to redepose this witness on

---

Page 9

1   things that could be subject to a protective order when we
2   can resolve that easily by proceeding and agree that the
3   entire deposition will be kept confidential until such
4   time as we enter into a protective order.  That should
5   protect any concerns you have about confidentiality.
6        MR. BAUMAN:  That is fine.
7        MR. LEON:  Okay.
8        (By Ms. Mann)  Can you go ahead and answer the
9   question?
10  A.   $150,000 a year.
11  Q.   Does that $150,000 a year include any kind of
12  bonus package arrangement?
13  A.   Can you elaborate?
14  Q.   Do you have a bonus -- an agreement for bonus
15  compensation that is in addition to the $150,000 a year?
16  A.   No.
17  Q.   There is no understanding with MesoFuel about a
18  bonus or possible bonuses that you might receive?
19  A.   I believe I just answered that.
20  Q.   Okay.  Are there other benefits that you receive
21  as president and CEO of MesoFuels that are not included
22  within the $150,000 a year?  And by that I mean, benefits
23  like stock options, profit sharing, retirement, that kind
24  of thing?
25  A.   Yes

---

3 (Pages 6 to 9)

## MESOSYSTEMS TECHNOLOGY, INC.'S PRIVILEGE LOG

| Date | Author | Recipient | Description of Document | Status | Applicable Privilege |
|---|---|---|---|---|---|
| 08/05/01 | Dick Rohde | Jeff Lubeck, Chuck Call | Email attaching revised draft of Seaba Offer Letter | Not Provided | Attorney-Client |
| 07/26/01 | Jeff Lubeck | Dick Rohde | Email regarding draft of Seaba Offer Letter | Not Provided | Attorney-Client |
| 03/07/02 | Kirk Soderquist | Paul Smith | E-mail forwarding e-mail dated 8/29/01 from Jeff Lubeck to Kirk Soderquist regarding incorporation of subsidiary | Not Provided | Attorney-Client |
| 03/07/02 | Kirk Soderquist | Paul Smith | E-mail forwarding e-mail dated 10/02/01 from Kirk Soderquist to Jeff Lubeck, Chuck Call & Mike Martin regarding Mesofuel formation | Not Provided | Attorney-Client |
| 03/07/02 | Kirk Soderquist | Paul Smith | E-mail forwarding e-mail dated 10/08/01 from Jeff Lubeck to Kirk Soderquist, Chuck Call & Mike Martin regarding incorporation of Mesofuel | Not Provided | Attorney-Client |

EXHIBIT D

| 03/07/02 | Kirk Soderquist | Paul Smith | E-mail forwarding e-mail dated 10/08/01 from Jeff Lubeck to Kirk Soderquist regarding MesoFuel board | Not Provided | Attorney-Client |
| 03/07/02 | Kirk Soderquist | Paul Smith | E-mail forwarding e-mail dated 10/19/01 from Jan Marsicek to Kirk Soderquist regarding MesoFuel formation documents | Not Provided | Attorney-Client |
| 03/07/02 | Kirk Soderquist | Paul Smith | E-mail forwarding e-mail dated 10/31/01 from Jeff Lubeck to Kirk Soderquist & Jan Marsicek regarding MesoFuel shareholder meeting; | Not Provided | Attorney-Client |
| 03/07/02 | Kirk Soderquist | Paul Smith | E-mail forwarding e-mail dated 11/07/01 from Kirk Soderquist to Jeff Lubeck & Jan Marsicek regarding incorporation of MesoFuel | Not Provided | Attorney-Client |
| 03/07/02 | Kirk Soderquist | Paul Smith | E-mail forwarding e-mail dated 11/07/01 from Jeff Lubeck to Kirk Soderquist & Jan Marsicek regarding MesoFuel incorporation | Not Provided | Attorney-Client |

| 03/07/02 | Kirk Soderquist | Paul Smith | E-mail forwarding e-mail dated 12/06/01 from Charles Call to Kirk Soderquist, Jeff Lubeck & Dick Rohde regarding draft agreement with James Seaba; | Not Provided | Attorney-Client |
| 03/07/02 | Kirk Soderquist | Paul Smith | E-mail forwarding e-mail dated 12/06/01 from Charles Call to Dick Rohde & Kirk Soderquist regarding letter to James Seaba and Cory Phillips | Not Provided | Attorney-Client |
| 03/07/02 | Kirk Soderquist | Paul Smith | E-mail forwarding e-mail from Samantha League to Kirk Soderquist regarding James Seaba's termination letter | Not Provided | Attorney-Client |
| 03/07/02 | Kirk Soderquist | Paul Smith | E-mail forwarding e-mail dated 12/18/01 from Jeff Lubeck to Jan Marsieck, Kirk Soderquist & Matt Wagner regarding incorporation of MesoFuel | Not Provided | Attorney-Client |
| 03/07/02 | Kirk Soderquist | Paul Smith | E-mail forwarding e-mail dated 11/28/01 from Charles Call to Kirk Soderquist | Redacted | Attorney-client |

[0404220400061]

| 08/02/01 | Samantha League/Charles Call | Richard Rohde | Draft of Offer of Employment with MesoSystems Technology, Inc. for James Scaba | Not provided | Attorney-client<br><br>Work product |
| 05/21/02 | Lisa Albrecht | Paul Smith | Facsimile forwarding report from Robert W. Hamic Jr. of The Everest Group, L.L.C. | Not provided | Attorney-client<br><br>Work product |

[JB\0222400mm]

6/10/03

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JAMES SEABA and CORY PHILLIPS, )
                                )
            Plaintiffs,         )      Civ: No.
                                )
      vs.                       )      02-103-LH/WWD
                                )
MESOSYSTEMS TECHNOLOGY, INC.,   )
                                )      COPY
            Defendant.          )
_____ )

DEPOSITION OF SAMATHA LEAGUE

Taken at the instance of the Plaintiffs

May 16, 2003

1:30 p.m.

415 N. Quay

Kennewick, Washington

BRIDGES & ASSOCIATES
Certified Shorthand Reporters
P. O. Box 5999
Kennewick, Washington  99336
(509) 735-2400 - (800) 358-2345



EXHIBIT
E

```
 1          A.    Okay.  We had a single server in
 2    Kennewick, Washington.  We backed up data only
 3    on a daily basis.  And this is data that people
 4    put out on the server to save.  And it was, I
 5    would say 99 percent of it was finance
 6    documents and research and development
 7    documents.
 8          Q.    And when was this basic back-up
 9    guide developed?
10          A.    We put this in place in July of
11    2002.
12          Q.    Okay.  And who developed this guide?
13          A.    We pulled this guide off of the
14    internet.  It was put in place in Albuquerque
15    first, and Phil Ferguson provided me this copy
16    as a guideline for putting things in place here
17    in Kennewick, Washington.
18          Q.    Who is Phil Ferguson?
19          A.    Phil Ferguson is an IT person for
20    Meso Fuel.
21          Q.    And why was it decided that you
22    should implement this procedure in, you say,
23    July of 2002?
24          A.    Yes, sir.  It is an improvement on
25    our existing system.  We upgraded our own
```

1   server here in terms of memory, and we needed a
2   better back-up system than the one we had in
3   place.
4         Q.    Okay.  Let's talk about what you had
5   in 2001.  Did you have the same server for the
6   entire year?
7         A.    We had the same server in 2001.
8         Q.    Okay.  What was the model, the
9   manufacturer of the server?
10        A.    It is a Dell server.  I don't have
11  the exact model number.
12        Q.    Was it a tape drive?
13        A.    We do have a tape drive back-up on
14  that server, yes.
15        Q.    Any other type of drive or back-up
16  system that it had?
17        A.    No.
18        Q.    So it's strictly a taped drive
19  server?
20        A.    Yes.
21        Q.    Where is the Dell server now?  You
22  said it has been upgraded or replaced.
23        A.    We upgraded the hard drives on that
24  server, and it is currently sitting in our
25  server room here at 415 North Quay Street.

1          Q.    Is there now a server in place in

2     Albuquerque?

3          A.    Yes, there is.

4          Q.    When was that server brought on

5     line?

6          A.    In the spring, I would say May, June

7     time frame of 2002.

8          Q.    Prior to that time all of the

9     Albuquerque data had to be backed up on the

10    Kennewick server, is that correct?

11         A.    That's incorrect.

12         Q.    Okay.  Correct me.

13         A.    Albuquerque computers, the people

14    who worked on their computers, they were not on

15    MesoSystems' network.  They were responsible

16    for backing up their own data.

17         Q.    How would they do that?

18         A.    They could do that with CD rewrite

19    drives.

20         Q.    Was there a separate drive for each

21    work station or was there a central CD drive

22    that you saved it to?

23         A.    There was an external CD rewrite

24    that was in Albuquerque.  It was in the office

25    also there, accessible to anyone who needed to

```
 1    take those individual back-ups and place it on
 2    a network server?
 3         A.    Not to my knowledge.  Not by me.
 4         Q.    So the data, as far as you know, the
 5    data on the Albuquerque server is going forward
 6    from July 2002 only, it doesn't have any
 7    historic or archived data?
 8         A.    I don't know of any archived data
 9    that's been put on it.
10         Q.    And each individual would have
11    whatever CD's they managed to copy during the
12    time prior to the server being put in service
13    in Albuquerque?
14         A.    Yes.
15         Q.    What operating system software was
16    used?
17         A.    For most of our computers that they
18    were operating they used Windows 2000 as their
19    operating system.  We had a few computers that
20    were running Windows ME.  And we had at least
21    one computer that was running Windows 98.
22         Q.    How was it determined which computer
23    would be using which operating system?
24         A.    It depended on what the computer
25    came with, for the most part.
```

1    any printers or any information on the server.

2         Q.    Now, what's the server doing?  I

3    come in with my laptop and I plug into the

4    wall, I put in my password, I am now on the

5    network.

6         A.    Uh-huh.

7         Q.    What is the server doing with

8    respect to the work that I do on my computer?

9    Is it automatically periodically checking to

10   see what's there and then saving it?  Is it

11   just ignoring me until I take some specific

12   steps to send data to it?  What is it doing?

13        A.    It is not doing anything.  It is

14   waiting for you to instruct it.  It's basically

15   a storage server.

16        Q.    Uh-huh.

17        A.    It's going to sit there until you

18   send data to it.

19        Q.    And how would I do that?  What

20   specifically -- Let's say I'm working on a

21   document in Microsoft Word, and I get ready to

22   save the document.  And I go to the save

23   command.

24             Does it ask me if I want to save it

25   to the server or save it to my local hard

1    drive, or what does it do at that point?

2        A.    You are going to be asked where you

3    want to save it to.  If you are on the network

4    and you are supposed to be on the network, then

5    one of the options you will have is to save it

6    to a network file.

7        Q.    Okay.

8        A.    But as the user, you have to

9    specify, yes, I want this to go on X file on

10   the server.  Your computer is not going to do

11   that automatically.  You as the user have to

12   tell it to.

13       Q.    If I don't tell it to, then where

14   will it save my document to?

15       A.    It will probably save your document,

16   depending on what your settings are on your

17   computer, to My Document on my desktop.

18       Q.    Is there some other place that it

19   could be saved to?

20       A.    If you set it to do that, yes, you

21   can set files to save just about anywhere on

22   your hard drive.

23       Q.    Is there any other place at

24   MesoSystems where I could save my documents,

25   other than the server or the local hard drive?

1          A.    Not that I'm aware of.

2          Q.    How long would the tape drive on the

3     server be in place before it got changed out

4     for another tape drive, on average? A day? A

5     week? Do you just leave it on permanently and

6     let it get overridden?

7          A.    Yeah.  In 2001 we had a system where

8     we had a different tape for each day of the

9     week, Monday through Friday.  Every morning I

10    would go in, if it's Monday morning, I would

11    take out the weekend tape, or the Friday tape,

12    and put in the Monday tape.

13         Q.    Okay.

14         A.    It is scheduled, and was scheduled,

15    to back up automatically at 10 p.m. at night to

16    that tape.  And it changed, you know, for every

17    Monday I used the same tape, every Tuesday I

18    would use the same tape.

19         Q.    So today is the 16th.  And on Monday

20    you would put in the tape for the 16th.  Are

21    you telling me that on Friday, the 23rd, would

22    you take that same tape, that May 16th tape,

23    and put it back in the server?

24         A.    I'm sorry?

25         Q.    Okay.  Today's the 16th.  Let's

SAMATHA LEAGUE - by Mr. Artuso                    22

1    pretend it's the 16th, sometime in 2001, and

2    it's a Friday, Friday the 16th in 2001.

3         A.    Okay.

4         Q.·   You come in on Monday, the server at

5    10 o'clock on Friday night took all of the

6    stuff that it had and sent it to the tape.

7    Right?

8         A.    Right.

9         Q.    You come in on Monday and you take

10   the tape out of the server, right?

11        A.    Correct.

12        Q.    Do you write the 16th on there, or

13   Friday on there?

14        A.    It's the Friday tape.

15        Q.    Okay.  Now, the 23rd comes, it's a

16   week later, it's the next Friday.  Do you take

17   the tape that you had on the 16th and stick it

18   back in the server?

19        A.    Yes.

20        Q.    Now, when the server sends data to

21   that tape on the 23rd, does it override the

22   material that was there on the 16th, or does

23   it just put it in a new sector on the tape,

24   or --

25        A.    It overrides.

1    Q.   Okay.  So the tape that you took out

2    on Monday is rewound all the way to the

3    beginning and then just overrides it?

4    A.   Right.

5    Q.   So you have no archives longer than

6    one week old in 2001, is that right?

7    A.   That's correct.

8    Q.   Why were you not preserving data for

9    a period longer than that?

10    A.   It costs a lot for tapes.  What we

11    were doing, what we wanted was if something

12    happened to the server to be able to access the

13    data basically that we had the day before.

14         You have to understand that this is

15    data that is, it's contract materials, it's

16    finance materials.  It basically changes in

17    terms of finance daily.  The rest of it is

18    basically hard drive -- or archived data from

19    R & D projects.

20    Q.   Now, finance data is pretty

21    important, right?

22    A.   Yes.

23    Q.   How would you make sure you had a

24    historical record of what the finances were a

25    month ago?

1    the server every day, where is it now?

2         A.    That server is in this building in

3    our server room.

4         Q.    Okay.  And so it would still have

5    data on it from 2001?

6         A.    That's correct.

7         Q.    Let's talk about E-mail.  I come

8    into the office, I have my laptop computer, I

9    plug into the wall, I enter my password, I am

10   working away happily during the day.  And I

11   decide I'm going to send an E-mail to somebody

12   in Albuquerque, and I know they are not on the

13   network, so I am going to have to go through

14   the internet and send it.

15              Right?

16        A.    That's incorrect.

17        Q.    Okay.  How would I send an E-mail to

18   someone in Albuquerque back in 2001 with my

19   plugged in laptop?

20        A.    At MesoSystems we used the E-mail

21   Client Outlook.  The Outlook settings were set

22   for an E-mail firm, I guess, they provided

23   E-mail services to us called Pacific Networks.

24        Q.    Is that the name of the firm?

25        A.    That is the name of the company that

1    provided our E-mail.

2         Q.    Okay.  And are they like an internet

3    service provider?

4         A.    They are not.  They are more of --

5    They provided us E-mail services.  They

6    basically have a giant E-mail server of their

7    own, and we access that.

8         Q.    Where are they located?

9         A.    They are in Oregon.

10        Q.    It's a big state.  Anyplace in

11   particular?

12        A.    I just know Oregon.

13        Q.    Do you still use them?

14        A.    No, we do not.

15        Q.    When did you stop?

16        A.    We stopped using them when we got

17   our exchange server, which was in May or June

18   of 2002.

19        Q.    Is the exchange server then the

20   server we have been talking about?

21        A.    Yes, it is.

22        Q.    What kind of -- what's the -- Who is

23   the manufacturer of the exchange server?

24        A.    Dell.

25        Q.    And the exchange server, what is

1     A.   That's for those of us who are

2  off-site, who are not at the same location as

3  the exchange server.

4     Q.   Okay.  Did the exchange server keep

5  a record of what it took off and where it sent

6  it and all of that?

7     A.   Once I do a send and receive and I

8  pop that server and all of those E-mails come

9  to me, there is no record of it out there.

10     Q.   Okay.

11     A.   That is the situation that we had

12  with Pacific Networks in 2001.

13     Q.   So, Pacific Networks server, what

14  you are telling me, and correct me if I am

15  wrong, is I would be at my desk with my laptop

16  plugged into the network here at MesoSystems

17  and I would prepare an E-mail and I would hit

18  send, and it would go to Pacific Networks

19  server.

20       Am I right so far?

21     A.   You are right so far.

22     Q.   That when the individual to whom it

23  was addressed went, booted up wherever they

24  were, and opened their inbox to get their

25  E-mail, the Pacific Networks server would send

1    their E-mail from itself to their inbox, is
2    that right?
3         A.    That's correct.
4         Q.    Okay.  And what you are saying is
5    there is no, once it does that, Pacific
6    Networks has no record, no back-up, no archived
7    copy of that E-mail?
8         A.    That's correct.
9         Q.    Okay.  So, the only place that those
10   E-mails would exist, then, are either on the
11   hard drive of my computer where I composed it
12   and sent it from, or on the hard drive of the
13   computer that received it, right?
14        A.    That's correct.
15        Q.    Or in the temp file or wherever else
16   it may end up storing that data after they
17   retrieve it, right?
18        A.    Yes.
19        Q.    Is there any other system that
20   MesoSystems was using in 2001 to try and back
21   up its electronic data or electronic files,
22   other than Pacific Networks server, and the
23   server that has the finance data on it?
24        A.    I am not aware of any other.
25        Q.    So the only other place that such

SAMATHA LEAGUE - by Mr. Artuso          30

(509)  735-2400  BRIDGES & ASSOCIATES  (800)  358-2345

1    Responses to Plaintiff James Seaba's First
2    Request for Production to Defendant, and it
3    says, "In accordance with Rule 34 MesoSystems
4    is hereby requested to produce the following
5    documents."
6             Did you ever see any sort of
7    document like that, were you ever given any
8    document like that to try and find documents
9    that may be relevant to this case?
10        A.    No.  I have been asked to produce
11   documents for this case, but I haven't actually
12   seen documents like that.
13        Q.    Okay.  Who would ask you to produce
14   documents for the case?  Counsel, or somebody
15   at MesoSystems?
16        A.    MesoSystems and MesoFuels employees
17   have asked me to produce documents for this
18   case.
19        Q.    Ned Godshall?
20        A.    Ned Godshall, Lisa Albright.
21        Q.    Anyone else?
22        A.    Chuck, I believe.
23        Q.    And how would you know what to look
24   for?
25        A.    I looked for whatever they asked

```
 1    for.
 2         Q.    Okay.  Look at this one.  This one
 3    says, "Please produce a copy of all documents
 4    that refer to, relate to or are otherwise
 5    concerned with any communication, whether
 6    written or verbal, between you and Dr. Janes
 7    James Seaba."
 8         A.    Okay.
 9         Q.    Do you remember looking for
10    documents that referred to Dr. Seaba,
11    communications with Dr. Seaba?
12         A.    Yes.
13         Q.    Okay.  Where did you look for them?
14         A.    For communications between
15    MesoSystems and Dr. Seaba, I asked folks to
16    look for E-mail and send any E-mails that they
17    had to me.
18              I compiled those.  And sent them on
19    to Lisa, if I am remembering correctly.
20         Q.    Did you give them any specific
21    direction as to where they were supposed to
22    look for E-mails?
23         A.    In their own E-mail systems and on
24    their own computers.
25         Q.    Okay.  And did you give them any
```

1    would reside or how long it would stay on the

2    system or how it would be backed up or anything

3    like that?

4         A.    No.

5         Q.    When you received requests to look

6    for documents from Ned Godshall or Charles Call

7    or anyone else responsive to this case, did you

8    search the network server that has primarily

9    financial and contract data on it?

10        A.    If what they asked me for pertained

11   to finance or data that I thought would be on

12   the server, then, yes, I searched those areas.

13        Q.    Did you do that personally or did

14   you ask someone else to do it for you?

15        A.    I would do that personally.

16        Q.    Okay.  And explain to me how you

17   went about your search.  What is it that you

18   would ask -- Or let me back up.

19             Where is it that you would ask the

20   server to look for responsive information?  Was

21   it in an active file, archived files?  Where

22   were you looking for stuff?

23        A.    It depended on what I was asked to

24   look for.

25        Q.    All right.

1   A. If I was asked for a copy of an
2 offer letter, I would go to the Human Resources
3 file and I would pull up their offer letters.
4   Q. Human Resources file would be on the
5 server?
6   A. Yes.
7   Q. Okay.  Now, we looked at a request
8 for production that said all documents that
9 referred to or relate to any communication
10 between Dr. James Seaba and MesoSystems.  Let's
11 look at that request by itself.
12   A. Okay.
13   Q. How would you have searched for
14 responsive documents on the server to respond
15 to that request?
16   A. I would first of all go, I would
17 pull information that has to do with their
18 hiring paperwork.  Any letters that were on
19 letterhead would be kept on the server or in
20 our letter book file.  I went to both of those
21 locations.  Anything that was to Jim Seaba or
22 for Cory Phillips, I pulled it and had it
23 available.
24     For E-mail, I asked individuals to
25 look, and any correspondence that they had

1    individually with either of those gentlemen,

2    and asked them to send those to me.  I compiled

3    them.  As I recall, I sent them to Lisa in

4    Albuquerque.

5        Q.    Okay.  Now, if I worked in Human

6    Resources and I typed up a letter to someone,

7    let's say Dr. Seaba, and I printed it out and I

8    saved it and I decided I wanted to save it to

9    the Human Resources database file on the

10   server, with me so far?

11       A.    Uh-huh.

12       Q.    And then later on I decide as I am

13   working in that file, well, I don't need to

14   keep that letter anymore, can I delete it?

15   It's stored on the server.  Can I delete it?

16       A.    Yes.

17       Q.    Okay.  When I do that, it's going to

18   be sent to a deleted file, right?

19       A.    Correct.

20       Q.    In your search did you query the

21   deleted file for items that were responsive to

22   the request?

23       A.    Not that I recall.

24       Q.    Now, some programs make a temporary

25   file, and they do that automatically, right?


         SAMATHA LEAGUE - by Mr. Artuso              43

1      A.     Yes.

2      Q.     If I were in Human Resources and I

3  typed a letter to Dr. Seaba or Dr. Phillips,

4  and subsequently decided I wasn't going to send

5  it, for whatever reason, but I saved it sort of

6  in draft form, and I decided, well, I am not

7  going to send it, and then came back later and

8  decided to delete it because I wasn't going to

9  send it, is it possible that a copy of it might

10  still exist in a temporary file on the server?

11      A.     I suppose it's possible.

12      Q.     Okay.  Now, --

13      A.     I'm going to back up there.

14      Q.     Okay.

15      A.     I know that it's not possible,

16  because we upgraded that server in 2002, and

17  the only things that we moved over to the new

18  hard drives were intact files, like our Human

19  Resources, our finance files, our contracts

20  file.

21           So anything that would have been in

22  a temp directory would not have been

23  transferred over.

24      Q.     Where are the old hard drives, the

25  ones you were using in 2001?  Where are they

SAMATHA LEAGUE - by Mr. Artusc                    44

(509)  735-2400   BRIDGES & ASSOCIATES   (800)  358-2345

1    now?

2         A.    They are in our server loop.

3         Q.    So it could be possible to look on

4    those old hard drives for temp directories to

5    see if there is anything that might be

6    responsive to the request there, right?

7         A.    Yes.

8         Q.    Okay.  When you were looking for

9    responsive documents, did you do that, did you

10   go to the old 2001 hard drives and look in like

11   a temp directory to see if there might be

12   responsive materials?

13        A.    No.  If I could ask, when is the

14   date of those requests for?  If it was before

15   we moved those files, there would have been no

16   need to go back to old hard drives.

17        Q.    I can find the date.  It was July or

18   August of 2002.  And would that have been after

19   the new hard drives were put into the server?

20        A.    July 25th, 2002, sticks out in my

21   mind as the day that we changed those hard

22   drives.

23        Q.    Okay.  Now, Dr. Call testified that

24   he had a laptop in 2001, and that it crashed,

25   became nonfunctional.

```
1              Were you aware of that?
2         A.    The only crashed hard drive -- or
3    crashed computer that Chuck had that I'm aware
4    of happened in March or early April of 2002.
5         Q.    Okay.  Where is that computer now?
6         A.    To my knowledge that computer is in
7    Albuquerque, New Mexico.
8         Q.    Okay.  And was any effort made to
9    try and recover the hard drive of that
10   computer, any of the data on that hard drive?
11        A.    Absolutely.  Yes.
12        Q.    Okay.  And who undertook that job to
13   try and recover the data on that hard drive?
14        A.    I did initially.
15        Q.    Okay.  And what were the results?
16   What were you able to accomplish?
17        A.    I was able to get partial documents
18   from his My Documents folder.  I was not able
19   to retrieve any of his Outlook file.
20        Q.    Any other data or document that you
21   were able to retrieve from that hard drive?
22        A.    The condition of that hard drive was
23   such, Chuck -- It would only boot up like one
24   out of ten tries.  So he said if we could get
25   his My Documents files and his Outlook files,
```